Jiménez, Peticionario, *v.* Reily, Demandado.

Solicitud para que se expida un auto de *mandamus* al Gobernador de Puerto Rico.

No. 203.—Resuelto en junio 1, 1922.

*Mandamus*—Gobernador—Jueces Municipales—Destitución del Cargo—Notificación y Audiencia—Interpretación de la Ley.—La ley aprobada en marzo 9, 1905, prescriptiva de que la duración de los cargos de los jueces municipales creados por esta Ley será de cuatro años, pero que el gobernador podrá destituirlos por causa justificada en cualquier tiempo, no quedó derogada por el artículo 49 de la Ley Jones en armonía con las disposiciones de los artículos 57 y 58 de dicha ley como consecuencia necesaria de cualquier poder implícito de destitución envuelto en la facultad de nombrar conferida por dicho artículo 49, procediendo, por tanto, el auto de *mandamus* contra el Gobernador de Puerto Rico para obligarle a la restitución de un juez municipal que ha sido destituído de su cargo sin una notificación y audiencia.

Los hechos están expresados en la opinión.

Abogados del peticionario: *Sres. R. Rivera Zayas* y *J. Jiménez Sicardó.*

Abogados del demandado: *Sres. M. A. Muñoz* y *J. A. Loret.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

En octubre 16, 1921, recibió el peticionario la siguiente carta:

"Mansión Ejecutiva.—Porto Rico.—Oficina del Gobernador.— Palacio del Gobernador.—San Juan, Porto Rico.—San Juan, Porto Rico, octubre 15, 1921.—Sr. Gustavo Jiménez Sicardó, Juez Municipal de San Juan, San Juan, Porto Rico.—Señor:—Tiene ésta por objeto informarle que en esta fecha le he separado a Ud. del cargo de Juez Municipal de San Juan, en bien del servicio del Pueblo de Puerto Rico. Dicha separación tendrá efecto inmediatamente.—De Ud. atentamente, (Firmado) E. Mont. Reily.—Gobernador."

A esta comunicación contestó el peticionario como sigue:

"San Juan, P. R., oct. 17, 1921.—Hon. E. Mont. Reily, Gobernador de Puerto Rico, San Juan, P. R.—Señor:—He recibido su comunicación del 15 del corriente separándome del cargo de Juez Municipal de San Juan, Sección Primera, en bien del servicio del Pueblo de Puerto Rico, a tener efecto la separación inmediatamente. —Ignorando las causas para tal separación y seguro como estoy de haber cumplido siempre con los deberes correspondientes a tal cargo, por la presente solicito de V. H. que me restituya en el referido cargo.—En espera de su contestación, cumpliendo con o negando esta solicitud dentro de las cuarenta y ocho horas siguientes del recibo de esta comunicación, quedo de Ud. respetuosamente, (Firmado) Gustavo Jiménez Sicardó.—Allen 79, San Juan, P. R."

Alega la petición que en mayo 5, 1921, y mediante el consejo y consentimiento del Senado, el peticionario había sido nombrado por el Hon. Arthur Yager, que era entonces Gobernador de Puerto Rico, para el cargo de Juez Municipal del Distrito Judicial Municipal de San Juan, Sección Primera, por un término de cuatro años, a partir de la fecha en que prestara juramento y tomara posesión de su cargo; que se cumplió con estas formalidades el día 5 de mayo, 1921, y que el peticionario continuó desempeñando sus deberes oficiales hasta la fecha en que recibió la comunicación a que anteriormente se ha hecho referencia en primer tér-

mino, por la cual fué ilegal y arbitrariamente privado del ejercicio de su cargo en sus derechos inherentes sin que se le formularan cargos de ninguna especie, sin notificación de los mismos, ni dársele oportunidad alguna de defenderse para contestar dichos cargos o presentar sus pruebas o ser confrontado y repreguntar a los testigos en su contra, sin justa causa y sin el debido proceso de ley, en abierta y flagrante violación de la ley de 1904 creando el cargo de Juez Municipal, enmendada en el año 1905, inciso primero de la sección 2 de la Ley Orgánica, y de la enmienda 14 a la Constitución de los Estados Unidos; y que el demandado se ha negado a restituir al peticionario en el referido cargo.

Fué ordenada la notificación de la solicitud y la celebración de una vista, en cuyo acto se señaló un día dentro del cual debían presentar alegatos.

En el alegato a nombre del Gobernador, el Attorney General insistió en que el peticionario no tenía derecho al auto por razón de los hechos expresados en la petición:

1. Porque no procede la expedición de un auto de *mandamus* contra el Gobernador de Puerto Rico.

2. Porque el deber, si alguno existe, de reponer al peticionario es cuestión de la exclusiva incumbencia del Gobernador y no de carácter ministerial.

3. Porque el Gobernador de Puerto Rico tiene el poder absoluto y discrecional para destituir a un juez municipal, y

4. Porque el peticionario tenía otros remedios adecuados.

La primera, segunda y cuarta de estas cuestiones habían sido resueltas adversamente a la alegación de los abogados del demandado por decisiones anteriores bien consideradas de este tribunal y el alegato arriba referido no revelaba ningún error en la doctrina hasta ahora enunciada que justifique el cambio de los precedentes establecidos. Sobre este punto no hubo diferencia de opinión entre nosotros.

No pudimos llegar a un acuerdo, sin embargo, en cuanto a un *memorandum per curiam* sometido por el anterior Juez

Presidente en el cual proponía la expedición de un auto alternativo; y después de bastante discusión de los casos citados bajo la tercera proposición que ha sido sometida por el Attorney General, se señaló otro día para una audiencia sobre las siguientes cuestiones:

"Primera: Sobre cual fué el verdadero pensamiento del Congreso en cuanto al poder de destituir, al conferir al Gobernador por la sección 49 del Acta Jones la facultad de nombrar los 'jueces, marshals y secretarios de los tribunales establecidos actualmente y que se establecieren en Puerto Rico, cuyo nombramiento por el Presidente no está dispuesto por el estatuto,' interpretado dicho pensamiento a la luz de la jurisprudencia, especialmente de la establecida por la Corte Suprema Nacional.

"Segunda: Sobre si las disposiciones de una ley que fije término al nombramiento de los funcionarios y prescriba que el Gobernador podrá destituirlo por causa justificada, puede considerarse o no como relativas, inconsistentes o incompatibles con el poder de destituir envuelto en la facultad de nombramiento, y

"Tercera: Sobre si la ley, entre otras, de 9 de marzo, 1905, que dispone que 'la duración de los cargos de los jueces municipales creados por esta Ley será de cuatro años; pero el Gobernador podrá destituirlos por causa justificada en cualquier tiempo,' debe o no considerarse derogada por la sección 49 del Acta Jones, de acuerdo con lo prescrito en las secciones 57 y 58 de la misma, en tanto en cuanto se oponga al repetido poder de destituir envuelto en la facultad de nombramiento."

El alegato adicional presentado por el Attorney General poco o nada agrega a los argumentos y autoridades citadas en apoyo de la tercera proposición sometida en la primera vista.

La teoría de los abogados del Gobernador es en substancia que por virtud de la sección 12 de la Ley Orgánica que inviste en él "el poder ejecutivo supremo" y le confiere "la inspección y control general de todos los departamentos y negociados del Gobierno de Puerto Rico, en todo aquello que no sea incompatible con las disposiciones de esta Ley" y por virtud de la facultad de nombramiento conferida en

la sección 49, *supra,* el Gobernador de Puerto Rico, como representante del Presidente y del gobierno nacional en esta Isla, tiene el mismo poder que el Presidente de los Estados Unidos de acuerdo con la Constitución Federal, y, por tanto, que el poder de nombramiento que aquí se considera incluye necesariamente un poder absoluto de destitución.

Se citan las siguientes autoridades en apoyo de esta proposición: Story sobre la Constitución, tomo 2, edición 5, sección 1543; una opinión emitida por el Attorney General Cushing, en marzo 26, 1853, 6 Opiniones del Attorney General de los Estados Unidos, p. 4; otra opinión del mismo funcionario, 8 Opiniones del Attorney General de los Estados Unidos, 223; otra de 1868 por el Attorney General Browning, 12 Opiniones del Attorney General, 421, 416; otra por el Attorney General Devens en 1878, 15 Opiniones del Attorney General, p. 421, y otra por el Attorney General Crittenden, en 1851, 5 Opiniones del Attorney General, 288, 290, 291; *Parsons* v. *United States,* 167 U. S. 324, 334; *Reagan* v. *United States,* 182 U. S. 419; *Shurtleff* v. *United States,* 189 U. S. 311; *Hennen* v. *United States,* 13 Peters 230, 260; *Seyers* v. *Wilmington,* 49 Atl. 931, aprobada en *Menahan* v. *Lewis,* 10 Ann. Cas. 1050; *Warner* v. *People,* 2 Denio 272, 43 Am. Dec. 740; *People* v. *Draper,* 15 N. Y. 552; *People* v. *Raymond,* 37 N. Y. 433; *People* v. *Albertson,* 55 N. Y. 55; *Mannie* v. *Hatfield,* 118 N. W. 817, y *Clayton* v. *Utah Territory,* 132 U. S. 632.

Las decisiones de la Corte Suprema arriba mencionadas han sido objeto de acalorado debate entre nosotros, varios *memorandums* sucesivos han sido sometidos y la discusión ha tomado un radio mucho más amplio que el de la argumentación contenida en los alegatos. No podemos comprometernos dentro de los límites de una opinión judicial a considerar extensamente todas las cuestiones así levantadas. Sólo algunos de los rasgos más salientes de la oposición a la expedición de un auto alternativo serán considerados.

Se ha alegado insistentemente:

Primero, citándose del caso de *Martin* v. *Hunter,* 1 Wheaton, 326, que (bastardilla nuestra): "La constitución habla inevitablemente en lenguaje general. No convenía a los fines del pueblo al redactar esta gran carta con nuestras libertades, prescribir en cuanto a los pequeños detalles de sus facultades, o declarar los medios por los cuales aquellas facultades debían ponerse en ejecución. Se previó que esto sería peligroso y difícil, si no una tarea impracticable. El instrumento no tenía por fin principal disponer meramente sobre las necesidades de algunos años sino que había de perdurar a través de un largo lapso de siglos, cuyos eventos estaban encerrados en los fines inescrutables de la Providencia. No podía preverse que nuevos cambios y modificaciones de poder podrían ser indispensables para realizar los fines generales de la carta constitucional; y las restricciones y especificaciones que en la actualidad podrían parecer saludables, pudieran, a la postre, demostrar la caída del propio sistema. De ahí que sus facultades estén expresadas en términos generales, *dejando a la legislatura, de tiempo en tiempo, que adopte sus propias medidas para realizar los fines legítimos, y de formar y modelar el ejercicio de sus facultades según su propio criterio y los intereses públicos lo requieran."*

Segundo, se cita de Cooley sobre Limitaciones Constitucionales, pág. 68, lo siguiente: "Una regla cardinal al tratar de instrumentos escritos es que han de recibir una interpretación invariable y que su significación práctica ha de ser uniforme. No puede hacerse que una constitución signifique una cosa en una ocasión y otra en una fecha subsiguiente cuando las circunstancias puedan haber cambiado de tal modo que quizás parezca conveniente adoptar una regla diferente en el caso. * * * Lo que una corte ha de hacer, por tanto, es declarar la ley como está escrita dejando que el pueblo mismo haga aquellos cambios que las nuevas circuns-

tancias puedan exigir. El significado de la constitución se fija al adoptarse y no es diferente en ningún momento posterior cuando una corte tiene oportunidad de considerarlo.''

También citándose del caso *Ex parte Woods,* 16 L. R. A. 455, se dice lo siguiente: ''La constitución gobierna. Es exactamente, por tanto, de día columna de nube, y de noche columna de fuego; para ser guía, 'y nos acompaña de día y de noche.' ''

''Asimismo, cuando las palabras que tienen una significación bien conocida aparecen en una constitución, debe presumirse que el Congreso las usó con la misma bien entendida significación.'' *Schuck* v. *United States,* 195 U. S. 65; *People* v. *Rosaly,* 227 U. S. 270.

Tercero, ''que la legislatura sólo tiene un ligero control sobre funcionarios constitucionales y generalmente no puede separar de sus deberes, la duración de sus términos, sus facultades de hacer nombramientos.'' Se cita el caso de *People ex rel. Burley* v. *Howland,* 41 L. R. A. 838; 23 R. C. L. 382; *State ex rel. Kennedy* v. *Brunst,* 7 Am. Rep. 84; *People ex rel. Hovey* v. *Noble,* 4 L. R. A. 101; *State ex rel. Geake* v. *Fox,* 56 L. R. A. 893; *Rathbone* v. *Wirth,* 150 N. Y. 459; *State ex rel. Buell* v. *Frear,* 34 L. R. A. (N. S.) 491; *State ex rel. Sweet* v. *Cunningham,* 88 Wis. 81, 57 N. W. 1119; *State ex rel. Bickett* v. *Knight,* L. R. A. 1915 F, 898; *Woods* v. *Vormun,* 24 Pac. 843; *Rankin* v. *Jauman,* 36 Pac. 504.

Cuarto, se hace la siguiente cita del caso *United States* v. *Babbitt,* 1 Black 561: ''Lo que se infiere de un estatuto, alegación, contrato o testamento es tanta parte de él como lo que aparece expresado,'' lo que se dice que es igualmente aplicable a las constituciones, citándose a Sutherland sobre Interpretación Estatutoria, par. 334; 8 Cyc. 742; *McCulloch* v. *Maryland,* 4 Wheaton 316.

Quinto, se cita del caso *Warner* v. *People,* 2 Denion 272, 43 A. D. 740, que se dice trata en cierto modo de la misma cuestión, lo siguiente: ''Cuando se confiere cierto poder por

una constitución todos los incidentes de ese poder se confieren con la concesión y cualquier acto de una legislatura en derogación o limitación del mismo o cualquiera de sus incidentes es anticonstitucional y nulo.'' Citándose el caso de *Tel. Co.* v. *Eyser,* 19 Wall. 427; *Township* v. *Talcott,* 19 Wall. 676; *Luria* v. *United States,* 231 U. S. 24, y casos citados; *Higgins* v. *Richards,* 77 S. W. 946; 8 Cyc. 74; 12 C. J. 719; 36 Cyc. 1112, y especialmente la nota 88.

Sexto, que es un principio bien establecido de interpretación que los términos específicos que comprenden la determinada materia prevalecerán sobre los términos generales del mismo u otro estatuto que en lo demás pudieran ser reguladores, citándose los casos *Kepner* v. *United States,* 105 U. S. 125; *Palliser* v. *Home Telephone Co.,* 44 So. 578.

Que, ''siempre que el Congreso legisle sobre cualquier materia que directamente se relacione con el gobierno del pueblo del territorio, deja ésta de ser materia adecuada de legislación territorial,'' citándose el caso de *Allen* v. *Reed,* 60 Pac. 734; también el de *Norton* v. *Brownsville,* 129 U. S. 590, y el de *Criswell* v. *Montana Central Co.,* 37 L. R. A. 354.

Que estos y otros casos incluyendo el del *Distrito de Columbia* v. *Hutton,* 143 U. S. 25, ''hacen imposible la teoría de que el precepto general de la Ley Orgánica exceptúa los estatutos de 1904 y 1905.'' También se nos cita en relación con esto el tomo 90 de A. S. R. 430 y el tomo 158 S. W. 823.

Séptimo, que ''en un número de casos se ha resuelto que cuando la carta de una corporación municipal confería la facultad de nombramiento a un funcionario en particular el municipio carecía de poderes al fijar un término para limitar la facultad de destituir del poder nominador.'' Se citan los casos de *Mathis* v. *Rose,* 44 Atl. 875; *State* v. *Archibald,* 66 N. W. 242, incluyéndose otros casos en ellos citados; Dillon sobre Corporaciones Municipales, sec. 587 (317); *People ex rel. Devery* v. *Coler,* 173 N. Y. 115, 65 N. E. 956; *State* v. *Johnson,* 27 S. W. 399.

Octavo, "que estas decisiones no pueden ser consideradas como limitadas a las corporaciones municipales sino como que enuncian principios generales de interpretación constitucional," lo cual se dice que en parte está demostrado en el caso de *State* v. *Kipp*, 74 N. W. 440; que el caso de *Higgins* v. *Cole*, citado con aprobación en el de *State* v. *Archibald*, *supra*, "demuestra que las corporaciones municipales en lo que respecta a sus poderes de nombramiento no se diferencian de las facultades de un gobernador en su derecho para nombrar y destituir," y que el caso de *Palliser* v. *Home Telephone Co.*, *supra*, también indica que "las municipalidades no son diferentes de otro organismo del gobierno."

No hay discusión alguna sobre los principios generales de ley constitucional e interpretación estatutoria. Hubiera tenido más aplicación al punto haber demostrado de algún modo la corrección de las premisas envueltas en la aplicación que se dió a tales principios generales al presente caso.

Para los presentes fines puede admitirse que "la legislatura sólo tiene el más ligero control sobre" el gobernador y su poder de nombramiento. Estamos obligados a dejar para luego el hacer un estudio acabado respecto al alcance y extensión de esta facultad legislativa hasta que surja la ocasión, si surgiere alguna vez como consecuencia de algún acto manifiesto por parte de la legislatura que indique una disposición a ejercitar un grado considerable de control en la prerrogativa gubernamental. "Cuando sea necesario se resolverá."

La falta de control legislativo sobre "los funcionarios constitucionales," en tanto es pertinente a algo que se relacione con éste, supone, sin revelar ninguna base apropiada para la suposición, que un juez municipal en Puerto Rico es un funcionario constitucional. Pero un funcionario constitucional ha sido definido como "cualquiera de aquellos funcionarios cuya duración de sus cargos esté fijada y definida por la constitución." Y los cargos constitucionales se dice

que son (bastardilla nuestra) "cargos que, a diferencia de los cargos legislativos o estatutorios, se denominan constitucionales, tales como los que son gubernativos por su naturaleza, como por ejemplo, el ejecutivo, judicial o cargos legislativos del estado o de cualquier división política del mismo. *Todos estos cargos o son creados o prescritos* en la constitución, mientras que aquellos cargos cuyo fin es la administración de los asuntos municipales, generalmente son *creados por la legislatura.*"    12 C. J. 1294.

"En muchos si no en todos los Estados, ciertas cortes son creadas por la constitución y no dependen exclusivamente del estatuto en cuanto a sus facultades.   Entre las clases más corrientes de tribunales así creados están las cortes supremas, cortes de circuito, cortes de condado, cortes criminales, cortes de distrito, cortes de testamentaría y juzgados de paz.   Aunque las prescripciones constitucionales que invisten el poder judicial del Estado en ciertas cortes las convierten al organizarse en tribunales constitucionales, sin embargo, si ninguna otra cosa existía a manera de precepto constitucional o mandato legislativo, tales cortes sólo tendrían una existencia imaginaria, únicamente desde un punto de vista legal, pero no una existencia real o positiva.   Es sólo mediante decreto legislativo que las cortes con sus elementos constituyentes de tiempo, lugar y funcionarios, llegan a tener existencia real y efectiva, a diferencia de la que tienen únicamente por virtud de las prescripciones constitucionales."   7 R. C. L. 977, sec. 6.

Véase también 7 Ann. Cases 627, 629; 18 *id.* 199, 200; *id.* 1914 C 1116; 1913 C 1160.

En el caso de *Board of Commissioners* v. *Gwin*, 136 Ind. 562, en la página 576, la corte dijo lo siguiente:

"Estas prescripciones constitucionales convierten a las cortes de circuito, al organizarse, en tribunales constitucionales; pero si ninguna otra cosa existía a manera de precepto constitucional o disposición legislativa, las cortes de circuito no tendrían más que una existencia imaginaria, únicamente para la ley, pero no una verdadera y positiva existencia."

"Brown sobre Jurisdicción dice lo siguiente: 'Pueden establecerse cortes y definirse su jurisdicción por la constitución o la ley

orgánica del Estado o por disposición legislativa. Sin embargo, generalmente la jurisdicción procede de la facultad estatutoria conferida, excepto cuando se confiere por la constitución, de lo cual la Corte Suprema de los Estados Unidos es un ejemplo; y los estatutos prescriben la forma en que las cortes actuarán y la forma y procedimiento, e indican y prescriben sobre el nombramiento o elección de los jueces y funcionarios subalternos, así como el medio o reglas de procedimiento que las regulan. No hay cortes en este país excepto las que así son creadas.' Brown sobre Jurisdicción, sec. 12.

"En el caso de *Levey* v. *Bigelow, supra*, la corte de apelación dijo lo siguiente: ' * * * En los tiempos modernos y bajo nuestra forma de gobierno, el poder judicial se ejercita por medio de las cortes. Una corte es un instrumento del gobierno. Es una creación de la ley y en algunos particulares una cosa imaginaria, que existe solamente para la ley, y es muy semejante a una corporación. Para completar la idea de lo que es una corte son elementos esenciales el tiempo, lugar y las personas por las cuales las funciones judiciales han de ser ejercitadas. Es en su forma organizada, con todos estos elementos constituyentes del tiempo, lugar y funcionarios, lo que determina la idea de una corte de acuerdo con la aceptación general y legal de la palabra. Pero una corte puede existir para los efectos de la ley sin funcionarios a quienes se impone el deber de administrar justicia.'

"Es sólo mediante disposición legislativa que estos elementos constituyentes de la corte de circuito de este Estado han llegado a tener existencia, y por ello la legislatura ha dado vida real a las cortes de circuito de este Estado a diferencia de la que tienen únicamente por virtud de las referidas disposiciones constitucionales."

Véase también el caso de *People ex rel. Ward* v. *Scheu*, 60 App. Div. 594, en el cual el caso de *Burby* v. *Howland* otra vez encabeza una larga lista de casos que se citan; *Wisconsin* v. *Duluth*, 30 Fed. Cas. 382, y *United States* v. *Union Pacific R. R. Co.*, 98 U. S. 569, 602 y 603."

"La facultad para fijar el término de duración de un cargo la tiene, a menos que otra cosa se prescriba, el organismo que bajo la ley puede crear el cargo, que generalmente es la legislatura. Pero si la constitución fija el término de duración del cargo, dicho término no debe ser cambiado por la legislatura." 29 Cyc., p. 1396, par. *b*.

En la página 835, tomo 12 de Corpus Juris, se dice lo siguiente:

"La legislatura no puede intervenir o limitar la facultad conferida a un funcionario ejecutivo por la Constitución, pero tiene el poder de establecer reglamentaciones razonables en cuanto al cumplimiento de los deberes de un funcionario constitucional."

Y en una nota se hace la cita que sigue como en "explicación de la regla," a saber:

" 'El hacer mención de un funcionario en la Constitución no lo pone sobre la ley ni le confiere igual control de su cargo como de sus negocios particulares. El es un funcionario público y los asuntos de su oficina deben llevarse de acuerdo con la ley. La Legislatura no puede privarle de las facultades que le confiere la Constitución, pero tiene poder para establecer reglamentaciones razonables respecto al tiempo y medios y manera de ejecutar los deberes de tal funcionario constitucional.' " *People* v. *Brady,* (Ill.) 114 N. E. 25, 27."

Nuestra Ley Orgánica no crea cortes municipales ni prescribe sobre ellas *eo nomine,* ni fija o define tampoco el término y duración del cargo de los jueces municipales. Ni siquiera prescribe para el nombramiento de jueces municipales por nominación. La prescripción de que los jueces y los funcionarios de las cortes "establecidas actualmente o que se establecieren en adelante en Puerto Rico," serán nombrados por el gobernador puede ser suficiente para convertir a tales cortes en tribunales constitucionales, pero esa proposición no es por sí evidente.

"Cuando la ley orgánica delega a la legislatura el poder de crear, establecer, organizar, o reorganizar las cortes, para regular su jurisdicción, o de otro modo legislar respecto a las mismas, ese cuerpo puede proceder así con sujeción a cualesquiera restricciones o limitaciones que se le impongan. Los términos en los cuales las constituciones que así hablan han delegado tal facultad son varios, siendo a la vez tanto generales y específicos, y estos incluyen por necesaria inferencia el ejercicio de aquella autoridad que es esencial para realizar los fines propuestos. Pero, fuere la delegación constitucio-

nal de la facultad general o específica, restrictiva o de otro modo, inherente o exclusiva, o sea cual fuere su naturaleza, el ejercicio de la facultad debe estar regulada por la ley orgánica que otorga o confiere el derecho.   Estos principios son fundamentales; se encuentran a través de todas las decisiones y regulan los estatutos que se refieren a cortes inferiores en general, cortes de condado y de procedimientos de testamentaría, cortes municipales y de policía, prescripciones de cartas relativas a tales cortes, a cortes de equidad en general, a cortes especiales o tribunales, comisiones, a creación de cortes ya de jurisdicción exclusiva o concurrente, cambio de estado legal de las cortes, leyes en derogación de preceptos constitucionales en cuanto a apelaciones, a la jurisdicción de apelación de cortes en particular y a estatutos que prescriben o dejan de hacerlo respecto a jueces o disponen o regulan la forma del procedimiento.'' 15 C. J. 859.

Cuando las palabras ''funcionario constitucional'' se usan en relación a una simple prescripción sobre el nombramiento de ciertos funcionarios para cargos creados por la legislatura, con términos fijos y requisitos razonables en cuanto a la elegibilidad, y se dejan como estaban en la constitución en tanto no son incompatibles con la misma enteramente sujetos al control legislativo,—¿hay alguna magia sobrenatural en la frase que pueda dar a tal disposición sobre nombramiento alguna facultad indefinida e intangible que no tendría si estuviera contenida en un estatuto? ¿La mera investidura de facultad judicial ''en las cortes establecidas actualmente o que se establecieren de acuerdo y por virtud de las leyes vigentes,'' en unión de la concesión de facultad legislativa ''para organizar, modificar o hacer un nuevo arreglo de los tribunales y su jurisdicción y procedimientos,'' no solamente priva a la legislatura de toda facultad para fijar los términos de duración a los funcionarios judiciales y prescribir los requisitos necesarios en cuanto a su elegibilidad, sino que también deroga los estatutos anteriores que fijan tales términos de duración y especifican los requisitos corrientes como previos al nombramiento? ¿Y se infiere inevitablemente este resultado no obstante la cláusula que pre-

cede inmediatamente a tal disponiéndose en el cual se prescribe expresamente que "la jurisdicción de dichos tribunales y los trámites seguidos en ellos, así como los distintos funcionarios y empleados de los mismos, continuarán como al presente hasta que otra cosa se disponga por ley?" ¿Eran los anteriores estatutos arriba indicados nulos *ab initio* por razón de semejante investidura de poder judicial bajo la anterior ley orgánica seguida del disponiéndose que la Asamblea Legislativa tendrá autoridad para legislar de tiempo en tiempo, según lo crea conveniente con respecto a dichas cortes, y a otras que estime conveniente establecer, "su organización, el número de jueces, funcionarios y empleados de los mismos, su jurisdicción y procedimientos y todas las demás cosas que puedan asignarles?"

No hemos tenido tiempo para hacer una investigación independiente de estas cuestiones pero cierto examen en relación con los particulares sugeridos parecería pertinente a la cuestión de funcionarios constitucionales *vel non*, en el sentido que se pretende dar a esa frase, de privar a la legislatura de todo excepto "el más ligero control" sobre tales funcionarios.

La posibilidad de clasificar las cortes municipales como cortes constitucionales a pesar de su origen estatutorio, dejándolas, o por lo menos los términos de duración y requisitos de sus funcionarios, fuera del control de la legislatura no parece habérsele ocurrido a los abogados del gobernador y los casos arriba mencionados no suministran mucha luz sobre la materia. Nuestro examen de estos casos ha sido por necesidad en cierto modo algo ligero y algunos puntos no pueden haber sido tomados en consideración; pero nos referiremos de paso a aquellos que parecen tener alguna relación con la cuestión que ahora está sometida a nuestra consideración.

Lo que se dijo por una corte en que la opinión estuvo dividida en el caso de *People ex rel. Burby* v. *Howland,* debe

leerse a la luz del artículo VI de la Constitución, y en la página 840 encontramos lo siguiente:

"Ese artículo establece la judicatura del Estado, lo mismo que los artículos anteriores habían establecido los departamentos legislativo y ejecutivo del gobierno. En su sección 17 prescribe que 'los electores de los diferentes pueblos elegirán en sus asambleas anuales * * * a los jueces de paz, cuya duración en sus cargos será de cuatro años. * * * Los jueces de paz o jueces de cortes inferiores que no son de registro y sus secretarios, pueden ser separados por causa después de la debida notificación y de dárseles una oportunidad de ser oídos por aquellas cortes que prescriba o pueda prescribir la ley. Los jueces de paz y jueces de cortes de distrito pueden ser elegidos en las diferentes ciudades de este estado, en tal forma y con las facultades y por los términos, respectivamente, según lo prescribe o pueda prescribirlo la ley.' Dispone la sección 20 del mismo artículo que 'ningún funcionario judicial, excepto los jueces de paz, recibirán para uso propio ningún derecho o emolumentos por el desempeño del cargo;' la sección 22 que 'los jueces de paz y' otros funcionarios judiciales locales 'en el desempeño de sus cargos cuando este artículo esté en vigor, los desempeñarán hasta el vencimiento de sus respectivos términos de duración;' * * * ." 41 L. R. A. 840.

En el caso de *State ex rel. Kennedy* v. *Brunst,* la corte resolvió, citando del sumario, lo siguiente:

"Cuando una constitución de Estado prescribe sobre la elección de alguaciles, fija el término de duración del cargo, etc., pero no define qué poderes, derechos y obligaciones corresponderán al mismo, la legislatura no tiene poder para restar al alguacil parte de sus deberes y funciones que ordinariamente corresponden al puesto, y asignarlo a un funcionario nombrado de modo distinto y que lo desempeñe por un período distinto de duración." 7 Am. Rep. 84.

En el caso de *State ex rel. Hovey* v. *Noble,* el párrafo tercero del sumario dice lo siguiente:

"Bajo la constitución de Indiana, artículo 7, sec. I, que dispone que 'El poder judicial del Estado estará investido en una corte suprema, en las cortes de circuito, y en todas aquellas cortes que

la asamblea general pueda crear,' la legislatura no puede establecer una comisión de la corte suprema para el despacho de los asuntos judiciales." 4 L. R. A. 101.

Los casos de *State ex rel. Geake* v. *Fox,* y *Rathbone* v. *Wirth,* en los cuales dos de los miembros estuvieron conformes en la resolución por las razones emitidas por separado y otros dos disintieron, son interesantes pero no de aplicación.

El párrafo pertinente del sumario al caso de *State ex rel. Buell* v. *Frear,* es como sigue:

"2. La discreción del funcionario nominador al hacer un nombramiento para un cargo no está indebidamente restringida por un estatuto que lo limita a elegir entre tres nombres en una lista de elegibles, excepto en el caso de auxiliares confidenciales o trabajadores, respecto a los cuales será impracticable el examen para demostrar su suficiencia." 34 L. R. A. (N. S.) 481.

Y en una nota a este caso, en la pág. 484, encontramos lo siguiente:

"En el caso del *Pueblo* v. *Gaffney,* 142 App. Div. 122, 126 N. Y. Supp. 1027, que confirma el de 69 Misc. 36, 125 N. Y. Supp. 762, se resolvió que las prescripciones de la ley del servicio civil de New York que permiten la elección de una persona entre tres que aparecen en la lista de elegibles deja suficiente facultad para hacer la elección al poder nominador para que se cumpla el derecho constitucional de las autoridades locales a elegir sus propios subordinados."

"En el caso de Rogers v. Buffalo, 123 N. Y. 173, 9 L. R. A. 579, 25 N. E. 274, se resolvió que la ley de servicio civil de New York de 1883, al exigir al alcalde de la ciudad preparar reglas para la elección de los funcionarios de la ciudad cuyo nombramiento ha sido delegado por la constitución a las autoridades municipales, las cuales deben ser aprobadas por la Comisión de Servicio Civil del estado antes de que puedan ponerse en vigor, no subordina el poder de las autoridades locales al de las autoridades del estado en violación del precepto constitucional que delega la facultad de nombramiento a las autoridades municipales."

Lo resuelto en el caso *State ex rel. Sweet* v. *Cunningham,* se resume en esta forma:

"1. Bajo el artículo 10, sección 2, de la Constitución que prescribe que el producto de todas las tierras para escuelas se empleará para el sostenimiento de las escuelas, la legislatura no tiene ningún poder para separar parte de estos terrenos para un parque del Estado.

"2. La legislatura no tiene poder para impedir que terrenos de escuelas sean vendidos, artículo 10, sección 8, de la Constitución, que confiere esa facultad únicamente a los comisionados de terrenos públicos.

"3. Los terrenos públicos que han sido excluídos de venta no están sujetos a ventas particulares hasta tanto que no hayan sido ofrecidos nuevamente en subasta pública. Leyes de 1885, c. 222." 57 N. W. 1119.

En el caso de *Woods* v. *Vormun* nada encontramos que merezca citarse.

El fundamento principal de la decisión del caso de *Ranking* v. *Jauman* puede verse en los párrafos segundo y tercero del sumario, a saber:

"La constitución dispone lo necesario y prescribe el procedimiento para la separación o procesamiento de funcionarios del estado por ciertos delitos menos grave (*misdemeanors*); y en la sección 7459, Est. Rev., la legislatura ha prescrito sobre la separación de ciertos funcionarios civiles por las causas especificadas en dicha sección, y ha prescrito entonces los procedimientos para la destitución sumaria de aquellos funcionarios que están comprendidos dentro de sus disposiciones.

"No hay precepto alguno en la constitución de Idaho que prohiba a la legislatura disponer un procedimiento y tribunal para la destitución sumaria de todos los funcionarios civiles cuya destitución no esté prescrita en la constitución, por delitos menos grave, incompetencia, o depravación en el cargo." 36 Pac. 502.

El primer párrafo del sumario del caso *Warner* v. *The People,* lee como sigue (bastardilla nuestra):

"Cuando la constitución prescribe *sobre el nombramiento para un cargo en forma determinada,* la legislatura no tiene poder para

crear un nuevo cargo para el cumplimiento del mismo, o la parte principal de los mismos deberes, y *disponer que el nombramiento se haga en otra forma."* 17 N. Y. Common Law Rep. 127.

El caso de North Carolina de *State ex rel. Bickett* v. *Knight*, envolvía el derecho que tiene una mujer para ser notario público y procedía del condado Buncombe. La sentencia de la corte inferior fué revocada por mayoría de votos. Hay una opinión disidente interesante, emitida por el Juez Presidente Sr. Clark y la opinión de la mayoría no está enteramente desprovista de un aspecto local. También contiene una exposición de la razón por la cual no podemos hacer ninguna excepción a la regla general en el presente caso. La corte hace primeramente una cita de Disraeli y luego de *Shakespeare,* a saber:

" 'Un precedente encierra un principio.' Si el principio no es seguro y correcto, bien podemos adoptar las palabras de Portia, quien al pedírsele que causara un pequeño daño del cual un gran bien podría resultar, replicó:

'Sería un ejemplar funesto,
'Una causa de ruina para el estado, ·
'No puede ser.'
"L. R. A. 1915 F. 906."

Los casos de *Tel. Co.* v. *Eyser*, *Luria* v. *United States* y *Higgins* v. *Richards,* no requieren comentario alguno.

En el caso de *Township* v. *Talcott, supra,* la Corte Suprema dijo, en parte, lo siguiente:

"Se dice que la ley está en conflicto con la constitución del Estado.

"Es un axioma en la jurisprudencia americana que no se declarará nulo un estatuto por este fundamento, a menos que la contradicción con la constitución sea clara y la conclusión de que existe, inevitable. Toda duda ha de resolverse en favor del estatuto. La cláusula particular de la constitución debe especificarse y la ley no admite interpretación razonable alguna en harmonía con su significado. La función judicial que envuelve tal resultado es delicada

y ha de ejercitarse siempre con cautela. Debe admitirse que la constitución que aquí se discute no contiene nada que esté directamente en contra de este punto. * * * El caso en cuanto a la constitución es uno en que puede debidamente aplicarse la máxima, *Expressio unius est exclusio alterius*. El instrumento está redactado con habilidad, cuidado y acopio de detalles. Si los que lo redactaron hubieran tenido la intención de prohibir la concesión de tal ayuda por parte de las corporaciones municipales del Estado, así como por el estado mismo, no es posible que no lo hubieran expresado de tal modo. No ha de suponerse que se incurrió en tal omisión en esa obra por un descuido o inadvertencia. * * * El poder legislativo de un estado se extiende a todo lo que esté dentro de la esfera de tal poder, menos en lo que esté restringido por la Constitución Federal o la del Estado. En el presente caso nada hemos encontrado que a nuestro juicio justifique la conclusión de que la ley en cuestión es defectuosa en su validez debido a su inconstitucionalidad. * * * No corresponde a las cortes interponer restricciones constitucionales. Nuestro deber es aplicar la ley y no hacerla. Puede abusarse de toda facultad cuando no hay disposiciones de reservas. El remedio en tales casos descansa en el pueblo, no en el poder judicial." 86 U. S. 673–677.

El caso de *Mathis* v. *Rose* estriba principalmente en la proposición siguiente:

"El concejo de la ciudad de 1893 no podía mediante una ordenanza limitar y restringir el concejo de la ciudad de 1899 en cuanto a poderes expresamente conferidos por la legislatura. Trowbridge v. Newark, 46 N. J. Law 140." 44 Atl. 877.

Asimismo, en el caso de *State* v. *Archibald* se dijo lo siguiente:

"Los reglamentos fueron aprobados en 1885 por una junta compuesta de personas distintas a la actual junta."

Al principio de la discusión sobre los méritos, la corte dijo lo siguiente (bastardilla nuestra):

"Que la junta de síndicos del asilo tenía facultad para separar al superintendente el Dr. Archibald, sin expresar causa, ni dar la debida notificación y en el ejercicio de su misma discreción que como

está sujeta a restricciones y no es revisable, no admite duda, *a menos que exista algo en los reglamentos a que luego podamos referirnos que intervenga con esa facultad.*"

Entonces sin necesidad muy aparente para la segunda parte de la cita que sigue, la corte pasó a decir lo siguiente:

"Para demostrar que la junta tuvo la intención de privarse de cualquier parte de esta facultad debe indicarse un lenguaje claro a ese efecto.   Lejos de haber nada en las palabras usadas que demuestre un propósito de privarse de su discreción en cuanto a la suficiencia y existencia de la causa para la separación, los *reglamentos declaran en sus términos* que el superintendente quedará sujeto a ser destituído por buena y suficiente causa '*a voluntad de la junta.*' Ellos han de juzgar finalmente toda la cuestión.   Ciertamente que por este lenguaje no confirieron a las cortes la facultad de investigar sobre la suficiencia o existencia de alguna causa para la destitución. dejaron el poder tan amplio como lo encontraron.   No podían hacer otra cosa.   *   *   *   Si la junta puede legalmente fijar un término de un año, asimismo puede dar al interesado un término durante la vida.   Si puede, con efecto legal, declarar que el superintendente puede ser destituído por buena y suficiente causa, puede limitar el motivo de la destitución a un caso en particular y poner así esta parte de la discreción conferida a la junta para el bienestar público fuera de la posibilidad de que la ejerciten las sucesivas juntas en los años venideros.   Por tanto la junta de síndicos quedaría privada por un tiempo y con la facultad de nombramiento especificada, del poder incidental de destitución, y hasta este punto del poder de tener el control general y administración que le ha conferido el estatuto. Aún cuando los reglamentos en cuestión fueron explícitos en cuanto a su limitación de poder en la junta, estaríamos obligados, por las razones expuestas a considerarlos sin efecto alguno.   Las autoridades están acordes en sostener este parecer.   State v. Lane (N. J. Sup.) 21 Atl. 302;  City of Newark v. Stout (N. J. Sup.) 18 Atl. 943;  Williams v. City of Gloucester (Mass.) 19 N. E. 348;  Higgins v. Cole (Cal.) 34 Pac. 678;  Carter v. City of Durango (Colo. Sup.) 27 S. W. 399;  Weidman v. Board of Education (Sup.) 7 N. Y. Sup. 309."   66 Atl. 241, 242.

No consta si se ha conferido o no algún poder legislativo a la junta.   Si no se ha hecho puede admitirse la corrección

de la conclusión a que se ha llegado sin tener en cuenta los méritos de la argumentación hecha en apoyo de la misma. Pero si la junta o algún otro organismo legislativo local tenía la facultad expresamente conferida por el estatuto para crear, reorganizar, echar abajo, establecer y para destruir la institución en cuestión, y si el estatuto hubiera dicho que los varios funcionarios y empleados de la misma continuarán como hasta ahora se prescribe,'' y si el término de duración del cargo del superintendente había sido anteriormente fijado por una ordenanza, entonces la conclusión a que se llegó sería enteramente insostenible, pero de todos modos puede hallarse una contestación suficiente al argumento en una opinión del Attorney General Akerman, XIII Opiniones del Attorney General 516, a la cual se hará luego referencia. Por ahora nos basta con decir que de un examen como el que hemos podido hacer de los casos citados no aparece base substancial alguna para la amplia declaración de que ''Las autoridades están acordes en sostener'' el criterio sustentado por la corte de North Dakota en el caso de *State v. Archibald.*

Las notas al principio del caso de *Horan v. Lane* dicen lo siguiente:

''1. Constituído un concejo común como lo estará cuando termine la duración del cargo que está para expirar y teniendo autoridad para nombrar al sucesor del interesado, puede legalmente hacer tal nombramiento antes del vencimiento del presente término.

''2. Cuando un estatuto faculta al concejo de la ciudad para nombrar para cierto cargo, una ordenanza del concejo que de ser puesta en vigor contra los sucesivos concejos que anulara o perjudicara materialmente su poder de nombramiento, es nula.'' 21 Atl. 302.

En el caso de *Mayor, Etc., of City of Newark v. Stout,* el párrafo undécimo del sumario expresa lo siguiente:

''La carta de la ciudad prescribía que ciertos funcionarios, incluyendo al tesorero municipal, debían ser nombrados de tiempo en

tiempo por el concejo común y que toda persona que fuera nombrada para algún cargo de acuerdo con las prescripciones de la carta continuaría en el mismo hasta tanto el cargo para el cual debía ser nombrado fuese declarado vacante o hasta que otra persona fuese nombrada para sustituirle y asumiera el ejercicio de las funciones de su cargo; y que el tesorero municipal debía, antes de empezar a ejercer los deberes de su cargo, prestar fianza con fiadores para el fiel cumplimiento de sus deberes. S. fué nombrado tesorero en enero de 1867, y continuó en el cargo hasta enero de 1875. Prestó fianza en enero, 1867, con fiadores de conformidad con la carta municipal. En una acción por virtud de su fianza oficial los fiadores alegaron que, según la carta y las reglas y costumbres del concejo común, todos los funcionarios nombrados por el concejo, incluyendo el tesorero de la ciudad, eran nombrados por un año sujetos a ser destituídos a voluntad, y de no ser reelegidos al vencimiento del término, se les permitía seguir en el cargo a voluntad; y los demandados otorgaron dicha fianza como fiadores con conocimiento de dichas reglas y costumbres del concejo común y por virtud de las promesas y manifestaciones hechas a favor y por la autoridad del concejo común y de los demandantes, de que sólo quedarían obligados como tales por el término de un año. Se *resolvió* que esta alegación no presentaba ninguna defensa.'' 18 Atl. 943.

En el caso de *Williams* v. *City of Gloucester,* los dos primeros párrafos del sumario expresan lo siguiente (bastardilla nuestra):

''De acuerdo con una carta municipal que prescribe que el alcalde y los concejales tendrán facultad para nombrar funcionarios de policía y *para destituirlos a voluntad,* la facultad de destitución no está limitada a los funcionarios nombrados por el alcalde que la ejercita sino que se extiende a los funcionarios nombrados por sus predecesores, aunque por otra cláusula el alcalde, con el consentimiento del poder nominador, puede destituir 'a cualquier funcionario sobre cuyo nombramiento él ha ejercitado la facultad de nominación.'

''Conferido el poder *'para destituir a voluntad,'* no es necesario que se acredite la causa ni la audiencia previa, y dada tal facultad por la carta no puede ser restringida por ordenanza.'' 19 N. E. 348.

En el caso de *Higgins* v. *Cole,* la corte se expresó como sigue:

"Sostiene el apelante que la ordenanza se extralimitaba en sus facultades (*ultra vires*) y era nula, pero no se cita ningún precepto constitucional o estatuto y no conocemos ninguno con el cual esté en conflicto. Por el estatuto bajo el cual la ciudad fué organizada se confirió poder a la junta de síndicos 'para aprobar ordenanzas que no estuviesen en conflicto con la constitución y leyes de este estado o de los Estados Unidos,' (sec. 764, subd. 1), y la ordenanza en cuestión debe por tanto ser declarada válida. La ordenanza, en efecto, disponía que el jefe debía ser nombrado para el cargo por un año, *o hasta que su sucesor fuese nombrado y tomara posesión del cargo.* Esto, según entendemos, debe ser interpretado en el sentido de que sólo declara que la duración del cargo seguirá hasta que sea elegido un sucesor y tome posesión del mismo y no necesariamente por un año completo. Y bajo el estatuto que prescribe que los síndicos pueden 'nombrar *y destituir* aquellos policías y otros funcionarios subordinados que crean conveniente,' parece que no tenía facultad para limitar su derecho de destitución. La constitución declara: 'Cuando no se prescribe la duración del término de algún funcionario o comisionado por esta constitución la duración del cargo de tal funcionario o comisionado puede ser declarada por la ley; y si no se declara de tal modo, dicho funcionario o comisionado desempeñará su cargo como tal funcionario o comisionado a voluntad de la autoridad que hace el nombramiento.' Sección 16, art. 20. Como la duración del cargo de jefe del departamento de bomberos no fué fijada por la constitución ni *declarada por la ley,* debe resolverse que la duración del cargo del apelante sólo continuó a voluntad del poder nominador y que él fué debidamente destituído." 34 Pac. 680.

En el caso de *Carter* v. *City Council,* encontramos lo siguiente (bastardilla nuestra):

"El hecho de que una ordenanza había sido aprobada por las autoridades municipales de Durango, en la cual se prescribía la presentación de cargos y una audiencia, previa la notificación, antes de hacerse las destituciones de cargos, no altera el resultado a que nos llevarían las anteriores conclusiones. El concejo no estaba obligado a suplir ningún procedimiento específico para la destitución de los jueces de policía. La ordenanza en cuestión, en general, se refiere

a un número de cargos, en algunos de los cuales las destituciones no son discrecionales en ese organismo. Dice lo siguiente: 'Cualquier funcionario arriba nombrado puede ser destituído por una mayoría del concejo de la ciudad por incompetencia, falta o violación de sus deberes, siempre que el concejo crea que los intereses de dicha ciudad exigen tal destitución; *disponiéndose,* que ningún funcionario será separado como queda dicho hasta tanto haya sido notificado de dicha intención de separarle y del cargo o cargos formulados contra él y notificádoles por el secretario municipal, y habérsele dado una oportunidad de exonerarse ante el concejo de la ciudad. * * * ' No podemos suponer que al adoptarse esta ordenanza los concejales intentaron restringir su facultad estatutoria de destituir a voluntad y limitarse a las destituciones por las causas especificadas únicamente. *Además, es sumamente dudoso si tal intención, de haber existido,* podía dársele de tal modo alguna fuerza o efecto; pues no está dentro de la facultad de una corporación municipal ampliar o restringir la autoridad conferida por el estatuto mediante ordenanza o reglamento. 1 Dill. Mun. Corp. Sec. 317. Se observará que el procedimiento especificado en la ordenanza arriba mencionada se limita a las destituciones por 'incompetencia' o 'abandono o incumplimiento del deber.' De los autos no nos consta que Carter fué destituído por ninguno de estos motivos. La única acción por la cual se llevó a efecto finalmente su destitución fué la siguiente: 'Resuélvase, que el concejo municipal de la ciudad de Durango no desea por más tiempo que Robert Carter actúe en la capacidad de juez de policía de dicha ciudad de Durango; por tanto, resuélvase que dicho Robert Carter sea, y por la presente es destituído de dicho cargo de magistrado de policía.' *Podríamos, tal vez,* declarar con el ilustrado juez ante el cual esta cuestión precisa fué primero promovida, que no puede permitirse que la ordenanza bajo ninguna circunstancia regule la forma de expresarse la 'voluntad' investida en el concejo de la ciudad por el estatuto; *pero es bastante para nosotros con decir que la destitución pudo haber sido por motivos que no se mencionan en la ordenanza,* y si ese era el caso, la cuestión del deber u obligación de observar el procedimiento prescrito *no surge razonablemente."* 27 Pac. 1058.

La Corte Suprema de Missouri, en el caso de *State* v. *Johnson,* tuvo menos cautela, y sin indicar ninguna razón para dar mayor alcance a la doctrina de los casos citados

como autoridades para la franca declaración de la conclusión a que llegó, se expresa en estos términos:

"El precepto contenido en la ordenanza de que el jefe del departamento de bomberos sólo podía ser separado por causa, es incompatible con la facultad amplia y general conferida por la carta para nombrar a voluntad, y por inferencia al menos para separar en la misma forma. En el caso de Williams v. City of Gloucester, 148 Mass. 256, 19 N. E. 348, se resolvió que una ordenanza de la ciudad de Boston que limitaba la facultad de destitución 'a voluntad' para destituir 'por causa,' era incompatible con el estatuto. Véanse también los casos de Stadler v. City of Detroit, 13 Mich. 346; Vason v. City of Augusta, 38 Ga. 542; State v. Lane, 53 N. J. Law, 275, 21 Atl. 302. *Además, la ordenanza prescribe que el alcalde y concejales* nombrarán al jefe ingeniero, mientras que, *bajo la carta,* el nombramiento *sólo puede hacerlo el concejo común, no teniendo el alcalde nada absolutamente que ver con esto, y esto estaba en este sentido en conflicto con el estatuto. Semejante poder, o parte del mismo, no podía ser conferido al alcalde por ordenanza de acuerdo con el estatuto.* I Dill. Mun. Corp. sec. 207 p. 289; Newark v. Sout, 52 N. J. Law, 35, 18 Atl. 943; Day v. Green, 4 Cush. 433; Beach, Pub. Corp. sección 147. Se verá pues que el peticionario desempeñó su cargo a voluntad del poder nominador sujeto a ser destituído en cualquier tiempo, a menos que el término de su cargo esté fijado o limitado a cierto tiempo por algún precepto de la constitución del Estado. *People* v. *Robb* (N. Y. App.) 27 N. E. 267." 27 S. W. 400.

La cita del caso de Massachusetts a que se ha hecho mención en primer término sería bastante para demostrar que no sostiene la proposición como ha sido enunciada; pero véase también el sumario, *supra.*

Las notas al principio del caso *Stadler* v. *City of Detroit* son las siguientes:

"La duración del cargo de marshal para la ciudad de Detroit, según se fija por la sección 13, cap. 2, de la carta enmendada (Leyes 1861, p. 181-2), es de dos años y este término no está limitado o afectado por la prescripción de la sección 2 del mismo capítulo.

"De acuerdo con dicha carta enmendada, S. fué nombrado por el concejo común de la ciudad para el cargo de marshal por un

año y prestó fianza en la cual se hacía mención de su nombramiento por ese término. Al vencimiento del año el concejo (sic), sin su consentimiento, o en resumen, destituyéndolo, nombró otra persona para el cargo, quien asumió el cargo y entró en el ejercicio de sus deberes. En una acción establecida por S. en cobro de su sueldo como marshal por el segundo año, se *resolvió* que por virtud de su nombramiento S. tenía derecho a permanecer en su cargo por dos años y a percibir un sueldo por el término completo; que la declaración hecha en dicha fianza respecto a un nombramiento por un año era supérflua, y la fianza era válida por todo el término; y que el nombramiento de otra persona para el cargo no era equivalente a la destitución de S. y no lo privaba del mismo." 13 Mich. 346.

No tenemos a mano el caso de Georgia. Las notas al principio del caso de *State* v. *Lane* se transcriben arriba.

En el caso de *People* v. *Robb* la Corte de Apelaciones de New York dijo lo siguiente (bastardilla nuestra):

"Con respecto a la tenencia o duración de un empleo público tal como el que el peticionario tenía a la fecha de su separación, la regla corriente es que cuando el poder de nombramiento se confiere en términos generales y sin restricción la facultad de destitución a discreción y voluntad del poder nominador es implícita y existe siempre, *a menos que esté restringida y limitada por algún otro precepto legal.* People v. Fire Commissioners, 73 N. Y. 437; Bergen v. Powell, 94 N. Y. 591; Ex parte Hennen, 13 Pet. 230; Laimbeer v. Mayor, etc., 4 Sandf. 109; Avery v. Inhabitants of Tyringham, 3 Mass. 177; Blake v. United States, 103 U. S. 277; People v. Thompson, 94 N. Y. 451; People v. Mayor, etc., 5 Barb. 43.

"*Esta regla general fué incorporada a la constitución de este Estado en el siguiente lenguaje:* 'Cuando la duración de cualquier cargo no está prescrita por la constitución, *puede ser declarada por la ley, y si no se declara de tal modo,* tal cargo será desempeñado a voluntad de la autoridad que hace el nombramiento.' " 27 N. E. 267.

En el caso de *Weidman* v. *Board of Education,* la corte refiriéndose a la junta indicó lo siguiente:

"Uno de sus poderes especificados es 'contratar con y dar empleo a todos los maestros en dicha escuela bajo su dirección, y, también, un portero y bibliotecario, y separarlos a voluntad.' "

Además:

"Si, como se alega por el demandante, el servicio que ha de ejecutarse por él era por virtud de un contrato especial con la junta en el que se estipulaban sus obligaciones y trabajos y la compensación que había de pagarse por el mismo, y que en ningún sentido desempeñaba un cargo o función pública, entonces igual resultado debe tener lugar, pues por los términos del convenio el demandado se reservó el derecho de dar por terminado el contrato a voluntad de la junta de directores." 4 Silvernail 240, 242.

En el caso de *People* v. *Coler,* la opinión emitida por el Juez Sr. Cullen, contiene lo siguiente:

"La Constitución habla en substancia, no meramente en forma. Cuando prescribe que el funcionario será elegido por los electores de la localidad o nombrados por alguna autoridad local, su mandato es que el cargo será cubierto y desempeñado únicamente por virtud de tal elección o nombramiento. Un poder absoluto de destitución en el gobernador es incompatible con tal duración del cargo. La cuestión ante nos es muy distinta a la que se presentaría por virtud de una disposición de que el gobernador podría destituir por mala conducta en el cargo después de notificación y audiencia. La Constitución en su sección 8, art. 10, prescribe que 'la legislatura puede declarar los casos en los cuales cualquier cargo se considerará vacante cuando nada se dispone con tal fin en la Constitución.' La legislatura ha ejercitado esta autoridad mediante leyes de carácter general y decretado que el cambio de residencia de un funcionario local fuera de la localidad para la cual fué elegido, la condena de un funcionario por un delito que implique una infracción de su juramento para el cargo, o su condena por un delito grave de cualquier naturaleza declara vacante el cargo. La validez de las disposiciones estatutorias nunca ha sido impugnada. No estoy preparado para afirmar que un estatuto que autorice al gobernador para destituir a un funcionario local por mala conducta a virtud de cargos después de una audiencia no puede estar justificado bajo la sección de la Constitución que ha sido citada." N. Y. Court of Appeals, Book XXXV, p. 573.

En el caso de *State* v. *Kipp,* estaba envuelta una ley de la legislatura titulada "Ley disponiendo la creación del cargo

de comisionado de aseguros y definiendo los deberes del mismo.'' La sección 3, en tanto es pertinente, y la 4 de la Constitución del Estado, prescriben lo siguiente:

''Sec. 3.—El gobernador y otros funcionarios de Estado y judiciales, menos los jueces de condado, jueces de paz y magistrados de policía, quedarán sujetos a procesamiento por embriaguez, crímenes, conducta corrupta o abandono o faltas menores en el desempeño del cargo; * * *.

''Sec. 4.—Todos los funcionarios que no estén sujetos a procesamiento podrán ser destituídos por mala conducta, abandono o delito o falta menor en el desempeño del cargo, o por embriaguez o absoluta incompetencia, en la forma en que la ley pueda prescribirlo.'' 74 N. W. 441.

La corte se expresó en parte como sigue (bastardilla nuestra):

''La regla de ley está bien establecida de que excepto cuando la constitución ha fijado límites o restricciones al poder legislativo deberá considerarse como prácticamente absoluto; y una ley de la legislatura que no invade las facultades conferidas a los otros departamentos del gobierno debe hacerse cumplir a no ser que las restricciones a la autoridad legislativa puedan fundarse en la constitución misma, o surjan por *necesaria* inferencia de algunas disposiciones de ese instrumento. * * * Somos de opinión de que no existe tal *necesaria* inferencia. Los autores de la Constitución habían *prescrito* en ese instrumento lo relativo a todos los funcionarios de estado y judiciales que consideraron necesarios para la debida organización del nuevo estado; y no es sino razonable suponer que al expresar 'que todos los demás funcionarios de estado y judiciales,' que aparecen en la sección 3, se referían sólo a aquéllos funcionarios que habían *creado y* nombrado en el instrumento. * * * Lo que se ha dicho respecto a la sección 3 es aplicable con igual fuerza a la sección 4. La constitución no solamente *prescribía en cuanto* a los funcionarios necesarios de estado, sino también disponía sobre los funcionarios corrientes de condado (sección 5 artículo 9), y prescribía sobre su elección por el pueblo. El término 'todos los funcionarios,' especificados en la sección 4 no sujetos a procesamiento, era, según entendemos, claramente para significar a los funcionarios de condado y aquellos funcionarios que no eran, estric-.

tamente hablando, funcionarios de estado, pero que sin embargo se les designaba en la constitución. De modo pues que tenemos una clase de funcionarios de estado que sólo pueden ser destituídos por causa, pero en aquella forma que prescriba la ley; y una extensa clase de funcionarios de la ciudad, municipales, o de distrito, y funcionarios *creados por la legislatura* cuya duración de sus cargos y forma de destituirlos está enteramente bajo el control del poder legislativo." Id., pág. 442.

Ya hemos citado del caso *Higgins* v. *Cole* lo suficiente para demostrar que el precepto del Código de California a que se ha hecho referencia es idéntico al de New York, respecto al cual se dice en el caso de *People* v. *Robb, supra,* que es una paráfrasis de la siguiente regla general:

"Cuando el poder de nombramiento se confiere en términos generales y sin restricción alguna el poder para destituir a discreción y a voluntad del poder nominador es implícito y existe siempre *a menos que esté restringido o limitado* por alguna otra prescripción *legal.*"

Los dos casos no están en conflicto sobre este punto. En el de Higgins los síndicos fueron autorizados expresamente por el estatuto para "nombrar *y destituir*" policías, y la ordenanza no pretendía regular o poner restricciones o limitaciones a tal poder expreso para destituir, sino que prescribía en substancia respecto a la duración del término por un año, a menos que, "o hasta," que "fuese nombrado y tomado posesión del cargo un sucesor." No estaba envuelta ninguna cuestión de poder implícito. No consta qué autoridad legislativa si existía alguna en cuanto a la creación de cargos municipales había sido conferida a la junta de síndicos. Dentro de las circunstancias lo que se acreditó en este caso al efecto de que "estas decisiones no pueden ser consideradas como limitadas a corporaciones municipales, sino como principios generales de interpretación estatutoria," no es muy satisfactorio.

En el caso de *Palliser* v. *Home Telephone Co., supra,*

sólo se hace una cita incompleta o equivocada del de *Kepner*
v. *United States*, 195 U. S. 100, a saber:

" 'Es un principio bien establecido de interpretación que los tér-
minos precisos que comprenden determinada materia específica pre-
valecerán sobre los términos generales contenidos en el mismo u otro
estatuto que de otro modo podrían ser reguladores.' " 44 So. 578.

No estamos dispuestos a refutar esta declaración como
proposición abstracta, pero la conclusión de que "las muni-
cipalidades no son diferentes de otro gobierno" difícilmente
puede considerarse como corolario de la misma.

Tampoco encontramos en el caso de *Higgins* v. *Cole, supra,*
nada que demuestre en forma muy persuasiva que las "cor-
poraciones municipales, en lo que respecta a sus poderes de
nombramiento, no son distintos de los poderes de un gober-
nador en su derecho a nombrar y separar."

Volviendo ahora a la argumentación de los abogados del
gobernador, encontramos en el caso de *Wallace* v. *The United
States,* resuelto en febrero 27, 1922, la última expresión de
la Corte Suprema, la cual, hablando por conducto del Juez
Presidente Sr. Taft, dice lo siguiente (bastardilla nuestra):

"Antes de la Guerra Civil no existía restricción alguna en el
poder del Presidente para destituir a un funcionario del ejército o
de la marina. El principio de que el poder de destitución era in-
herente al de nombramiento quedó desde mucho antes resuelto por
el Senado en el sentido de que envolvía la conclusión de que por
lo menos *a falta de legislación restrictiva,* el Presidente, si bien no
podía nombrar sin el consentimiento del Senado, podía destituir sin
tal consentimiento en el caso de un funcionario cuya duración de
su cargo no estaba fijada por la Constitución. La primera restric-
ción legislativa a esta facultad fué aprobada en marzo 3, 1865, por
el mismo precepto que ahora consideramos (13 Est. 489), que luego
vino a ser la sección 1230 de los Estatutos Revisados. Posterior-
mente en julio 17, 1866, el Congreso quitó enteramente el poder del
Presidente para destituir a un funcionario del ejército o marina en
tiempo de paz a menos que fuese de acuerdo con una sentencia de
una corte marcial, o en conmutación de la misma. Después de eso,

en la controversia entre el Presidente Johnson y el Senado, la ley sobre duración del cargo fué aprobada, en la cual se eliminó el poder del Presidente para destituir a funcionarios civiles. Ley de marzo 2, 1867, 14 Est. 430. *La validez de estas leyes nunca ha sido considerada directamente por esta corte en ningún caso.* La cuestión *ha sido expresamente reservada.* Parsons v. The United States, 167 U. S. 324–339.''

Un extracto del caso de *Mullan v. United States,* 140 U S. 240, citado en el párrafo que sigue a la anterior cita, será bastante para demostrar que la Corte Suprema no quiso decir y no resolvió en el caso de Wallace que el Congreso no tenía poder para fijar ningunas restricciones o limitaciones al poder presidencial para destituir como incidental a la facultad de nombramiento aún cuando tal poder de destitución no lo ejercite el Presidente sólo, sino ''con y por el consejo y consentimiento del Senado.'' La parte esencial de lo manifestado por la corte en el caso de *Mullan v. United States,* en tanto es pertinente a la cuestión, dice así (bastardilla nuestra) :

''En el caso de Blake v. United States, 103 U. S. 227, 235, se resolvió, después de amplia consideración, que la quinta sección de la ley de presupuesto para el ejército de julio 13, 1866, c. 176, 14 Est. 92, arriba citado, *significaba,* 'que por cuanto, de acuerdo con la ley de julio 17, 1862, lo mismo que antes de su aprobación, *sólo el Presidente* estaba autorizado para separar a un funcionario del ejército o marina del servicio por cualquier causa que, a su juicio, lo incapacitaba o cuya separación promovería el servicio público, *él sólo no* ejercitará, luego, en tiempo de paz, tal facultad de separar, a menos que sea de acuerdo con la sentencia de una corte marcial a ese efecto o en conmutación de la misma.' Además, en el mismo caso se dijo: 'Nuestra conclusión es que *no había el propósito,* en la sección 5 de la ley de julio 13, 1866, de quitar al Presidente la facultad, con el consejo y consentimiento del Senado de substituir a un funcionario en el servicio militar o naval mediante el nombramiento de alguien para su puesto. Si el poder del Presidente y el Senado, en este sentido, pudiera estar constitucionalmente sujeto a restricciones del estatuto, (*respecto al cual no expresamos ninguna opinión*), es bastante para el presente caso con decir que el Congreso

*no tuvo la intención* en esa sección de imponer esas restricciones. No es sino en substancia y efecto más que una declaración de que el poder hasta entonces ejercitado por el Presidente sin el concurso del Senado de destituir sumariamente o separar funcionarios del ejército y marina, siempre que a su juicio los intereses del servicio lo exigieran, no existirá o será ejercitado en tiempo de paz, a menos que sea en cumplimiento de una sentencia de una corte marcial o en conmutación de la misma. *No hubo, creemos, ninguna intención* de negar o restringir la facultad del Presidente, por y con el consejo y consentimiento del Senado, para desplazarlos mediante el nombramiento de otras personas para sus puestos.'

"Estos principios fueron confirmados en el caso subsiguiente de Keyes v. United States, 109 U. S. 336, 339." 140 U. S. 245, 246.

El Juez Asociado Sr. Brandeis, hablando a nombre de la corte en el caso de *Burnap* v. *United States,* 252 U. S. 512, y al discutir "los principios generales de derecho que regulan el nombramiento y separación en el servicio civil de los Estados Unidos", en la página 515 dice que:

"El poder de separar a falta de disposición estatutoria en sentido contrario es incidental al de nombrar. *Ex parte Hennen,* 13 Pet. 230, 259, 260; *Blake* v. *United States,* 103 U. S. 227, 231; *United States* v. *Allred,* 155 U. S. 591, 594; *Keim* v. *United States,* 177 U. S. 290, 293, 294; *Reagan* v. *United States,* 182 U. S. 419, 426; *Shurtleff* v. *United States,* 189 U. S. 311, 316. Y el poder de suspensión es incidental al de separar."

El caso principal es el de *Ex parte Hennen,* resuelto en enero 1839. Hennen, era un secretario de la Corte de Distrito de los Estados Unidos para el Distrito del Este de Louisiana y fué separado por el juez, no por razón de ninguna mala conducta, sino simplemente por el deseo del juez de preparar el terreno para un amigo personal que fué nombrado para cubrir la vacante.

En la vista el abogado de Hennen, entre otros particulares, alegó que "los poderes únicamente se infieren de la necesidad. Si no existe razón convincente de por qué aquello que no se confiere en términos expresos debe, sin embargo,

pasar por deducción, tal interpretación no debe ser favore-
cida.''

La corte no refuta esta proposición, sino que más bien
adopta el criterio de tal modo sugerido; y, siguiendo esta
misma línea de razonamiento, funda la doctrina de un poder
implícito para separar, completamente en la necesidad de
elegir entre la teoría de su existencia como incidental al
poder de nombramiento y la imputación de una intención,
rechazada por imposible para conferir al que desempeñe el
cargo un término de duración durante la vida del mismo,
necesidad que surge de la ausencia absoluta de disposición
constitucional o reglamentación estatutoria. Después de ha-
cer un relato histórico y una breve discusión del uso esta-
blecido e interpretación práctica de la constitución y leyes,
y de una referencia a la actitud de las cortes inglesas acerca
de casos que no están regulados por la antigua costumbre,
en los cuales ''la duración del cargo se determina por el sig-
nificado e intención del estatuto''—la opinión pasa a demos-
trar que en las cortes de estados también la misma ''regla''
prevalece y ''las cuestiones han sido reglamentadas por la
interpretación que se ha dado a la constitución y a las leyes
del estado donde surgieron.'' Así pues, se nos dice que en
el caso de *Avery* v. *Inhabitants of Tyringham,* 3 Mass. 177,
se ha establecido como regla general ''que un cargo se desem-
peña a voluntad de cualquiera de las partes, a menos que
se haya expresado una duración diferente en el nombra-
miento, o se deduzca de la naturaleza del cargo o resulte de
la antigua costumbre.'' Por tanto, el caso de *Hennen* se
diferencia en este sentido: ''el cargo desempeñado por
el peticionario claramente que no está comprendido dentro
de ninguna de estas excepciones y por supuesto cae dentro
de la regla general y se desempeña a voluntad de cualquiera
de las partes. El peticionario, sin duda, alegaría el derecho
a renunciar la secretaría si resolviera hacerlo. Y la corte
tenía derecho a darlo por terminado a su elección.'' Así

también, al citar el caso de *Commonwealth* v. *Sutherland,* 3
Serg. & Rawle 145, se dice que la Corte Suprema de Pennsyl-
vania reconoció "el principio de que el poder de separar
era incidental al de nombrar, a falta de precepto constitu-
cional o legislativo sobre el particular." También en el caso
*Hoke* v. *Henderson* (N. C.) 4 Dev. 1, el cual se dice que no
está en manera alguna en conflicto con los otros que han
sido mencionados, establece así la diferencia "de que ese
caso, como los demás, giraron sobre la constitución y leyes
de Carolina del Norte; y de acuerdo con los preceptos ter-
minantes de la ley, la duración del cargo era durante buena
conducta; y estaba, por supuesto, reglamentado por muy
diferentes consideraciones de aquellas que son aplicables al
caso que está ahora ante la corte."

Estas son las circunstancias bajo las cuales la corte dijo
lo siguiente:

"La ley que confiere a las cortes de distrito la facultad de nom-
brar sus propios secretarios, no prescribe ninguna forma en la cual
esto debe de hacerse. El peticionario alega que ha oido y cree que
el Juez Lawrence expidió en 18 de mayo de 1838 y entregó a John
Winthrop, una comisión o nombramiento como secretario de la corte
de distrito para el distrito del Este de Louisiana y que él comenzó
en el desempeño de su cargo y fué reconocido por el juez como el
único secretario legal de la corte de distrito. Y además de esto,
el peticionario fué notificado por el juez acerca de su separación del
cargo de secretario y del nombramiento de Winthrop en su lugar;
todo lo cual era enteramente suficiente si el cargo se desempeñaba
a discreción de la corte. El poder investido en la corte era contí-
nuo; y el mero nombramiento de un sucesor *per se,* sería una sepa-
ración del anterior funcionario por lo menos en lo que concernía a
sus derechos."

El Attorney General Legaré, en el caso de Randolph
(1842) Opiniones del Attorney General, Tomo IV, página 1,
llegó a la conclusión siguiente:

"El Presidente de los Estados Unidos tiene la facultad de hacer
que un oficial del ejército sea eliminado de las listas sin la celebra-

ción de un juicio por una corte marcial, no obstante existir una decisión a su favor de una corte investigadora nombrada para la investigación de su conducta.

"Es un poder absoluto y formidable, incidental al Ejecutivo del Gobierno, quien es solamente responsable al país por un incumplimiento del solemne fideicomiso."

La opinión, que es sumamente breve, no hace mención del caso de Hennen, y prescindiendo de lo que el que la emitió pudiera haber pensado acerca de "la facultad para separar el cargo, si la cuestión fuera *res integra,*" se basa en el fundamento de que aún entonces era "demasiado tarde para refutar la interpretación establecida en el año 1879," de que el poder de separar era "de acuerdo con esa interpretación, por la misma naturaleza de la facultad ejecutiva, absoluta en el Presidente, sujeta solamente a su responsabilidad para con el país," y que "en Inglaterra la prerrogativa real puede ejercitarse en todas las ocasiones al separar funcionarios del servicio sin someterlos a la forma de un juicio."

Que el Sr. Legaré no encontró ninguna incompatibilidad insuperable entre la existencia de este "poder absoluto y formidable" como incidental al poder ejecutivo de nombramiento, a falta de reglamentación estatutoria y de un poder coexistente en el Congreso dentro de límites razonables para prescribir la forma o circunstancias en las cuales deba ejercitarse tal facultad ejecutiva, aparece razonablemente del siguiente extracto de otra opinión emitida por el mismo funcionario un año después (4 Opiniones del Attorney General 162) relativa al nombramiento y separación de inspectores de aduana (bastardilla nuestra):

"Mi propia opinión sobre las cuestiones que ahora se proponen está, sin embargo, enteramente resuelta. Creo que el Congreso no tiene ningún poder para *investir el nombramiento* de cualquier empleado que esté razonablemente comprendido en la definición de un funcionario inferior del gobierno, *en ninguna otra autoridad pública*

que no sea el Presidente, los Jefes de Departamento o los tribunales judiciales.

"¿Pero no puede éste investir el poder de nombramiento en cualesquiera de estos *para ejercitarlo en cierto modo, con ciertas precauciones o limitaciones, por determinado período,* etc.? *Creo que puede.*"

Pocos años después, al considerar la reclamación hecha por un cirujano de la marina, por sueldos atrasados, (4 Opiniones del Attorney General, 603), el Attorney General Clifford dijo lo siguiente (bastardilla nuestra):

"La autoridad del Presidente en este respecto fué sostenida en el debate de 1789 por el fundamento de que 'ella provenía de la naturaleza de la facultad y de la conveniencia y hasta de la necesidad de su ejercicio; que era claramente por su naturaleza parte de la facultad ejecutiva, e indispensable para el debido cumplimiento de las leyes y la ordenada administración de los asuntos públicos.' Esta doctrina ha sido desde entonces sancionada expresamente por el criterio unánime de la Corte Suprema, *basándolo sin embargo, más distintamente en la razón* de que *como regla necesaria,* 'la facultad de separar es incidental a la de nombrar.' (13 Pet., 259)."

\*     \*     \*     \*     \*     \*     \*

"El razonamiento de la corte en el caso citado ayudará mucho sobre la cuestión general envuelta en este caso. El Juez Asociado Sr. Thompson, al emitir la opinión se expresa en estos términos: 'Todos los cargos cuyos términos de duración no han sido fijados por la constitución *o limitados por la ley* deben ser desempeñados, bien durante buena conducta o (lo que es la misma cosa a juicio de la ley) durante la vida del nombrado, o deben ser desempeñados a voluntad y discreción de algún departamento del gobierno y sujetos a separación a voluntad del que nombra. No puede por el momento admitirse que fué la intención de la constitución que aquellos cargos que se denominan 'cargos inferiores' deben ser desempeñados durante la vida; y si pueden ser separados a voluntad, por quién ha de hacerse tal separación? A falta de todo precepto constitucional *o reglamentación estatutoria,* parece ser una regla saludable y *necesaria* considerar la facultad de separar como incidental a la de nombrar. Y tal parece haber sido la interpretación legislativa de la constitución; pues en la organización de los tres grandes departamentos de Estado, Marina y Tesoro, en el año 1789, se dis-

pone lo necesario para un funcionario subalterno al Jefe del Departamento, quien estará a cargo y custodiará los records, libros y documentos pertenecientes a la oficina, cuando el Jefe del Departamento haya de ser removido del cargo por el Presidente de los Estados Unidos. Al establecerse el Departamento de Marina en el año 1798, (1 *Story,* 498,) se dispuso lo necesario para el cuidado de los libros, registros y documentos del Departamento en caso de una vacante en el cargo de secretario ocurrida por separación o de otro modo.'

"La forma de una comisión militar en uso general describe expresamente la duración del cargo y muy claramente reconoce la doctrina de 1789: 'Esta comisión continuará en vigor a voluntad del Presidente de los Estados Unidos por ahora.' "

En el año 1851 se pidió al Presidente que separara de su cargo al Juez Presidente del Territorio de Minnesota "por cargos muy serios de incapacidad, inhabilidad y falta de carácter moral."

El Presidente entonces solicitó una opinión del Attorney General en cuanto a la facultad de separar, y la opinión del Sr. Crittenden, (tomo V, Opiniones del Attorney General, 289) es en parte como sigue (bastardilla nuestra):

"La ley del Congreso bajo la cual él fué nombrado, dispone en la Sección 9 'que el poder judicial de dicho Territorio estará investido en una Corte Suprema, Cortes de Distrito, Cortes de Testamentaría y Juzgados de Paz. La Corte Suprema estará constituida por un Juez Presidente y dos jueces asociados, * * * quienes desempeñarán sus cargos durante el término de cuatro años.' Y en la Sección 11 se dispone además, 'que el gobernador, secretario, juez presidente, y jueces asociados, attorney y marshal, serán designados y con el consejo y consentimiento del Senado, nombrados por el Presidente de los Estados Unidos.' Según aparece de la faz de este estatuto, el nombramiento de estos jueces territoriales no era sin término ni mientras observaran buena conducta, sino por el término de cuatro años solamente.

"No siendo cortes constitucionales y no estando comprendidos los jueces dentro del artículo III de la constitución relativo al poder judicial y a la duración del cargo durante buena conducta, la pregunta es ¿por qué término de duración desempeñan sus cargos

estos jueces territoriales?   *¿No existe medio alguno de separarlos del cargo que no sea mediante procesamiento (impeachment) por la Cámara de Representantes y convicción por el Senado por traición, soborno, u otros grandes delitos y misdemeanors?*   Siendo funcionarios civiles nombrados por el Presidente, con el consentimiento y consejo del Senado y autorizados por el Presidente, no están ellos exentos de aquella facultad ejecutiva, la cual, por la constitución, está investida en el Presidente de los Estados Unidos sobre todos los funcionarios civiles nombrados por él, y cuyos términos de duración en sus cargos la constitución misma no le da más estabilidad que no sea a voluntad del Presidente de los Estados Unidos.   *   *   *
De esta facultad los jueces nombrados para los territorios de los Estados Unidos no están exceptuados.   Que estos jueces territoriales fueron nombrados bajo una ley que *limitaba* sus cargos al término de cuatro años, en manera alguna significa que continuarán en sus cargos durante ese término *sea cual fuere su conducta.*   La declaración expresa en el estatuto de que *no serán separados* del cargo durante el término, *hubiera estado* en conflicto con la constitución y *obstaculizado* ya a la Cámara de Representantes o al Presidente en el ejercicio de sus respectivos poderes de procesamiento (*impeachment*), o separación.   *La ley no quiso expresar otra cosa* sino que estos funcionarios al finalizar ese término deben, ciertamente, quedar fuera del cargo o sometidos nuevamente a la investigación del Senado al volver a nombrárseles.

"*Cuando el objeto es que esta facultad de separación sea ejercitada respecto a un juez nombrado para la administración de justicia del pueblo de un gobierno* territorial, *debe admitirse que deberá procederse con cautela y circunspección.*   Pero la facultad de separación está investida por la constitución en el Presidente de los Estados Unidos para promover el bienestar público, permitirle cuidar que las leyes sean debidamente cumplidas, hacerle responsable si permite que continúen en sus cargos aquellos *que claramente están incapacitados y no son acreedores a la confianza pública.*"

Si la Corte Suprema hubiera dicho antes del año 1851 como lo hizo medio siglo después, "que cuando el término de duración de un cargo es por un período fijo son esenciales la notificación y audiencia," claramente que el Sr. Crittenden hubiera tenido poca o ninguna vacilación para adoptar ese criterio en el asunto.

Una opinión emitida por el Attorney General Cushing, en el año 1853, (6 Opiniones del Attorney General, 4) contiene lo siguiente:

"Admitiendo, sin embargo, que los guarda-almacenes militares son oficiales, o por lo menos cuasi oficiales, del ejército, de ello no se infiere que no están sujetos a ser privados de sus cargos a voluntad del Presidente.

"No conozco ningún fundamento de distinción en este respecto en cuanto concierne a la cuestión legal estricta entre oficiales del ejército y cualesquiera otros funcionarios del gobierno. Como regla general, con excepción solamente de funcionarios judiciales, todos desempeñan sus cargos durante el mismo período en cuanto a esto. Puede considerarse que existen razones de índole especial por las cuales la regla no deba ser aplicada a militares en la misma forma en que se aplica a funcionarios civiles; pero la aplicabilidad legal a ambas clases de funcionarios es, según se cree, la interpretación establecida de la constitución. No se contesta a esta doctrina con decir que los oficiales del ejército están sujetos a ser privados de sus cargos por la decisión de una corte marcial. Así lo están los funcionarios civiles mediante procesamiento (*impeachment*). La diferencia entre los dos casos es en la forma y manera del juicio, no en el principio que deja intacto, lo mismo en uno que en otro caso, todo el poder constitucional del Presidente.

"Parece innecesario, en este caso, resumir en detalle los elementos de interpretación constitucional e inducción histórica por los cuales esta doctrina ha sido establecida como la ley pública de los Estados Unidos. Observo solamente que en tanto se trata de la cuestión del poder abstracto, no se de nada que sea esencial en los fundamentos o conclusión legal que haya sido más minuciosamente analizado en distintas épocas, en cuanto a funcionarios civiles, que no sea aplicable a oficiales del ejército."

Otra opinión emitida por el mismo funcionario (Tomo VIII, Opiniones del Attorney General, 223), va aún más lejos tal vez, si bien su parte pertinente concluye con el siguiente párrafo (bastardilla nuestra):

"En el caso ante mi la misma ley del Congreso parece haber resuelto la cuestión ordenando la separación de ciertos oficiales de la marina. Si pudiese admitirse por vía de argumento que la consti-

tución no sujeta a los oficiales de la marina a separación por el
Presidente, cierto sería también que la constitución no se hace ina-
movible. *No son oficiales constitucionales de nombre. Son de la
clase de oficiales constitucionales cuya existencia ha de ser 'estable-
cida por la ley,' estando en este caso el poder para tal cosa com-
prendido en los poderes para declarar la guerra, y fomentar y sos-
tener una marina, y en el poder para decretar todas las leyes ·que
sean necesarias y convenientes para poder cumplir con tales poderes.
Desde luego que la duración de sus cargos puede ser materia de legis-
lación en unión de aquella de muchos funcionarios legislativos en
otros ramos del servicio público. De modo que las dudas del poder
del Presidente por motivos generales no son aplicables a la separa-
ción hecha por el Presidente en cumplimiento de la presente ley del
Congreso.''*

En el caso de Major Belger (1868), 12 Opiniones del At-
torney General 421, se dice lo que sigue: ''el término de du-
ración de su cargo era a voluntad del Presidente entonces,
y tal era el carácter de su comisión.'' La opinión del At-
torney ·General Browning contiene la siguiente cita (bastar-·
dilla nuestra):

''La autoridad del Presidente para separar a un funcionario del
servicio militar o naval ha sido siempre entera y juiciosamente con-
siderada por los varios Attorneys Generals. En cada caso en que
la cuestión surgió ellos han afirmado que la autoridad estaba san-
cionada por la *interpretación establecida* de ese instrumento y la
*práctica uniforme de la rama ejecutiva del gobierno.*

   ❋      ❋      ❋      ❋      ❋      ❋      ❋

''A la fecha de la separación del Coronel Belger, no sólo no hubo
tentativa alguna por el Congreso para imponer ninguna restricción
en la facultad discrecional del Presidente para destituir sino que la·
existencia del poder estaba reconocida categóricamente en toda su
amplitud. En la última cláusula del undécimo Artículo de Guerra,
aparecen las palabras 'ni será separado del servicio ningún oficial·
comisionado a menos que sea *por orden del Presidente* de los Esta-
dos Unidos, o por sentencia de una Corte Marcial.'

''Por la sección 17 de la ley de julio 17 de 1862 (12 Estatutos
596) el Presidente de los Estados Unidos estaba '*autorizado para y
se le exigía* que separara y retirara del servicio militar, ya en el ejér-

cito, marina, cuerpo de marina o voluntarios del servicio de los Estados Unidos a cualquier oficial por cualquier causa que a su juicio haga inconveniente a tal oficial para el servicio público o cuya separación beneficie dicho servicio.'

"Esta disposición en mi opinión no dió al Presidente ningún nuevo poder sino una *sanción legislativa expresa* al ejercicio de un poder *incidental al alto fideicomiso oficial* puesto en sus manos.

"Se le exigía privar a cualquier oficial de su comisión siempre que el interés del servicio, a su juicio, fuera así mejorado. Aquellos que niegan que el poder de separar es incidental al poder limitado de nombramiento del cual está investido el Presidente por la Constitución deben ciertamente admitir que los términos *'autorizado y requerido'* que aparecen en la ley de 1862 le confieren una autoridad discrecional y limitada en el asunto.

"Por tanto, en la época en cuestión el Presidente tenía el poder, *ya derivado de la Constitución o conferido por concesión legislativa,* de separar a un oficial del servicio militar de los Estados Unidos."

En agosto de 1868 el Attorney General Evarts, en una opinión enviada al Secretario del Tesoro (12 Opiniones del Attorney General, 445) se expresó como sigue (bastardilla nuestra):

"El objeto de la 'ley sobre duración del cargo de funcionarios civiles' fué cambiar la doctrina y práctica del gobierno por la cual la separación de un cargo a mera discreción del Presidente, había sido establecida como debida y necesaria parte, según se creyó, incidental de las funciones y responsabilidad del ejecutivo bajo la Constitución, de mantener la eficiencia y fidelidad del servicio público, en el cumplimiento de las múltiples e incesantes obligaciones de la administración y en la ejecución de las leyes. Este fin, *que pudo haber quedado limitado al requisito de la concurrencia del Senado con el ejecutivo al llevar a cabo una destitución y que sin embargo se dejaba la capacidad para destituir como un acto separado e independiente sujeto a las exigencias del servicio público, ha sido observado por la ley hasta el punto de eludir la terminación del que desempeña el cargo por la voluntad combinada del Ejecutivo y el Senado, excepto por el único y específico modo* de nombramiento, confirmación y toma de posesión de un sucesor. Esta firme retención de un cargo, al cual una vez él es llevado, se consigna de modo preciso

en la ley como cuestión del derecho y título del oficial. La consecuencia de esto es que no hay otro modo posible de dejar vacante el cargo así protegido contra la voluntad del funcionario durante la sesión del Senado, por malvada y perjudicial que su conducta personal u oficial pueda ser, excepto por el procedimiento constitucional de 'impeachment.' Durante el receso del Senado se prescribe el procedimiento reparador de suspensión temporal por causa por el Ejecutivo, al que sigue una acusación en el Senado, su sentencia sobre el mismo, y puede resultar en la separación del funcionario sin la necesidad del nombramiento simultáneo, confirmación y toma de posesión de su sucesor.

"El texto de la sección que garantiza este derecho y el título del que desempeña el cargo es demasiado claro para que pueda haber dudas:

" 'Que toda persona que desempeña cualquier cargo civil para el cual ha sido nombrado por y con el consejo y consentimiento del Senado y toda persona que en lo sucesivo sea nombrada para cualquiera de tales cargos y que esté debidamente capacitada para desempeñarlo, tiene y tendrá derecho a retener tal cargo hasta que su sucesor haya sido asimismo nombrado y debidamente tomado posesión, excepto en lo que de otra manera se disponga en la presente.'

"El Señor Rollins entonces, en la fecha de su carta al Presidente tenía derecho a desempeñar el cargo de Comisionado de Rentas Internas hasta que un sucesor hubiese sido nombrado, por y con el consejo y consentimiento del Senado, y hasta que hubiera tomado posesión, y la única interrupción de este su derecho personal, posiblemente bajo esta ley era el procedimiento general de impeachment y sentencia por virtud del mismo, o los procedimientos especiales de suspensión, acusación y sentencia, prescritos en la propia ley y que claramente participan de la naturaleza del impeachment.

*　　*　　*　　*　　*　　*　　*

"He resuelto la cuestión que me ha sido sometida enteramente dentro de los límites de la legislación vigente que regula la materia y sin discutir para nada los más amplios particulares relativos a la conformidad o conflicto de esta legislación con la constitución, pues tal discusión no sería adecuada a las preguntas acerca de las cuales me ha llamado usted la atención."

En el tomo 13, pág. 419, el Attorney General Ackerman, al hablar de la duración del término de un Registrador de

Testamentos para el Distrito de Colombia, dijo lo siguiente (bastardilla nuestra):

"El Presidente tiene el poder, por y con el consejo y consentimiento del Senado, para nombrar todos los funcionarios de los Estados Unidos sobre cuyos nombramientos no se disponga otra cosa (Estatutos de los Estados Unidos, artículo 2, sección 2). No existiendo otras prescripciones en la ley para el nombramiento de Registradores de Testamentos, el nombramiento corresponde al Presidente con el consejo y consentimiento del Senado y la duración del cargo es a voluntad del Presidente, *bajo la modificación prescrita en las recientes leyes conocidas por leyes sobre duración del cargo.*"

En el mismo tomo, páginas 516 *et seq.*, el Sr. Ackerman, tratando de ciertas cuestiones "presentadas por la institución conocida por Comisión de Servicio Civil," resolvió como aparece reseñado en el sumario, lo que sigue:

"El poder de nombrar conferido por la constitución es una función sustancial y no meramente nominal y el criterio y voluntad del depositario constitucional de ese poder solo debe ser ejercitado o tener efecto legal al cubrir cargos creados por la ley.

"El derecho del Congreso a prescribir requisitos para un cargo está limitado por la necesidad de dejar margen al criterio y voluntad de la persona o institución en el cual la constitución inviste la facultad de nombrar.

"El Congreso puede a voluntad distribuir el nombramiento de funcionarios inferiores entre el Presidente, cortes de ley y jefes de departamentos o dejar los mismos exclusivamente a uno o más de estos depositarios, pero no puede constitucionalmente investir tal nombramiento en otra parte, directa o indirectamente.

"De conformidad con esto una ley que requiere del Presidente, las cortes y jefes de departamentos que nombren para cargos a las personas designadas por una junta examinadora como las más competentes, estaría en desavenencia con la Constitución toda vez que virtualmente dejaría el poder de nombrar a esa junta.

"Pero aunque el resultado de un examen ante tal junta no pueda hacerse que sea legalmente concluyente para el poder que nombra contra su propio criterio y voluntad, sin embargo puede recurrirse a él para que sirva de información a ese poder.

"Y a pesar de que el poder nominador solamente puede designar

a un individuo para un cargo, sin embargo, bien el Congreso por legislación directa o el Presidente por la autoridad que deriva del Congreso pueden prescribir condiciones y exigir que la designación sea de una clase de personas escogidas mediante las debidas pruebas y que reunan esas condiciones."

La opinión concluye de este modo:

"La otra cuestión propuesta por los comisionados es esta:

"¿Puede el Presidente, por la ley por la cual esta junta ha sido organizada, regular el ejercicio del poder nominador ahora investido en los jefes de departamentos o en las cortes de ley de tal modo que restrinja los nombramientos a una clase de personas cuyas condiciones o habilidad han de ser determinadas mediante un examen hecho independientemente del poder nominador?

"Mi opinión es que sí puede. Aunque el poder nominador sólo puede designar un individuo para un cargo, bien el Congreso, mediante legislación expresa, o el Presidente, por la autoridad que deriva del Congreso, pueden prescribir condiciones y exigir que la designación sea hecha de una clase de personas que ya se ha determinado mediante las debidas pruebas de reunir esas condiciones; y no es necesario que los jueces de las pruebas sean elegidos por el poder nominador. El Attorney General Legaré ha emitido una opinión sobre una cuestión parecida en principio. Al discutir la cuestión de nombramientos de inspectores de aduanas por el Secretario del Tesorero, considera que 'sería un ejercicio razonable del poder constitucional del Congreso exigir que el Secretario haga un nombramiento de un cierto número de candidatos propuestos por el Colector,' (4 Opiniones, 164). La ley bajo la cual la actual Comisión de Servicio Civil ha sido organizada confiere al Presidente autoridad 'para prescribir tales reglas y reglamentos relativos a la admisión de personas en el servicio civil de los Estados Unidos para mejor promover la eficiencia de dicho servicio,' y esta misma amplia autoridad comprenderá ciertamente el derecho a exigir que las personas admitidas en el servicio hayan sido encontradas competentes por los examinadores.

"Se ha arguido que un derecho en el Congreso a limitar en lo más mínimo el campo de selección implica un derecho a continuar el procedimiento que se contrae a la designación de un individuo en particular. Pero no creo que esta es una conclusión razonable. El Congreso podría exigir que los funcionarios sean ciudadanos ame-

ricanos, o de cierta edad, que los jueces sean de la profesión legal y de cierta reputación en su profesión y aún dejar margen al poder nominador para el ejercicio de su propio criterio y voluntad. Y no estoy preparado para afirmar que ir más lejos, y exigir que se haga la selección entre otras personas que se encuentran en buenas condiciones a juicio de una junta examinadora en tales particulares así como actividad, instrucción, integridad, buenas formas y adhesión al gobierno, impondría una limitación inconstitucional al poder nominador. Todavía tendría un límite razonable para su propio criterio y voluntad. ¿Pero puede preguntarse, en que punto deberá terminar el procedimiento restrictivo? Confieso mi incapacidad para contestar. Pero la dificultad para establecer una línea entre tales limitaciones como las que permite la Constitución y las que no permite, no es prueba de que ambas clases no existen. En investigaciones constitucionales y legales la razón o la sin razón a menudo es una cuestión de grado. Sin embargo, es imposible decir precisamente cuándo es que en la escala termina el derecho y empieza el mal. Las cuestiones sobre fianzas excesivas, castigos crueles, daños y perjuicios excesivos y dudas razonables son ejemplos familiares. En la cuestión que ahora se discute no es de suponerse que el Congreso o el Presidente exijan a los candidatos para cargos condiciones que no pueden obtenerse en número suficiente para facilitar amplia oportunidad para hacer una selección.''

El tomo 14 de las Opiniones del Attorney General en la página 164 contiene una opinión instructiva en cuanto a nombramientos y ascensos en el ejército, emitida por el Attorney General Williams, de la cual, prescindiendo de media docena de datos históricos, hacemos la siguiente cita:

''Con respecto a ascensos en el ejército no he podido después de un examen cuidadoso encontrar un solo caso en el que el poder del Congreso para prescribir la regla referente a los mismos haya sido siquiera puesto en duda. Pero, al cubrir vacantes o cargos en el ejército nuevamente creados, el Presidente Monroe anticipó su opinión en un mensaje al Senado fechado abril 12 de 1822 de que 'el Congreso no tenía derecho bajo la Constitución a imponer ninguna restricción por ley al poder conferido al Presidente a fin de impedir el poder hacer éste una selección a su gusto de las debidas personas para estos cargos de entre todos sus conciudadanos.' El Senado, sin embargo, no estuvo conforme con esa opinión, sosteniendo que,

como la Constitución confirió al Congreso el poder de 'hacer reglas para el gobierno y la reglamentación de' el ejército, ese cuerpo tenía derecho a hacer cualquiera que creyera que beneficiaría al servicio público y a fijar la regla tanto en cuanto a promociones como a nombramientos en el ejército. Véase el tomo 22, Niles' Reg., págs. 411 a 418; también Story sobre la Constitución, tomo 2, página 339, nota 3.)''

La opinión del Attorney General Devens de fecha enero 8 de 1878 (tomo 15, Opiniones del Attorney General, página 421) simplemente resolvió, como se expresa en el sumario:

''El Presidente tenía en 1861 el poder de separar del servicio a un oficial del cuerpo de marina.

''Parece que la sección 17, ley de julio 17 de 1862, capítulo 200, en tanto autorizaba la separación por el Presidente del servicio militar sólo declaraba la ley por mucho tiempo establecida y que la fuerza del precepto se funda en la palabra 'exigido' (*requested*), por la cual se pretendía dar más fuerza a este poder en manos del Presidente en una gran crisis.''

''No creo que las leyes subsiguientes,'' dice el autor en la parte principal de la opinión, ''por las cuales el poder del Presidente para destituir ha sido limitado, tienen ninguna tendencia a probar que él no poseía el poder en el año 1861 de separar a un oficial bajo su propia responsabilidad.''

En el tomo 18, página 25, el Attorney General Brewster, en 1884, al considerar el proyecto para la ayuda de Fitz John Porter, dijo lo siguiente:

''Uno de mis antecesores en una opinión de fecha enero 9, 1873, (14 Opiniones 164) en la cual la misma materia se considera, después de examinar la actuación tanto de la rama ejecutiva como de la legislativa del gobierno en cuanto al ascenso y nombramiento de oficiales en el ejército, concluye de este modo: 'Puede, por tanto, considerarse como enteramente establecido por la práctica del gobierno que la reglamentación y gobierno del ejército incluye, por estar debidamente dentro de su alcance la reglamentación del nombramiento y ascenso de oficiales del mismo. Y como la Constitución

expresamente confiere al Congreso autoridad para establecer reglas para el gobierno y reglamentación del ejército, se infiere que este cuerpo puede, por virtud de esta autoridad, imponer aquellas restricciones y limitaciones al poder nominador que estime convenientes en relación con los ascensos o nombramientos para cubrir todas las vacantes de cualquier clase que surjan en el ejército, disponiéndose, sin embargo, que las restricciones y limitaciones no sean incompatibles o inconsistentes con el ejercicio del poder nominador por el departamento del gobierno al cual pertenece constitucionalmente ese poder.

"Concediendo, sin embargo, todo lo que aquí se alega en cuanto al Congreso bajo el precepto de la Constitución a que se ha hecho referencia no se infiere que el derecho a regular los nombramientos para cargos en el ejército puede ser aplicado a la designación de individuos particulares para cubrir tales cargos sin imponer una restricción anticonstitucional al poder nominador. El derecho del Congreso a regular está en sí limitado por la necesidad de dejar el debido alcance al poder nominador para el ejercicio de su criterio y voluntad en cumplir sus funciones, que es el objeto de la Constitución."

En el caso de *McAllister* v. *United States,* 1890, 141 U. S. 174, el Hon. William Howard Taft, entonces Procurador General y luego Presidente de los Estados Unidos y ahora Juez Presidente de la Corte Suprema, representaba al gobierno. En tanto aparece de la decisión publicada, solamente una cuestión fué promovida por él o resuelta por la corte. En la página 177 encontramos lo siguiente:

"El gobierno disputa el derecho del apelante a recibir ninguna parte de la suma por la cual él demanda. Su defensa descansa en el párrafo 1768 de los Estatutos Revisados. Esa sección y la precedente son como sigue:

" 'Sec. 1767.—Toda persona que desempeñe cualquier cargo civil para el cual ha sido o pueda ser luego nombrado por y con el consejo y consentimiento del Senado y que haya reunido todas las condiciones para actuar en dicho cargo, tendrá derecho para desempeñar el referido cargo durante el término por el cual fué nombrado, a menos que antes sea separado por y con el consejo y consentimiento del Senado o por el nombramiento con el mismo con-

sejo y consentimiento de un sucesor en su lugar, con excepción de lo que aquí de otro modo se prescribe.'

" 'Sec. 1768.—Durante cualquier receso del Senado el Presidente está autorizado, a su discreción, para suspender cualquier funcionario civil nombrado por y con el consejo y consentimiento del Senado, excepto los jueces de las cortes de los Estados Unidos, hasta el final de la próxima sesión del Senado, y para designar alguna persona conveniente, sujeta a ser separada, a su discreción, por la designación de otra persona, para desempeñar los deberes de dicho funcionario suspendido en el ínterin, y la persona así designada prestará juramento y dará la fianza exigida por la ley que ha de tomar y dar los funcionarios suspendidos, y durante el tiempo que desempeñe los deberes de tal funcionario tendrá derecho al sueldo y emolumentos del cargo y ninguna parte del mismo pertenecerá al funcionario suspendido. El Presidente, dentro de treinta días después de comenzar cada sesión del Senado, excepto para cualquier cargo que según su opinión no debe ser cubierto, nominará personas que cubran todas las vacantes en los cargos que existían al reunirse el Senado, ya estén temporalmente cubiertas o no, y también en el lugar de todos los funcionarios suspendidos; y si el Senado, durante tal sesión, se negara aconsejar y consentir un nombramiento en lugar de cualquier funcionario suspendido, entonces y no de otro modo el Presidente presentará el nombre de otra persona tan pronto como sea posible en la misma sesión del Senado.'

"Estas secciones se sacaron de la ley de marzo 2 de 1867 regulando la duración del cargo de ciertos funcionarios civiles y la ley de abril 5, 1869, enmendatoria de la misma, 14 Estatutos 430, c. 154, 16 Stat. 6, c. 10. Por una ley del Congreso aprobada en marzo 3 de 1887 esas secciones así como las secciones 1769, 1770, 1771 y 1772, relativas a la misma materia, quedaron derogadas, sujetas a la condición de que la derogación no afectaría ningún funcionario hasta entonces suspendido, o cualquier designación, nominación o nombramiento hecho anteriormente bajo y por virtud de las secciones derogadas. 24 Estatuto 500, c. 353. Como el nombramiento y suspensión del Juez McAllister tuvo lugar antes de la aprobación de la ley de 1887, el presente caso no está regulado por sus disposiciones sino que depende del efecto que ha de darse a las secciones de los Estatutos Revisados arriba citadas, interpretadas a la luz de la ley que establece la corte de la cual el apelante era juez en el año 1884. Cuáles han de ser los poderes del Presidente sobre los jueces terri-

toriales, ahora que esa sección 1768 ha sido derogada, es un cuestión que no necesitamos discutir.

"Por una ley aprobada en mayo 17, 1884, 23 Stat. 24, c. 53, el territorio cedido a los Estados Unidos por Rusia y conocido por Alaska quedó constituído en un distrito civil y judicial con un gobernador, fiscal general, juez, márshal, secretario y comisionados que habían de ser nombrados por el Presidente por y con el consejo y consentimiento del Senado, quienes desempeñarán sus respectivos cargos por el término de cuatro años y hasta que sus sucesores sean nombrados y tomen posesión."

Al interpretar varias disposiciones de la ley últimamente citada en relación con las secciones 1767 y 1768, la corte resolvió como se expresa en el sumario, lo que sigue:

"Una persona nombrada por el Presidente por y con el consejo y consentimiento del Senado bajo las disposiciones de la ley de mayo 17, 1884, 23 Estatutos 24, c. 53, párrafo 3, para desempeñar el cargo de juez de la corte de distrito del distrito de Alaska, no es un juez de una corte de los Estados Unidos dentro del significado de la excepción contenida en la sección 1768 de los Estatutos Revisados relativa a la duración del cargo de los funcionarios civiles y estaba antes de su derogación sujeto a separación con anterioridad al vencimiento del término del cargo por el Presidente en la forma y condiciones enumeradas en esa sección."

La opinión disidente emitida por el juez, señor Field, con quien estuvo conforme el Juez Señor Gray y el Juez Señor Brown, como fué resumida en conclusión, se basaba en el fundamento: "Primero, de que el cargo judicial en cuestión había de ser desempeñado por el interesado durante buena conducta por el término prescrito y, segundo, que la sección 1768, en la cual se fundaba la suspensión, exceptúa expresamente a los jueces de las cortes de los Estados Unidos de suspensiones por el Presidente, y que esa sección comprende todos los jueces de todas las cortes establecidas por las leyes de los Estados Unidos ya que dichas cortes cumplan con sus deberes judiciales dentro de los Estados o dentro de los Territorios."

La segunda de estas dos proposiciones, en tanto incluye a los jueces territoriales dentro de la excepción referida, es incompatible con la opinión de la mayoría, pero la primera es incompatible con el criterio de la mayoría solamente en tanto trata de aplicar los principios generales invocados "al cargo particular en cuestión," que la mayoría ha resuelto que no está comprendido dentro de tal excepción.

Podemos pasar por alto todo lo dicho en la opinión disidente con respecto a las diferencias que pueden o no determinarse entre las cortes territoriales y constitucionales de los Estados Unidos, y todo lo que se ha dicho acerca de la interpretación estatutoria de la intención del Congreso y de la aplicabilidad de la sección 1768, en otras palabras, todo lo que está en conflicto con la opinión de la mayoría. Podemos, además, eliminar la reseña histórica del cargo judicial. Entonces hemos dejado un principio fundamental cuya corrección no se refuta pero que sujeto únicamente a cierta restricción, modificación o infracción por el Congreso en el ejercicio de su poder legislativo soberano, ha sido implícita si no expresamente reconocido por la mayoría.

Esta proposición esencial y que no ha sido refutada está contenida en el siguiente extracto:

"Mi objeción al poder ejercitado por el Presidente en este caso surge de la naturaleza del cargo judicial, *cuando se desempeña por un juez de una corte de record* * * *. La idea que esencialmente pertenece y que está envuelta en el cargo judicial es que su ejercicio debe estar libre de restricción sin temor a ser separado o suspendido u otro castigo por desempeñar honradamente y sin temor sus funciones dentro de la esfera de la jurisdicción que se le asigna. Nadie, a mi juicio, bajo nuestro sistema de leyes puede ser nombrado juez de una corte de récord con jurisdicción sobre casos civiles y criminales, para desempeñar el cargo a gusto y a voluntad de otra persona. Semejante doctrina no ha sido sostenida en Inglaterra desde el estatuto de 13 William, III, c. 2 'para la ulterior limitación de la corona y mejor manera de garantizar los derechos y libertades del súbdito,' aprobado en 1700, una de las grandes leyes posteriores a la revolución de 1688 * * *.

"Los importantes estatutos a que se ha hecho referencia fueron aprobados mucho antes de nuestra revolución y limitaba la ley existente del Reino Inglés y sus dependencias sobre las condiciones bajo las cuales el cargo judicial en las cortes de récord podía desempeñarse. La ley así modificada constituyó entonces una parte del derecho público o ley común de este país. Quienquiera que aquí esté revestido de las funciones de un cargo judicial, que lo faculta para juzgar en cualquier caso que afecte a la vida, la libertad o la propiedad del ciudadano, no puede quedar restringido de cumplir sin temor con sus deberes, por cualquier sospecha de separación o suspensión en caso de que estuviera en contra la voluntad o gusto del poder nominador. No puedo creer que bajo nuestra Constitución y sistema de gobierno ningún funcionario judicial investido de estas grandes responsabilidades pueda desempeñar su cargo sujeto a tales condiciones arbitrarias. A mi juicio la buena conducta durante el período de su nombramiento es la única condición legal y constitucional para la retención de su cargo * * *.

"Siempre que este principio ha sido desatendido ha levantado profunda y general indignación. Entre los repetidos daños y usurpaciones del Rey de la Gran Bretaña que sirvieron a nuestros antepasados para declarar como justa causa de separación de la madre patria era que él había 'hecho depender a los jueces sólo de su voluntad en el desempeño de sus cargos y cuantía y pago de sus salarios.' Este fué uno de los males que nuestros antepasados sometieron a 'un mundo libre de prejuicios' para justificar al pueblo de los Estados Unidos en separarse de la nación inglesa y establecer por sí mismos una nueva forma de gobierno."

Que no existe verdadero conflicto entre estos pareceres y aquéllos de la mayoría lo demuestra concluyentemente el siguiente extracto de la opinión de la corte que trata de este aspecto del caso, a saber:

"Un razonamiento bien acabado y que muestra un profundo estudio e investigación por parte del abogado se presenta en apoyo de la proposición de que de acuerdo con principios generales que tienen su origen en la base de nuestras instituciones, el poder judicial en los territorios, ejercitado como debe ser para la protección de la vida, la libertad y la propiedad, debe tener las garantías que se prescriben en otras partes dentro de la jurisdicción política de la nación para la independencia y seguridad de los tribunales judiciales crea-

dos por el Congreso por virtud del artículo tercero de la Constitu-
ción.  No tenemos oportunidad para refutar la corrección de este
parecer en tanto descansa en bases de política pública.  Pero no po-
demos pasar por alto el hecho de que mientras la Constitución con
respecto a los jueces de cortes en las cuales el poder judicial de
los Estados Unidos puede estar investido, ha garantizado su inde-
pendencia por una disposición expresa de que dichos jueces pueden
desempeñar sus cargos durante buena conducta y recibir en deter-
minadas fechas una compensación por sus servicios que no podrá
ser rebajada mientras continúen en dichos cargos, tales garantías
no se prescriben en ese documento con respecto a los jueces de cortes
creadas por o bajo la autoridad del Congreso para un territorio de
los Estados Unidos.  La falta· en la Constitución de tales garantías
para los jueces territoriales sin duda se debió al hecho de que la
organización de los gobiernos para los territorios no fué sino tem-
poral y había de ser cambiada cuando los territorios quedaban con-
vertidos en Estados de la Unión.  Toda la materia de la organiza-
ción de las cortes territoriales, la duración por la cual los jueces
de tales cortes habrán de desempeñar sus cargos, el sueldo que reci-
birán y la forma en que habrán de ser separados o suspendidos de
sus cargos, quedó por la Constitución en el Congreso bajo su pleno
poder sobre los territorios de los Estados Unidos.  Hasta qué punto
está restringido el ejercicio de ese poder por los principios esenciales
en que descansa nuestro sistema de gobierno y que están contenidos
en la Constitución, no tenemos necesidad de investigarlo, aunque
debemos repetir lo que se dijo en el caso Mormon Church v. United
States, 136 U. S. 144, a saber: 'Sin duda el Congreso al legislar
para los territorios quedaría sujeto a aquellas limitaciones funda-
mentales en favor de los derechos personales formulados en la Cons-
titución y sus enmiendas; pero estas limitaciones existirían más
bien por inferencia, y el espíritu general de la Constitución del cual
el Congreso deriva todos sus poderes, que de ninguna aplicación
expresa y directa de sus disposiciones.'  Sólo es necesario en este
caso decir que aquellos principios y limitaciones no se infringen por
un estatuto que dispone para el cargo de un juez de una corte terri-
torial una duración por un período determinado de años, o que
autoriza su suspensión en la forma indicada en la sección 1768, y
su separación final del cargo después de la suspensión por el nom-
bramiento de alguna persona en su lugar por y con el consejo y
consentimiento del Senado.

"Se ha sugerido que la conclusión a que se llega en este caso
no está en armonía con algunas observaciones del Juez Presidente,
Sr. Marshal, en el caso de Marbury v. Madison, 1 Cranch 137, 162.
En dicho caso se dijo lo siguiente: 'Cuando un funcionario puede
ser separado a voluntad del Ejecutivo la circunstancia que completa
su nombramiento nada tiene que ver, porque el acto es en cualquier
momento revocable, y la comisión puede ser suspendida si está aún
en el cargo. Pero cuando el funcionario no puede ser separado a
voluntad del Ejecutivo el nombramiento no es revocable y no puede
ser anulado. Ha conferido derechos legales que no pueden ser qui-
tados.' Además, 'El Sr. Marbury entonces, desde la fecha de su
comisión (como juez de juzgado de paz en el distrito de Colombia)
quedó nombrado y como la ley que crea el cargo confería al fun-
cionario el derecho de desempeñarlo por cinco años independiente
del Ejécutivo, el nombramiento no era revocable sino que investía
en el funcionario derechos legales que están protegidos por las leyes
de su país.' Además, el cargo de juez de paz del distrito de Co-
lombia ha sido creado por ley especial del Congreso y ha garanti-
zado, en tanto pueden garantizar las leyes a la persona nombrada,
para desempeñarlo por cinco años. 2 Estatutos, 107, c. 15, párrafo
11. Nada en esas observaciones milita en manera alguna contra
el criterio que hemos expresado. Por el contrario, el Juez Presi-
dente afirmó la autoridad del Congreso para fijar el término de
un juez de paz en el distrito de Colombia fuera del poder del Pre-
sidente para acortarlo por su separación o reteniendo su comisión
después de haber hecho el nombramiento de acuerdo con una ley del
Congreso por y con el consejo y consentimiento del Senado y des-
pués de firmada la comisión por el Presidente y sellada por el Se-
cretario de Estado. Así, pues, en el presente caso, mientras el Con-
greso fijó el término del cargo del juez de distrito de Alaska en
cuatro años y hasta que su sucesor tomara posesión lo hizo así sin
modificación y, por tanto, en vista del estatuto entonces en vigor
que confería al Presidente el poder para *suspender* a su discreción
a cualquier funcionario civil (excepción de los jueces de la Corte
de los Estados Unidos) nombrado por él con el consejo y consenti-
miento del Senado, hasta el final de la próxima sesión de ese cuerpo.
La decisión en el presente caso es un reconocimiento de la completa
autoridad del Congreso sobre los cargos territoriales en virtud de
'aquellos poderes generales que ese cuerpo posee sobre los territo-
rios de los Estados Unidos,' lo mismo que en el caso de Marbury

v. Madison era un reconocimiento del poder del Congreso sobre la
duración del cargo de un Juez de Paz para el Distrito de Columbia.

"Se insistió en la vista que un juez territorial nombrado y de-
signado por un número de años tenía derecho por ley a desempeñar
su cargo durante ese término con sujeción solamente a la condición
de buena conducta.  Este criterio no se basaba en ninguna cláusula
específica de la Constitución sino que suponía que estaba justificado
por el genio y el espíritu de nuestras libres instituciones y los prin-
cipios de la ley común.  Este razonamiento no da la debida con-
sideración al hecho de que al legislar para los Territorios el Con-
greso ejercita 'los poderes combinados del gobierno general y el es-
tado.'  ¿Podrá alegarse que un Estado de la Unión no podría pres-
cribir por su ley fundamental o por decreto legislativo no estando
prohibido por esa ley, respecto a la suspensión de uno de sus jueces
por su gobernador hasta el final de la próxima sesión de su legis-
latura?  ¿Tiene el Congreso bajo el derecho general de soberanía
existente en el gobierno de los Estados Unidos respecto a todas las
materias que han sido delegadas a su exclusivo dominio, incluyendo
el hacer reglas y disposiciones que son necesarias acerca de los Te-
rritorios de los Estados Unidos, algún poder inferior sobre los jue-
ces de los Territorios que un Estado, si no está restringido por su
propia ley orgánica, podría ejercer sobre los jueces cuyos cargos
él mismo ha creado?  Si el Congreso puede, y se admite que así
es, prescribir un determinado número de años como término de du-
ración del cargo de un juez territorial, no vemos por qué no puede
prescribir que su nombramiento habrá de quedar sujeto a la con-
dición de que puede ser suspendido por el Presidente hasta el final
de la próxima sesión del Senado, y separado enteramente debido al
nombramiento de alguna persona en su lugar por y con el consejo
y consentimiento de ese cuerpo."

La contestación a otra proposición presentada en el caso
de McAllister se encuentra en la página 185 donde, después
de resolverse que "las palabras 'jueces de las cortes de los
Estados Unidos' en la sección 1768 fueron empleadas con
referencia a la reconocida distinción entre cortes de los Es-
tados Unidos y cortes meramente territoriales o legislati-
vas," la opinión continúa diciendo:

"Se alega que este parecer no está sostenido por la historia de

la legislación congresional relativa a la organización de las cortes en los Territorios. No estamos conformes con esta proposición. Las leyes que prescriben sobre cortes en los Territorios de Orleans, Iowa, Minnesota, New Mexico, Utah, Colorado, Nevada, Dakota y Arizona fijaban la duración del término de los jueces en esos Territorios, respectivamente, en cuatro años. Aquéllas que prescribían para las cortes en los Territorios de Missouri, Arkansas, Florida, Oregon, Washington, Nebraska, Kansas, Idaho, Montana, Wyoming y Oklahoma fijaban la duración del cargo de los jueces en cuatro años, con la adición, en algunos casos, de las palabras 'a menos que antes sean separados;' en otras, de las palabras 'a menos que antes sean separados por el Presidente,' o, 'y no por más tiempo,' o 'y hasta que sus sucesores hayan sido nombrados y tomen posesión' o 'a menos que antes sean separados por el Presidente con el consentimiento del Senado.' Desde luego que el Congreso no hubiera pretendido en las leyes que prescribían sobre las cortes en los Territorios nombrados, el limitar los términos de duración de los jueces en las formas indicadas, si hubiera supuesto que tales cortes eran de los Estados Unidos de la clase definida en la primera sección del artículo tercero de la Constitución, cuyos jueces desempeñan sus cargos fuera del poder del Congreso para prescribir otra cosa, durante buena conducta. Ni es tal el criterio de que las cortes en los Territorios son cortes legislativas a diferencia de cortes de los Estados Unidos, debilitado por las circunstancias de que el Congreso en algunas de las leyes relativas a las cortes territoriales fijó términos de duración para los jueces de aquéllas durante 'buena conducta.' Como las cortes de los Territorios no eran cortes cuyos jueces tenían derecho por virtud de la Constitución a desempeñar sus cargos durante buena conducta, correspondía al Congreso prescribir la duración por buena conducta, como en las leyes últimamente citadas, o prescribir, como en las otras leyes arriba relacionadas, la duración de cuatro años y no más, o cuatro años a menos que antes fueran separados, o cuatro años a menos que antes fueran separados por el Presidente con el consejo del Senado, o cuatro años y hasta que su sucesor fuera nombrado y tomara posesión. La importancia de estas disposiciones legales, así como de las leyes de 1867 y 1869, y la sección 1768 de los Estatutos Revisados, se ve en el hecho de que el Congreso ha procedido uniformemente por virtud de la teoría de que los jueces de cortes territoriales eran meramente cortes legislativas y no tenían derecho, por virtud de su nombramiento y la Constitución de los Estados Unidos, a desempeñar sus cargos durante

buena conducta, a menos que así fuese declarado en las respectivas leyes que prescribían la organización de tales cortes. Que el Congreso al prescribir un gobierno para Alaska así los consideró, resulta evidente del hecho de que la ley de mayo 17 de 1884 fijaba la duración del cargo del juez de la Corte de Distrito de Alaska en cuatro años, y hasta que su sucesor fuera nombrado y tomara posesión. Esta prescripción no derogó el artículo 1768 de los Estatutos Revisados; pues no era incompatible con ese artículo. De modo que la ley de Alaska debe considerarse como limitada por ese artículo que confiere al Presidente el poder de suspensión."

En el año 1897, cuando el caso de Parsons fué resuelto, los jueces Bradley, Blatchford y Lamar habían sido sustituídos por los jueces Schiras, White y Peckham. De la mayoría en el caso McAllister sólo el Juez Presidente Sr. Fuller, el Juez Sr. Harlan, que emitió la opinión y el Juez Sr. Brewer, quedaban allí. Los jueces Field, Gray y Brown, quienes disintieron en el caso de McAllister, tomaron parte en el de Parsons y al parecer no encontraron incompatibilidad de importancia entre la decisión más reciente y el criterio sustentado por ellos en la opinión disidente anterior. Lo resuelto en el caso de Parsons, 167 U. S. 324, ha sido abreviado en el sumario en la siguiente forma:

"El Presidente tiene poder para separar a un fiscal de los Estados Unidos cuando tal separación tiene lugar dentro del término de cuatro años a partir de la fecha del nombramiento del fiscal, y con el consejo y consentimiento del Senado, para nombrarle un sucesor.

"La sección 769 de los Estatutos Revisados que prescribe que 'los fiscales serán nombrados por un término de cuatro años y sus nombramientos terminarán al vencer el período de cuatro años desde sus respectivas fechas,' dispone que el término no durará más de cuatro años, con sujeción al derecho que tiene el Presidente para antes separarlos.

"Fué la intención del Congreso al derogar las secciones de los Estatutos Revisados relativas a la duración del cargo, volver a conceder al Presidente el poder de separación, si le había sido quitado por la ley primitiva sobre duración de cargo, y por virtud de la

derogación, autorizarle de tal modo para separar a un funcionario cuando a su juicio lo considere conveniente para el bien público, aunque el término de duración haya sido limitado por las palabras del estatuto que crea el cargo.''

Si el Congreso, en vez de prescribir que ''los fiscales serán nombrados por un término de cuatro años y sus nombramientos terminarán al vencer los cuatro años desde sus respectivas fechas,'' hubiera simplemente dicho que los fiscales serán nombrados por un término de cuatro años, o por un término de cuatro años a menos que antes sean separados por causa justificada, o hubiese especificado un término de duración de cuatro años y luego hasta que su sucesor en el cargo sea nombrado y tome posesión, hubiera manifestado la intención clara e inequívoca de fijar un término a diferencia de una mera limitación de lo que de otro modo podría llegar a ser un término por vida, entonces claramente una cuestión muy diferente se hubiera presentado y resuelto.

Después de un análisis de los debates congresionales, adicionados por citas del caso de Hennen y de las opiniones de los Procuradores Generales Clifford (1847), Crittenden (1851), Evarts (12 Opiniones Attorney General 439, 446), Cushing (6 Opiniones Attorney General 4) y cita del caso de Belger (12 Opiniones Attorney General 421, 425) y la opinión del Attorney General Devens (12 Opiniones Attorney General 421), la corte se expresa en los siguientes términos:

''Las anteriores referencias a los debates y opiniones no se han hecho con el fin de que nos ayuden a llegar a una decisión sobre la cuestión del poder constitucional del Presidente para, dentro de su discreción, separar a funcionarios durante el período por el cual fueron nombrados y no obstante existir un estatuto que prohibe tal separación, sino simplemente con el fin de ver cuál ha sido el criterio de los varios departamentos del gobierno sobre la materia relativa al poder del Presidente para separar y qué alegaciones se han hecho y hasta qué punto se ha aprobado la proposición de que al Presidente pertenecía el poder exclusivo de separar en todos los casos excepto por medio de procesamiento (*impeachment*). No ne-

cesitamos en este caso determinar la importante cuestión del poder
constitucional a que nos hemos referido.

"El breve examen que hemos hecho suministra luz sobre la cues-
tión de la verdadera interpretación del lenguaje usado por el Con-
greso en la sección de los Estatutos Revisados que examinamos.  Con-
sideraremos otra legislación."

Respecto al caso de *McAllister* v. *United States*, se ha
dicho:

"No hay nada en ese caso que sirva de apoyo a la doctrina sus-
tentada por el apelante.

"El caso nada contiene en oposición a la alegación referente a
la interpretación práctica que había sido dada a la Constitución por
el Congreso en el año 1789 y por el gobierno generalmente desde esa
fecha y hasta la ley de 1867."

La opinión pasa entonces a indicar que el estatuto de
1789 disponía simplemente lo relativo al nombramiento de
fiscales sin disponer ya en cuanto al término o a la separa-
ción, y que en 1820 se aprobó una ley titulada "Ley para
limitar el término de duración del cargo de ciertos funcio-
narios en ella especificados y para otros fines," disponién-
dose en su primera sección que "todos los fiscales   *   *   *
serán nombrados por el término de cuatro años pero po-
drán ser separados del cargo a voluntad."  Surge entonces
la conclusión lógica en cuanto a la intención del Congreso
en esa fecha, a saber:

"La disposición de la segunda sección, que los nombramientos
deberán cesar y expirar al final del término de cuatro años, demues-
tra claramente que la intención del Congreso fué restringir lo que
posiblemente hubiera sido un término de duración en el cargo du-
rante la vida, a un período de no más de cuatro años, al hacerse
cualquier nombramiento. La disposición relativa a la separación
del cargo a voluntad no era necesaria para el ejercicio de esa facul-
tad por el Presidente, debido al hecho de que entonces se conside-
raba como revestido de tal poder en cualquier caso.  Considerando
la interpretación de la Constitución en este sentido que le dió el
Congreso en 1789, y teniendo presente la práctica constante y uni-

forme del gobierno en armonía con la misma, debemos interpretar
esta ley como que prescribe absolutamente que el término de dura-
ción del cargo vence al finalizar el período de cuatro años, y no en
el sentido de que dispone sobre un término de duración que habrá
de durar, de todos modos, por ese tiempo, y creemos que la dispo-
sición de que los funcionarios podían ser separados del cargo a vo-
luntad no era sino un reconocimiento de la interpretación casi uni-
versalmente seguida y aceptada en cuanto al poder del Presidente
para destituir.''

No hubo cambio alguno después hasta que fué aprobada
la primera Ley sobre duración del cargo en marzo 2, 1867.

De la reseña histórica y comentario de la legislación ini-
ciado entonces colegimos que la corte no aprobó enteramente
la actuación del Congreso en este sentido y hasta casi tuvo
cierta duda referente a la constitucionalidad de las leyes en
cuestión, pero no se ha declarado que sean anticonstitucio-
nales.

La clave de toda la opinión así como toda su parte sus-
tancial está contenida en los tres o cuatro últimos párrafos
los cuales no es necesario que citemos aquí enteramente.
Será bastante con decir que en la página 343 encontramos
todos los datos históricos acumulados en las páginas ante-
riores reunidos todos en el artículo 769 de los Estatutos Re-
visados, *supra,* en apoyo de la conclusión de que ''la misma
interpretación del texto de esa sección debe ser adoptada la
que aplicaríamos a la Ley de 1820, y que aplicó el Attorney
General Crittenden y por virtud de la cual actuó el Presi-
dente, en el caso relativo al cargo del Juez Presidente del
Territorio de Minnesota, 5 Opiniones del Attorney General,
288, que es una interpretación de la limitación y no de una
concesión, una interpretación por la cual no se permite más
de un período de cinco años, sujeto en el ínterin al poder
del Presidente para destituir.''

La corte no dice que la interpretación ''aplicada por el
Attorney General Crittenden y puesta en práctica por el Pre-
sidente en el asunto del cargo de Juez Presidente del Terri-

torio de Minnesota'' éra la debida interpretación en ese caso
o que hubiera·llegado a la misma conclusión en las circuns-
tancias allí envueltas.   Ni, *a fortiori,* en ella se sugiere que
si el Congreso hubiera prescrito en cuanto a un término de
cuatro años a menos que antes fuera separado por el Pre-
sidente por causa, o después de notificarse los cargos pre-
sentados y de una vista, sea *haec verba* o por necesaria de-
ducción de fijar un término preciso en lenguaje claro e ine-
quívoco, entonces tal ley sería anticonstitucional.   Es bas-
tante con decir, además, que ''al interpretar de tal modo la
sección 769 creemos que se da cumplido efecto a su texto y
se observa la interpretación práctica de los períodos ante-
riores, mientras que al propio tiempo también se da cumplido
efecto al propósito del Congreso de conservar los funciona-
rios en sus cargos en las disposiciones que siguen sobre la
materia relativa a la duración del cargo.   El derecho a per-
manecer en el cargo se hace depender de aquellas subsi-
guientes secciones, y cuando en el año 1887 fueron deroga-
das por el Congreso, 24 Estatutos 500, se permitió que vi-
niera a desempeñar su cometido toda la fuerza legal y el
efecto del lenguaje usado en la sección 769, libre de las res-
tricciones de las secciones así derogadas.   En estas condi-
ciones, las personas nombradas por virtud de la sección 769
no tienen derecho a continuar en sus cargos por cuatro años
en contraposición a cualquier poder que pueda tener el Pre-
sidente para separarlas, y en ningún caso pueden ellas per-
manecer en el cargo por más tiempo de ese período sin ser
vueltas a nombrar.   Esta interpretación de la ley como una
de limitación, creemos, a la luz de la historia sobre la mate-
ria, es la más natural y adecuada.''

Además, los párrafos siguientes indican claramente que
se llega hasta la conclusión a que acabamos de referirnos y
que se cita *argüendo* más bien que como verdadera base de
la decisión, cuya parte substancial está contenida en el pá-
rrafo tercero del sumario, *supra,* y la proposición allí enun-

ciada parece fundarse principalmente en el "resultado extraordinario" que sobrevendría de la adopción de la teoría del apelante y el absurdo de imputar al Congreso cualquier intención de llegar a ese resultado.

"Esta intención nunca hubiera sido la del Congreso. Por el contrario, estamos satisfechos de que su intención al derogar la sección relativa a la duración del cargo de los Estatutos Revisados fué volver a conferir al Presidente el poder de separar si le había sido quitado en la primitiva ley de duración del cargo, y por virtud de la derogación autorizarle para separar a un funcionario cuando a su juicio lo estime conveniente para el bien público, aunque el término de duración haya sido limitado por el lenguaje del estatuto que establece el cargo. A este fin se llega por la interpretación que damos a a sección 769, mientras que la otra interpretación convierte un estatuto cuyo objeto fué ampliar el poder del Presidente, en uno que lo circunscribe y limita más de lo que estaba en la ley que fué derogada precisamente con el fin de ampliarla." *Idem*, pág. 343.

En el caso de *Keim* v. *United States*, 177 U. S. 292, la corte cita los casos de Hennen y Parsons sin agregar nada a la doctrina de ninguno de ellos después de hacer la siguiente cita:

" 'No puede admitirse por un momento que fué la intención de la Constitución que aquellos cargos que se denominan inferiores deban ser desempeñados durante la vida. Y si los que los desempeñan pueden ser separados a voluntad, ¿por quién ha de hacerse tal separación? En ausencia de todo precepto constitucional o reglamentación estatutoria parece ser una regla saludable y necesaria considerar el poder de separar como incidental al de nombrar."

En el año 1901 el Juez Presidente Fuller emitió la opinión del tribunal en el caso de *Reagan* v. *United States*, 182 U. S. 419. En esa fecha el Juez Asociado Sr. Field había sido substituído por el Juez Asociado Sr. McKenna. Con esta excepción el personal de la corte era el mismo que en el caso de Parsons.

Una ley del Congreso había prescrito "que la corte de los Estados Unidos en el Territorio Indio tendrá todos los

poderes de las cortes de circuito de los Estados Unidos, o de los jueces de cortes de circuito para nombrar comisionados dentro de dicho Territorio Indio  *  *  *  y tales comisionados, al ser nombrados, tendrán dentro del distrito para el cual haya de designárseles, en el orden en que se nombran, todos los poderes de los comisionados de las cortes de circuito de los Estados Unidos  *  *  *  y dichos comisionados ejercitarán todos los poderes conferidos por las leyes de Arkansas a los jueces de paz dentro de sus distritos, pero no tendrán jurisdicción para juzgar ningún caso en el cual el valor de la cosa o cuantía en controversia exceda de $100.''

Una ley posterior prescribía sobre jueces adicionales con facultades para nombrar comisionados dentro de ciertas restricciones que se prescribían y: *"Disponiéndose,* que los presentes comisionados quedarán incluídos en ese número y desempeñarán sus cargos de acuerdo con sus nombramientos existentes, sujetos a ser separados por el juez del distrito donde dichos comisionados residan, por las causas prescritas en la ley.''

Hacemos la siguiente cita de la opinión (bastardilla nuestra):

''El apelante fué nombrado comisionado en abril 25, 1893, y era tal comisionado en marzo primero, 1895. En vista del precepto legal siguió en el cargo hasta enero 31, 1896, cuando fué separado por el juez del distrito donde residía, y en su lugar nombrada otra persona.

''Alega ahora que la separación fué nula porque el motivo alegado para la actuación del juez no era una de las 'causas prescritas en la ley,' y porque no se le hizo notificación alguna de ningún cargo contra él, ni se le oyó en su defensa, todo en contra del estatuto.

''Los comisionados nombrados por los jueces de la corte de los Estados Unidos en el Territorio Indio son funcionarios inferiores, que no desempeñan sus cargos por vida, *o por un término fijo de duración, y están comprendidos dentro del principio establecido* de que el poder de destituir es incidental al de nombrar. *Ex parte Hennen,* 13 Pet. 230, 258; *Parsons* v. *United States,* 167 U. S. 324.

Pero se supone que por razón del texto del precepto legal, los comisionados nombrados por la corte con anterioridad a marzo 1°., 1895, constituían una clase excepcional de comisionados nombrados por los jueces de esa corte después de dicha fecha, y que desempeñan sus cargos hasta que sean separados por las causas prescritas en la vigente ley, o hasta que el Congreso apruebe una ley definiendo tales causas. El último parecer puede ser rechazado inmediatamente, pues las palabras 'causas prescritas en la ley' claramente se refieren a las causas prescritas cuando la ley fué aprobada, o por lo menos cuando la separación tuvo lugar. No sólo no hay allí nada que aquí pueda dársele otro significado, sino que no puede presumirse que el Congreso intentara prohibir que los jueces ejercitaran su poder en las cuestiones de estos nombramientos en el caso de estos comisionados en particular, o disponer que deban ellos desempeñar su cargo durante la vida, o hasta que el Congreso especifique las causas por las cuales puedan ser separados, mientras que todos los otros comisionados podían ser separados a voluntad del poder nominador.

*　　　*　　　*　　　*　　　*　　　*　　　*

"Lo que hay que investigar es, por tanto, si existían causas de separación prescritas en la ley de marzo 1°. de 1895, o a la fecha de la separación. *Si existían, entonces sería aplicable la regla de que cuando las causas de separación han sido especificadas por la Constitución o el estatuto, como también cuando el término de duración es por un período determinado, la notificación y audiencia son esenciales.* Si no las había, el poder nominador podía separar a voluntad, o por tales causas que considerara suficientes.

*　　　*　　　*　　　*　　　*　　　*　　　*

"No consta que ninguna causa para la separación de estos funcionarios judiciales jamás hubiera sido especificada de modo afirmativo por el Congreso, pero se dice que el Congreso había prescrito tales causas por virtud de la adopción en el Territorio Indio de ciertas leyes de Arkansas. Por la sección 31 de la ley de mayo 2, 1890, algunas de esas leyes se pusieron en vigor en el Territorio Indio, y por la sección 39 los comisionados quedaron autorizados para ejercitar todos los poderes conferidos por las leyes de Arkansas a los jueces de paz dentro de sus distritos, y las disposiciones del capítulo 91 de esas leyes que regulan la jurisdicción y procedimiento ante los jueces de paz se hicieron extensivas a ese Territorio. Por la ley de marzo 1°., 1895, éstas fueron restablecidas y los capítulos 45 y 46 del Digesto de Mansfield, que tratan de ley y procedimiento criminal, también fueron puestos en vigor.

"El razonamiento es que el efecto de estas disposiciones fué dejar a los comisionados en lugar de los jueces de paz en Arkansas, y por consiguiente que las causas prescritas en la ley para la separación de jueces de paz deben considerarse prescritas en la ley como causas para la separación de comisionados.

"En nuestra opinión no se infiere esta conclusión. Para revestir a los comisionados de los poderes pertenecientes a los jueces de paz, se cumplía convenientemente con esto mediante sindicatura, pero eso no convertía a estos funcionarios de la corte de los Estados Unidos en el Territorio Indio en jueces de paz o cambiaba las relaciones entre ellos y los jueces de esa corte. Los jueces de paz en Arkansas, de acuerdo con la Constitución del Estado y las leyes, desempeñan sus cargos por dos años, y no pueden ser separados excepto por causa, y mediante notificación y audiencia. *Los comisionados no desempeñan sus cargos por vida, ni por ningún término específicado, y están comprendidos en la regla que considera el poder de separar como incidental al de nombrar, a menos que otra cosa se disponga.* Por los capítulos 45 y 46 los jueces de paz al ser convictos por los delitos enumerados pueden ser separados del cargo, pero éstos no comprenden necesariamente todas las causas que podrían hacer necesaria o conveniente la separación de los comisionados. El Congreso no dispuso nada sobre la destitución de comisionados por aquellas causas por las cuales los jueces de paz podrían ser separados, y si esto había de regularse de otro modo mediante interpretación, *el efecto sería sostener a los comisionados en sus cargos por vida a menos que algunas de aquéllas causas específicamente enumeradas vinieran a ser aplicables a ellos.*" 182 U. S. 424-25-26.

Dos años después, los Jueces Asociados Sres. Holmes y Day, que ocuparon los puestos de los jueces Sres. Gray y Shiras, la corte, en el caso de *Shurtleff* v. *United States,* 189 U. S. 313, hablando nuevamente por conducto del Juez Asociado Sr. Peckham, quien emitió la opinión en el caso de Parsons, se expresó como sigue (bastardilla nuestra):

"El cargo de aforador general de mercancías fué creado por la sección 12 de la ley del Congreso aprobada en junio 10, 1890, conocida comúnmente por Customs Administrative Act, 26 Estatutos 131, 136. La parte esencial de esa sección es como sigue:

" 'Sección 12.—Que el Presidente nombrará, con el consejo y consentimiento del Senado, nueve aforadores de mercancías, cada

uno de los cuales recibirá un sueldo de siete mil dólares anuales. No se nombrarán más de cinco de dichos aforadores de un mismo partido político. No se dedicarán a ningún otro negocio, profesión o empleo y podrán ser separados de su cargo en cualquier momento por el Presidente por ineficiencia, abandono en el cumplimiento de sus deberes, o mala conducta en el cargo    *    *    * .'

"No hay duda, por supuesto, en cuanto al poder del Congreso para crear tal cargo como se prescribe en la anterior sección. *De acuerdo con la prescripción de que el funcionario podría ser separado del cargo en cualquier momento por ineficiencia, abandono en el cumplimiento de sus deberes, o mala conducta en el cargo, somos de opinión de que si la separación se trata de hacer por esas causas o por alguna de ellas el funcionario tiene derecho a una notificación y audiencia.* Reagan v. United States, 182 U. S. 419, 425. Al hablar de las causas de separación, el Juez Presidente Sr. Fuller se expresó como sigue en ese caso:

" 'La cuestión es, por tanto, si existían causas de separación prescritas en la ley de marzo 1, 1895, o al tiempo de la destitución. *Si existían, entonces sería aplicable la regla de que cuando las causas de separación han sido especificadas por la Constitución o el estatuto, así como cuando el término de duración del cargo es por un período determinado, la notificación y audiencia son esenciales.* Si no las había, el poder nominador podía separar a voluntad o por aquella causa que él estimase suficiente.'

"Varias cortes de Estado también han declarado que cuando un funcionario puede ser separado por ciertas causas, él tiene derecho a una notificación y audiencia.

"Véanse los casos de Dullam v. Wilson, 53 Michigan, 392, 401; Pa. e. g. Hardin, 8 B. Mon. 648, 672; Willard's App. 4 R. I. 597; Commonwealth v. Slifer, 25 Pa. St. 23, 28; State v. Hawkins, 44 Ohio St. 98, 114; Biggs v. McBride, 17 Oregon, 640, 650; Ham v. Boston, 142 Massachusetts, 90.

"Debe presumirse que el Presidente no hizo la separación por ninguna causa especificada en el estatuto, *porque no se dió al funcionario ninguna notificación u oportunidad de defenderse.* Surge entonces la cuestión de si puede el Presidente ejercitar la facultad de separar por algunas otras causas que no sean aquéllas especificadas en el estatuto; en otras palabras, ¿está él circunscrito a una separación por aquellas causas solamente o puede ejercitar su facultad general de separar sin tal restricción?

"*Asumimos,* para los fines de este caso solamente, *que el Con-*

*greso podía poner tales condiciones a la separación de un funciona-*
*rio nombrado de acuerdo con este estatuto según lo estimara proce-*
*dente y, por tanto, que podía disponer que el funcionario sólo fuese*
*separado por las causas especificadas y no por ninguna otra, y des-*
*pués de una notificación y de la debida oportunidad de audiencia.*
¿Lo ha dispuesto así el Congreso por virtud de la sección duodé-
cima de la referida ley?

    ❋        ❋        ❋        ❋        ❋        ❋        ❋

    ''Sostiene el apelante que porque el estatuto especificaba ciertas
causas por las cuales el funcionario podía ser separado, dicho esta-
tuto, por tanto, implícitamente excluía y negaba el derecho a una
separación por cualquiera otra causa, y que el Presidente, por con-
siguiente, de acuerdo con el estatuto estaba impedido de poder hacer
una separación a menos que fuera por las causas, o algunas de ellas,
especificadas en el mismo.  La máxima *expressio unius est exclusio
alterius* se emplea como ejemplo del principio en el cual se funda
la teoría.  Somos de opinión que como ha sido usada la máxima no
justifica la alegación del apelante.  La consideramos inaplicable a
los hechos de este caso.  El derecho de separar existiría si el esta-
tuto no hubiera dicho nada sobre la materia.  *No existe por virtud
de la concesión, sino que es inherente al derecho de nombrar, a me-
nos que esté limitado por la Constitución o el estatuto.*  Debe ser
claro el lenguaje *para quitarlo.*  ¿Dispuso por ello el Congreso al
usar el lenguaje prescribiendo la separación por ciertas causas que
el derecho sólo podía ser ejercitado por las causas especificadas?  *Si
lo hizo, véase qué diferencia tiene lugar en la duración del cargo
en cuanto a este empleo, de la que existía generalmente en este país.*
La duración del cargo de los funcionarios judiciales de los Estados
Unidos está prescrita en la Constitución, pero con esa excepción nin-
gún funcionario civil jamás ha desempeñado un cargo *durante la
vida* desde la fundación del gobierno.  Hasta los jueces de las cortes
territoriales pueden ser separados por el Presidente.  McAllister v.
United States, 141 U. S. 174.  *Interpretar el estatuto como alega
el apelante es dar a un aforador de mercancías el derecho a desem-
peñar el cargo durante su vida o hasta que sea declarado culpable
de algún acto especificado en el estatuto.*  Si esto es así, *una verda-
dera revolución en la duración general del cargo tiene lugar,* por
inferencia, en cuanto a este cargo en particular.  Creemos que es
inadmisible *atribuir una intención por parte del Congreso de hacer
tal cambio extraordinario en el principio usual que regula la dura-
ción del cargo, y que ha de ser aplicado a este cargo en particular*

*solamente,* sin mostrar tal intención en lenguaje claro y explícito, en vez de dejar que sea deducido de inferencias dudosas. La regla expresada en la máxima es muy pertinente y está basada en el razonamiento justificado en muchos casos, pero no debe dársele un peso decisivo cuando hacerlo así *envolvería la alteración de la práctica universal del gobierno desde hace más de un siglo y la consiguiente restricción de las facultades.* No vemos ninguna razón para tal actuación por parte del Congreso con referencia a este cargo o a los deberes relacionados con el mismo.''

Este caso, asumiendo sin resolver que el Congreso ''podía disponer que los funcionarios sólo fuesen separados por las causas especificadas y no por ninguna otra,'' y siguiendo la regla de interpretación adoptada en los casos anteriores de Blake, McAllister y Parsons, sostiene que la intención de hacerlo así debe ser clara e inequívoca. Aquí la corte no discute el efecto de un término fijo, ni el poder del Congreso de fijar un término, ambas de cuyas proposiciones se admiten, sino que considera si el Congreso al especificar ciertas causas de separación pudo o no haber intentado *quitar* al Presidente la facultad de separar por cualquier causa que no hubiera sido especificada de tal modo. Pero la opinión *también expresamente ratifica y vuelve a confirmar* la doctrina de *Ex parte Hennen* y *Reagan* v. *United States* al efecto de que ''*cuando las causas de separación han sido especificadas por la Constitución o el estatuto,* así como cuando *el término del cargo es por un período determinado,* la notificación y audiencia son esenciales.'' No existiendo tales causas especificadas ni duración determinada por la Constitución, en tanto concierne a los cargos inferiores, esto es equivalente a la forma más breve adoptada por el señor Juez Brandeis en el caso de *Burnap* v. *United States, supra,* en donde la frase estereotipada ''especificada por la Constitución'' se omite y las palabras ''disposición estatutoria en contrario'' son substituídas por abarcar toda la materia. La cita del caso de Reagan tomada en relación con la anterior declaración constituye un reconocimiento del poder del Con-

greso, al fijar un término sin más nada y por el efecto legal
que se le atribuye a tal acción, regula el ejercicio del poder
implícito de destituir.   El razonamiento también se retrotrae
al caso *Ex parte Hennen* en su justificación de tenerse que
recurrir a la doctrina de un poder implícito de separación
como única alternativa a la duración del cargo durante la
vida.   Para los fines del presente caso, no necesitamos in-
vestigar si es más adecuado decir que tal poder nunca es
absoluto en el sentido de que la forma de su ejercicio no
pueda ser regulada o de ningún modo restringida por el Con-
greso, o afirmar que en el caso de disposiciones estatutorias
que fijan un término o especifican una separación por causa,
entonces, la razón y necesidad de no ser clara la regla no
puede inferirse una prerrogativa absoluta del poder de nom-
brar ni considerarse como inherente a él, o en otras pala-
bras, que en tal caso la ocasión para tal inferencia nunca
surge porque el verdadero fundamento para ello no existe.
En ningún caso se infiere, ni tampoco ha resuelto nunca la
Corte Suprema de los Estados Unidos, que los requisitos de
notificación y audiencia que se infieren del hecho de fijarse
un término por prescripción estatutoria deben estar some-
tidos al poder implícito de separación como corolario del
poder constitucional de nombrar.   Por el contrario, el caso
de *Shurtless*, tal vez más que ningún otro parece indicar cla-
ramente lo contrario a la conclusión así sugerida y que trata
de establecerse.

De la opinión de la Corte Suprema de Nuevo Méjico en
el caso de *Territorio* v. *Armijo,* 89 Pac. 267, hacemos la si-
guiente cita:

"La alegación del demandado se funda en tres proposiciones, las
cuales, presentadas por el orden lógico, son las siguientes: que el
Presidente de los Estados Unidos tiene el poder se separar de un
cargo.   Que lo tiene por virtud de las secciones 1 y 3 del artículo
2 de la Constitución de los Estados Unidos.   Que la concesión del
poder ejecutivo del gobernador en la sección 3 de la ley orgánica

(sección 1841, Estatutos Revisados de los Estados Unidos) es prácticamente idéntica en su texto y significación a las partes que se han relacionado de las secciones de la Constitución a que hemos hecho referencia. De estas principales premisas, según se explican y están sostenidas por otras partes de la Constitución y de la ley orgánica, se infiere, alega él, como necesaria conclusión, que el poder del gobernador en la esfera de sus deberes es el mismo que el del Presidente en el suyo. Las partes de la sección 3 de la ley orgánica en las cuales el demandado especialmente se funda, son las siguientes: 'Que el poder ejecutivo y autoridad en y sobre dicho territorio de Nuevo Méjico estará investido en un gobernador; él comisionará todos los funcionarios que hayan de ser nombrados para cargos bajo las leyes de dicho Territorio y cuidará de que las leyes se cumplan fielmente.' Esta es prácticamente una ilustración de las prescripciones correspondientes de la Constitución de la cual es de presumirse que fueron tomadas. Nos sentimos obligados a seguir la cuestión hasta donde nos lleve, aunque pertenezca eso al dominio de la ley constitucional que es de la jurisdicción peculiar de la Corte Suprema de los Estados Unidos. La alegación de que el Presidente tiene el poder de separar está tan en armonía con el entendimiento general y observación que no parece exigir consideración, pero es curioso que hemos pasado bastante del segundo siglo de la Constitución y de la Corte Suprema sin una decisión por ese augusto tribunal de que el Presidente tiene o no tiene el poder de separar del cargo como derecho constitucional. 'Es un hecho curioso que un poder que es tan trascendental como ese deba depender de inferencias solamente y que nunca haya sido materia de discusión por las cortes.' 1 Comentarios de Kent (edición 12, pág. 310). Desde la época de esa declaración ha habido una discusión histórica completa sobre la materia en el caso de *Parsons* v. *United States*, 167 U. S. 324, 17 Sup. Ct. 880, 42 L. Ed. 185 (1896), citado por el demandado, pero el examen concluye en esta forma: 'Las anteriores referencias a los debates y opiniones no se han hecho con el fin de que nos ayuden a llegar a una decisión sobre la cuestión del poder constitucional del Presidente en su discreción para destituir a funcionarios durante los términos para los cuales fueron nombrados, y no obstante existir un estatuto que prohibe tal separación, sino simplemente con el fin de ver cuál ha sido el parecer de los varios departamentos del gobierno sobre la materia relativa al poder del Presidente para separar y qué objeciones se hicieron y hasta qué punto ha sido aprobada la cuestión de que al Presidente correspondía la

facultad exclusiva de destituir en todos los casos, excepto mediante *impeachment.* No tenemos necesidad de resolver en este caso la importante cuestión del poder constitucional arriba expresado.' En el caso de United States v. Guthrie, 17 How. (U. S.) 284, 15 L. Ed. 102, el cual ha sido examinado en la misma opinión, la mayoría del tribunal resolvió que la cuestión del poder constitucional no estaba envuelta, pero el Juez Sr. McLean emitió una opinión disidente, en la que sostenía que la cuestión del poder del Presidente para destituir estaba ante la corte y que no se dejó por la Constitución solamente al Presidente. Creemos necesario, por consiguiente, toda vez que el demandado se funda tanto en la alegada relación del poder del gobernador para destituir al del Presidente, hacer cierta pesquisa para averiguar la base en que descansa este último y entonces investigar si el poder del gobernador tiene la mismo o parecida base.

* * * * * * *

''El demandado, además, sostiene que teniendo el Congreso pleno poder sobre los territorios, debe, en su ejercicio, suponérsele que ha conservado por medio del ejecutivo un 'nervio de poder que asciende al gobierno general' tan protegido que no estaría sujeto a ataque y destrucción por el pueblo para cuya restricción se hizo. Se alega especialmente si el Congreso tomaría naturalmente ese curso en el caso de un territorio que entonces había sido adquirido por medio de una guerra y con una población hóstil a nuestro gobierno.

* * * * * * *

''En la ley orgánica hay poco que indique ninguna disposición para reprimir o dominar al pueblo de un territorio. 'El nervio de poder que asciende al gobierno de los Estados Unidos—varios de los mismos fueron en verdad preservados. El gobernador y los jueces de las cortes superiores habían de ser nombrados por el Presidente. El gobernador venía a ser una parte esencial del Departamento Ejecutivo (ley orgánica, sección 5) y finalmente el Congreso se reservó el derecho, el cual, como dijo la corte en el caso de National Bank v. County of Yankton, 101 U. S. 132, 133, 25 L. Ed. 1046, lo tenía sin reservárselo, para anular todos los actos del legislativo que no merecieran su aprobación. Ley Orgánica, sección 7. Pero aquéllas no eran prescripciones inusitadas al establecerse el gobierno civil para los Territorios. * * * Esa parte del primitivo territorio de Nuevo Méjico que aún retiene el nombre y organización territorial originalmente adoptada por el Congreso, ha estado por más de medio

siglo bajo un gobierno territorial. En esa época se estableció un cuerpo de leyes estatutorias que trataban de todas las principales cuestiones que son materias de legislación en los diferentes Estados de la Unión. En sólo dos casos durante todo ese tiempo el Congreso ha creído conveniente anular un estatuto aprobado por una asamblea territorial. Se cita esa circunstancia, no para demostrar que únicamente dos leyes que merecen ser anuladas lo han sido por la asamblea, probablemente hay muchas otras, sino que mientras más haya habido más fuerte es la prueba del procedimiento general del gobierno hacia el pueblo de este Territorio. ¿Si el mismo poder ha existido sobre la legislación de los Estados, cuántos hubieran participado mejor en ese sentido?

"El demandado da mucha importancia al hecho de que el pueblo de los Territorios dependen enteramente del Gobierno de los Estados Unidos en sus derechos políticos, los cuales, como la corte declara en el caso de Murphy v. Ramsey, 114 U. S. 44, 45, 5 Corte Suprema 747, 774 y 29 L. Ed. 47, son 'franquicias que tienen como privilegios en la discreción legislativa del Congreso de los Estados Unidos.' Que la circunstancia es muy significativa en relación con este examen, estamos de acuerdo; pero creemos que han de establecerse inferencias de ella, que son muy diferentes de aquéllas sugeridas por el demandado. Este gran poder lo tiene principalmente el Congreso. En el caso de McAllister v. United States, 141 U. S. 174, 11 Corte Suprema 949, 35 L. Ed. 693, la corte dijo lo siguiente: 'La decisión en el presente caso es un reconocimiento de la completa autoridad del Congreso sobre los funcionarios territoriales en virtud de aquellos poderes generales que posee ese cuerpo sobre los Territorios de los Estados Unidos, pues Marbury v. Madison fué un reconocimiento del poder del Congreso sobre el término de duración del cargo de un juez de paz para el Distrito de Columbia.' El Congreso, naturalmente, no actuaría para derogar sus propios derechos, especialmente cuando el efecto sería robustecer otro departamento del gobierno. No puede haber tenido la intención de establecer un ejecutivo territorial que fuera nombrado por el Presidente, con poder para anular a su capricho las elecciones hechas por el pueblo que había autorizado. El Congreso podría, sin duda, haber dado al gobernador todo el poder que se alega que tiene. También podría haber gobernado el Territorio por una legislación directa o por delegación, sin ningún ejecutivo individual y sin ninguna participación en el gobierno por el pueblo. Pero que el Congreso no necesita haber dado al pueblo de Nuevo Méjico ni un ápice de go-

bierno propio no es enteramente incompatible con el hecho real de que sí le dió una gran cantidad de gobierno propio. 'La ley orgánica de un territorio substituye a la Constitución como ley fundamental del gobierno local.' National Bank v. Yankton, *supra*. Los derechos políticos por él conferidos son, de acuerdo con la ley, tan seguros y sagrados como aquéllos que garantiza la Constitución de los Estados Unidos, hasta que sean, mediante legislación, retirados por el poder que los otorgó.

"Finalmente, debe creerse que el Congreso ha tenido conocimiento, así real como interpretativo, de lo que se ha visto en Nuevo Méjico en relación a la cuestión del poder del gobernador para separar de un cargo. La ley orgánica (sección 7) prescribe que todas las leyes aprobadas por la asamblea legislativa y el gobernador serán sometidas al Congreso de los Estados Unidos, y de no ser aprobadas serán nulas y sin ningún valor. Ha habido una ley que da al gobernador el derecho de separar a los alguaciles de sus cargos, otra que le quita el derecho así conferídole, y ahora hay una ley que prescribe sobre la separación de los alguaciles por las cortes de distrito en ciertos casos. Todas estas leyes, es de presumirse que han sido sometidas al Congreso. Además de eso, la cuestión del poder del gobernador para separar, por lo menos ha estado tres veces ante esta corte, nunca se ha declarado que exista, como ahora se alega, y una vez ha sido negada. Territorio v. Ashenfelter, *supra*, (1887) ; Conklin v. Cunningham, 7 N. M. 445, 38 Pac. 170 (1894) ; Eldolt v. Territory, 10 N. M. 141, 61 Pac. 105 (1900). El primero de los casos nombrados fué también a la Corte Suprema de los Estados Unidos, donde permaneció por más de seis años, fué discutido dos veces, dos veces se ordenó la celebración de nueva vista, una vez con notificación al Attorney General y finalmente desestimado sin una decisión.

*     *     *     *     *     *     *

"En vez de aumentar el poder del gobernador, el Congreso en el año 1868 (sección 1842, Estat. Rev. de los Estados Unidos) formalmente lo rebajó privándole de la participación que tenía en la formación de las leyes y del derecho del veto absoluto de las leyes de la asamblea que hasta entonces tuvo, y le dejó únicamente el poder de vetar según estaba limitado ordinariamente. Y es, en verdad, una parte de la política general del Congreso, no intervenir excepto en casos extremos en la manera de llevar los asuntos de un Territorio por su pueblo. Ha considerado y tratado la forma territorial de gobierno como una especie de escuela preparatoria para la estadidad. El Territorio, como embrión del futuro Estado—un

Estado como los demás Estados de la Unión en todos sus particulares esenciales.''

Además, en el caso de *Territory* v. *Mann* (1911), 114 Pac. 362, la misma corte se expresa en estos términos:

''Se alega por el abogado del apelado, sin embargo, en su bien terminado alegato y argumentación, que el caso de Ashenfelter es contrario tanto a las autoridades como a la razón. Se dice que se ha puesto en duda en un caso subsiguiente resuelto en esta corte (Territory v. Armijo, 14 N. M. 202, 89 Pac. 275) y que las premisas en que se funda se ha demostrado que son claramente insostenibles en un número de casos federales resueltos desde esa decisión.

''Los casos principalmente citados en el último sentido son los de McAllister v. United States, 141 U. S. 174, 11 Corte Sup. 949, 35 L. Ed. 693, Parsons v. United States, 167 U. S. 324, 17 Corte Sup. 880, 42 L. Ed. 185, y el de Shurtless v. United States, 189 U. S. 311, 23 Corte Sup. 535, 47 L. Ed. 828. Se alega que los casos que acaban de citarse establecen, primero, que el Presidente tiene un poder inherente que emana de las funciones de su cargo como han sido definidas en la Constitución, para separar a todos los funcionarios nombrados por él con el consentimiento del Senado, excepto aquéllos que bajo la Constitución gozan de una duración en el cargo durante la vida; segundo, que el gobernador, bajo la ley orgánica, tiene precisamente los mismos poderes en cuanto a los funcionarios por él nombrados, por y con el consejo y consentimiento del Consejo Legislativo; y tercero, que por tanto el gobernador tiene el poder de separar aquellos funcionarios dentro del Territorio, precisamente como lo tiene el Presidente dentro de la nación en general. Este criterio ha recibido la detenida consideración que por su importancia merece. De un examen de los casos citados, sin embargo, no llegamos a la conclusión que alega el apelado. En el caso de Armijo nada encontramos de esta corte en donde se dude la corrección del caso de Ashenfelter sobre el punto aquí envuelto. Ese es un caso que envolvía el poder del gobernador para separar a un funcionario de un condado elegido por el pueblo y en él esta corte cuidadosamente se reserva la cuestión de si el caso de Ashenfelter ha sido alterado por alguna autoridad federal posterior. Examinando la última clase de decisiones, el caso de McAllister envolvía simplemente la cuestión de si un juez territorial en Alaska era 'un juez de una corte de los Estados Unidos' a fin de quedar exento

del poder de suspensión expresamente conferido al Presidente respecto a todos los funcionarios civiles (excepto tales jueces) en la ley de duración del cargo.  La Corte Suprema resolvió que un juez territorial no estaba dentro de la excepción del estatuto y por mandato expreso del Congreso quedó, por tanto, sujeto a separación por el Presidente.  Este caso demuestra que el poder ejecutivo para destituir fué considerado como de origen estatutorio más bien que de la Constitución.  En el caso de Parsons la corte consideraba la separación por el Presidente de un fiscal nombrado bajo un estatuto semejante en sus términos a aquél por virtud del cual el peticionario fué nombrado.  La corte revisó la historia del ejercicio del poder de destitución del Presidente y de la legislación relativa al mismo, incluyendo la ley de mayo 15, 1820, c. 102, 3 Estat. 582, la cual expresamente disponía que los fiscales podían ser separados a voluntad, la derogación implícita de esta última ley por la primera ley sobre duración del cargo, marzo 2, 1867, c. 154, 14 Estat. 430, y la derogación de la ley posterior en 1887.  La corte resolvió 'a la luz de la historia de la materia' que el término del cargo de cuatro años prescrito para los fiscales era una limitación y no una fijación del término.  Pero la corte en ese caso expresamente rehusó resolver 'la cuestión del poder constitucional del Presidente dentro de su discreción para separar a funcionarios durante el término para el cual habían sido nombrados.'  Esto se indica muy claramente por este tribunal al hablar por conducto del Juez Asociado Sr. Abbott, en el caso de Territory v. Armijo, *supra,* en el cual el alcance del caso de Parsons se discute hasta tal punto que resulta innecesario hacer más comentarios sobre el particular.  Nos basta con decir que una decisión fundada como lo fué esa en el curso de la historia nacional y de la legislación existente entonces y peculiar al ejercicio de las funciones presidenciales, no suministra ninguna verdadera base de donde poder derivar las facultades de un gobernador de un territorio.

"En el caso de Shurtless v. United States, *supra,* es cierto que hay expresiones en el sentido de que el Presidente puede, por virtud de su poder general de nombramiento, separar a un funcionario aún siendo nombrado por y con el consejo y consentimiento del Senado. Pero la corte consideraba allí el punto del nombramiento de un aforador general en el cual no se había designado en absoluto ninguna duración para el cargo.  Estaba frente a la alternativa de que si el Presidente no tenía ningún poder para destituir, el interesado (sujeto únicamente a buena conducta) desempeñaba el cargo durante

la vida. Una duración por toda la vida para tal funcionario, dejándole al mismo nivel en que están los funcionarios judiciales en la Constitución, se resolvió por el tribunal que claramente no había sido la intención del Congreso y resolvió que la duración de su cargo, a falta de alguna disposición que la fije, era, pues, necesariamente a voluntad del Presidente. Para un caso como el presente en el que la duración del cargo es definida, el caso de Shurtleff no puede suministrar analogía alguna de la que podamos precisar las facultades del gobernador.''

El autor de una nota adicionada al caso de *State* v. *Rhame,* Ann. Cases, 1914 B, 519, está conforme con el parecer de la Corte Suprema de Carolina del Sur sobre el caso de *Parsons,* a saber:

''Por las razones consignadas en los comentarios al mismo en el caso reportado, el caso de Parsons v. United States * * * no proporciona ayuda alguna a la alegación de que el poder nominador, a falta de disposición estatutoria respecto al mismo, tiene el derecho de separar a un funcionario cuyo término es fijo.''

En la nota citada en último lugar, los casos en que se discute el derecho del poder nominador para separar a un funcionario cuando el término del cargo es fijo, se agrupan en dos clases, a saber: aquéllos que niegan específicamente la existencia de tal derecho como incidental al poder de nombrar, y los que sostienen ''que aunque el poder nominador puede tener el derecho de separar a un funcionario que desempeña un cargo fijo, sin embargo, este derecho puede ser ejercitado solamente mostrándose causa.''

Suponiendo que el requisito de ''mostrar causa'' sea equivalente al de notificación y audiencia, la importancia de los casos resueltos por la Corte Suprema está en que, aunque la autoridad del caso de *Marbury* v. *Madison* puede o no haber sido cambiada en cierto modo por decisiones subsiguientes, principalmente en el caso de *Parsons,* y si estas últimas decisiones tienen o no toda la extensión de la regla enunciada en el primer grupo de casos de estado, *supra,* la

proposición expresada, sin embargo, en el segundo grupo, nunca ha sido negada y ha sido en substancia, si no uniformemente, reconocida en varias ocasiones, enunciada y confirmada.

No necesitamos repetir aquí todo lo que se ha dicho sobre la materia en las cortes de Estados. El caso de *Rhame* llama la atención al hecho ya observado de que ''En el Pueblo v. Robb, *supra,* la corte de apelaciones de New York dice que la siguiente disposición de la Constitución de New York era una incorporación (*embodiment*) de la regla generalmente reconocida, a saber: 'Cuando la duración de cualquier cargo no ha sido prescrita por la Constitución, puede declararse por ley y, de no ser declarada así, tal cargo será desempeñado a voluntad de la autoridad que hace el nombramiento.' ''

Véase también a *Roth* v. *State,* 63 N. E. 460, en el que se interpreta así un precepto constitucional idéntico y se cita el caso de *Robb.*

En la Opinión de los Jueces al Gobernador y al Consejo, 216 Mass. 605, encontramos lo siguiente:

''La parte substancial de la cuestión es si bajo la Constitución el Gobernador como Comandante en Jefe, o el Gobernador y Consejo actuando como Departamento Ejecutivo del gobierno, tiene el poder ilimitado para separar al Ayudante General de su cargo o si la Corte General tiene la facultad de fijar el término de su cargo y la forma de su separación.

''El poder de nombrar al Ayudante General se confiere por la Constitución, c. 1, párrafo 1, artículo 10, en estas palabras: 'El Gobernador nombrará al Ayudante General.' Si estas palabras apareciesen solas, el poder para separar podría inferirse del de nombrar. Véase a In re Hennen, 13 Pet. 230, 259. El poder de separar a un funcionario público no es un incidente necesario e inherente de la autoridad de nombrar. Frecuentemente están desligados.

''Pero la Constitución contiene otra disposición pertinente. En c. 2, párr. 1, art. 4, hay estas palabras: 'Y, además, amplio poder y autoridad se confiere y dan por la presente a dicha Corte General de tiempo en tiempo * * * para establecer los varios deberes, poderes y límites de los diferentes funcionarios civiles y militares

de esta comunidad.' Claramente, que el Ayundante General es uno de los funcionarios militares de la comunidad. La palabra 'límites' como ha sido aplicada a los funcionarios militares en esta cláusula en relación con las otras palabras jurisdiccionales empleadas, incluye el derecho a fijar la duración del cargo y la forma de separación. Significa limitaciones en cuanto al tiempo así como al deber en el ejercicio y poder de mando. La legislatura está, pues, revestida de autoridad para establecer por ley general los términos del cargo para todos en la rama militar del servicio de la comunidad.

"Cuando la Constitución crea un cargo pero no establece ninguna disposición en cuanto al período de su duración o a la forma de hacerse la separación del mismo, el poder de la legislatura para actuar en interés del público en este sentido está bien establecido. Opinión de los Jueces, 117 Mass. 603. Wales v. Belcher, 3 Pick 508.

"La legislatura tenía poder con respecto a tal cargo para prolongar o acortar el período de duración mientras lo desempeñó el nombrado, y por tanto para extender o abreviar el término de lo que era al ser nombrado primeramente. Taft v. Adams, 3 Gray, 126. Barnes v. Mayor of Chicopee, 213 Mass. 1.

"Estas dos prescripciones de la Constitución son armónicas. El poder absoluto de nombrar al Ayudante General está investido en el Gobernador, pero la legislatura puede fijar el término de su duración y determinar la forma de su separación. Cada una de estas funciones es independiente de la otra. Ambas pueden coexistir en el mismo documento sin que haya conflicto entre el departamento ejecutivo y el legislativo.

"No hay nada que sea incompatible con la conclusión del artículo 4 de las enmiendas a la Constitución en el sentido de que 'todos los funcionarios comisionados con mando en la milicia pueden ser separados de sus cargos en aquella forma en que la legislatura pueda prescribir mediante ley.' En verdad que esa enmienda confirma la conclusión a que aquí se ha llegado.

"La legislatura ha actuado al fijar el término de duración del cargo del Ayudante General en cinco años y prescribir sobre su destitución. Estatutos 1912, c. 720, párr. 1; 1908, c. 604, párrs. 91, 92, 101. R. C. L. 18, párr. 2, que autoriza al gobernador para destituir a cualquier funcionario nombrado por él, a menos que otra cosa se disponga por la ley, es aplicable solamente a aquellos que están en el servicio civil.

"El poder del Congreso para legislar respecto a la separación de funcionarios del ejército y limitar los poderes irrestringidos del

Presidente en ese sentido, parece haber sido reconocido en los casos de Blake v. United States, 103 U. S. 227; United States v. Carson, 114 U. S. 619 y Hartigan v. United States, 196 U. S. 169. Véase, sin embargo, Parsons v. United States, 167 U. S. 324. Pero sean cual fueren los poderes respectivos del Presidente y Congreso bajo la Constitución Federal y la práctica desarrollada bajo la misma, los amplios términos de la concesión de poderes legislativos a nuestra Corte General no dejan duda alguna en cuanto a su autoridad para decretar el estatuto de 1912, capítulo 720."

No existe ningún conflicto necesario entre este criterio sobre el asunto y la doctrina de la Corte Suprema de los Estados Unidos como ha sido resumida en la simple declaración del Juez Asociado Sr. Brandeis, de que "el poder de destituir es, a falta de precepto estatutorio en sentido contrario, incidental al poder de nombrar."

El alegato del demandado asume pero no revela que el Gobernador al hacer los nombramientos autorizados por la sección 49 de la Ley Orgánica ejercita los poderes conferidos al Presidente por la Constitución de los Estados Unidos. Dicho alegato parece insistir en la misma premisa en la proposición de que al conferir el poder de nombramiento al Presidente y al Gobernador, el Congreso emplea el mismo lenguaje y debe entenderse que significa la misma cosa en ambos casos—insinuando así que el propósito era conferir al Gobernador el poder tradicional del Presidente de acuerdo con la Constitución Federal. Tal vez hubiera sido bastante con decir que si los funcionarios que se mencionan en la sección 49 son los funcionarios inferiores de los Estados Unidos dentro del significado del artículo 2, párrafo 2, de la Constitución, entonces el Congreso podría investir con las facultades de nombramiento a cualquiera de los jefes de departamento del gobierno nacional o algún tribunal judicial, pero no a ningún otro organismo.

Hemos dedicado tanto tiempo y amplitud a las opiniones emitidas por los Fiscales Generales y la Corte Suprema de los Estados Unidos sólo porque se ha hecho gran hincapié

sobre ellas, tanto en el alegato del demandado como en la discusión entre nosotros mismos. Lo más que puede sostenerse para demostrar que la doctrina enunciada en ellas es de aplicación al presente caso es que por analogía y *mutatis mutandi,* el mismo principio debe regir en tanto los hechos y circunstancias envueltos puedan hacer que este caso quede comprendido en el razonamiento de la regla; y aparte de las distinciones indicadas en los casos de Nuevo Méjico y en otros, hasta ahora no se ha hecho esfuerzo alguno por demostrar que al tratar de los territorios el Congreso haya levantado alrededor del ejecutivo territorial tal parapeto de costumbre, práctica, precedentes y tradición que constituye el fundamento histórico de la interpretación ahora establecida del poder constitucional del Presidente para separar a funcionarios de los Estados Unidos ''a falta de disposiciones estatutorias en contrario''—incluyendo la conclusión, si fuere una conclusión necesaria, de que la intención del Congreso en fijar un término, siempre que así se decida a hacerlo, debe ser clara. Ciertamente que la breve historia de la legislación congresional para esta isla no revela tal política en cuanto a los poderes conferidos al Gobernador en relación con nombramientos y destituciones. Dentro de las circunstancias no parece existir verdadera razón por la cual no debamos adoptar con respecto a ''el uso establecido e interpretación práctica'' del gobierno nacional bajo la Constitución Federal más o menos la misma actitud que la asumida por la Corte Suprema en el caso de *Hennen* y por las cortes inglesas a que allí se hace referencia en cuanto ''a la duración del cargo bajo la antigua Ley Común'' y a la ''antigua costumbre'' en las cuales se basaron las reglas y principios que regulan dicho término de duración. Pero aunque fuese de otro modo y admitiendo en pro del argumento que el poder implícito del Gobernador para destituir de un cargo es tan sacrosanto como aquél de que está investido implícitamente el Presidente, y que la legislatura local no tiene más

poder- para regular el privilegio gubernativo que tiene el
Congreso para intervenir con la prerrogativa presidencial,
aún así el único resultado tangible bajo las decisiones de
la Corte Suprema es que cuando se fija un término deberá
ser clara la intención de fijarlo para que pueda prevalecer.

No consideramos necesario demostrar mediante un aná-
lisis acabado que nuestra actual Ley Orgánica quiso ser y
es un paso de avance hacia un completo gobierno propio,
o que por ella se renunció a una gran medida del control eje-
cutivo sobre la acción legislativa local. El Consejo Ejecu-
tivo que anteriormente constituía la Cámara Alta de la Le-
gislatura se componía enteramente de personas nombradas
por el Presidente. Una mayoría de éstas eran funcionarios
ejecutivos y miembros *ex officio* del Consejo. De los seis
jefes de departamento cuatro, substituídos por los seis fun-
cionarios ejecutivos nombrados anteriormente por el Presi-
dente, por y con el consejo y consentimiento del Senado de
los Estados Unidos, son ahora nombrados por el Goberna-
dor, por y con el consejo y consentimiento del Senado elec-
tivo insular de nueva creación. Ni la forma en que funciona
esta experimentación prácticamente, ni si actuó o no sabia-
mente el Congreso al substituir un Senado electivo por el
antiguo Consejo Ejecutivo, pueden tener ninguna relación
legítima con el asunto que ahora se considera. La cuestión
es que en un sentido general el poder legislativo local au-
mentó grandemente a expensas de las anteriores funciones
ejecutivas. La tendencia general, objeto y política de esta
nueva concesión de facultad política son por sí evidentes y
no dan lugar a duda razonable o discusión.

Con raras excepciones el Congreso al tratar de los nom-
bramientos presidenciales en Puerto Rico así como al tras-
pasar al Gobernador el poder que ejercía anteriormente el
Presidente al hacer el nombramiento de ciertos jefes de de-
partamento insulares, poco o nada deja sujeto a inferencias
o suposiciones.

La sección 17 del Acta Foraker constituía una división general separada de dicha ley, titulada "el gobernador" cuyo nombramiento "duraría cuatro años y en tanto se designe e instale su sucesor a menos que antes sea depuesto por el Presidente." Bajo la Ley Jones, sección 12, o sea, el primer párrafo de una división general titulada "Departamento Ejecutivo" en la cual se prescribe debidamente sobre seis departamentos ejecutivos que en la misma se crean, "el poder ejecutivo supremo" residirá en un funcionario ejecutivo, cuyo título oficial será "el Gobernador de Puerto Rico," quien ha de desempeñar su cargo "a voluntad del Presidente y hasta que se designe e instale su sucesor." Esta eliminación de los cuatro años de límite a la duración de un cargo ya desempeñado a voluntad del Presidente, así como el aumento en sueldo, es una de las pocas y menos importantes compensaciones para la amplia restricción del poder ejecutivo en otras partes de la ley. El objeto y propósito de estos cambios son demasiado conocidos de todos los que tengan el más ligero conocimiento de la marcha de los acontecimientos y, por tanto, no requieren explicación.

Bajo la Ley Foraker el Gobernador debía en todo tiempo cumplir fielmente con las leyes y en ese sentido había de tener "todas las atribuciones de los gobernadores de los Territorios de los Estados Unidos." El tiene ahora "la inspección y control general de todos los departamentos y negociados" y se le hace "responsable por el fiel cumplimiento de las leyes;" pero la concesión expresa de "todas las atribuciones de los gobernadores de Territorios" ha sido omitida. Otra innovación interesante puede encontrarse en la disposición de que el informe oficial al "Departamento Ejecutivo del Gobierno de los Estados Unidos que será designado por el Presidente" ha de ser transmitido, no al Presidente sino al Congreso.

Apenas si es necesario agregar que la disposición por la cual es el deber del Gobernador "de desempeñar aquellos

otros deberes y funciones que en cumplimiento de la ley el Presidente delegare en él," no funciona automáticamente; y que los "departamentos" indicados en la frase "departamentos y negociados" son los "departamentos ejecutivos" enumerados en la sección 13, y no los departamentos ejecutivos, legislativo y judicial de que tratan las divisiones más generales de la ley en el orden indicado.

Bajo la Ley Foraker "un Secretario, un Fiscal General, un Tesorero, un Auditor, un Comisionado del Interior y un Comisionado de Educación habían de ser nombrados por el Presidente mediante el concurso y consentimiento del Senado *por un término de cuatro años, a no ser antes depuestos por el Presidente."* Estos, en unión de "otras cinco personas bien acreditadas, que también nombrará el Presidente por el mismo término de cuatro años, mediante el concurso y consentimiento del Senado," habían de constituir un Consejo Ejecutivo. La última ley crea seis departamentos ejecutivos, designa los jefes de los mismos por sus títulos y prescribe entonces que "el Fiscal General y el Comisionado de Educación serán nombrados por el Presidente con el concurso y consentimiento del Senado de los Estados Unidos y desempeñarán sus cargos *por cuatro años y hasta que sus sucesores sean nombrados y hayan tomado posesión, a menos que antes sean depuestos por el Presidente.* Los jefes de los cuatro departamentos restantes serán nombrados por el Gobernador con el concurso y consentimiento del Senado de Puerto Rico. Los jefes de departamento nombrados por el Gobernador desempeñarán sus cargos *por el término de cuatro años y hasta que sus sucesores sean nombrados y hayan tomado posesión, a menos que antes sean destituídos por el Gobernador."*

Con excepción del cargo de Gobernador y tal vez para algunos, el puesto de Fiscal General, el de Secretario se consideraba como el más importante y el más codiciado entre los puestos ejecutivos insulares. El primer Secretario fué

un distinguido jurisconsulto que pasó luego a ser Gobernador y ahora es un bien conocido juez federal de circuito. Dos veces fué cubierta la vacante en el cargo de Secretario mediante ascenso de otros miembros del Consejo Ejecutivo, uno de los cuales pasó a ser Gobernador. Este cargo no continuó como un departamento ejecutivo ni se le aumentó el sueldo como ocurrió siempre que el anterior funcionario ejecutivo pasaba a ser jefe de un departamento ejecutivo. El cargo de Secretario de acuerdo con el texto de la sección 52 ha sido expresamente abolido. La sección 22, sin embargo, simplemente prescribe "que el Gobernador nombrará, con el concurso y consentimiento del Senado de Puerto Rico, un Secretario Ejecutivo con un sueldo anual de $4,000." Pasa entonces a prescribir ciertos deberes y a ordenar que el interesado en este cargo nuevamente establecido "cumplirá los demás deberes que le asignare el Gobernador de Puerto Rico." Sin entrar en detalles será bastante con decir que el cargo de Secretario Ejecutivo a que aquí se hace referencia, no es el de Secretario creado por la Ley Foraker, ni una continuación o restablecimiento del mismo bajo un nuevo nombre sino que es hoy una mera adición a la oficina del Gobernador. Sin duda que las relaciones íntimamente excepcionales y personales que necesariamente existen entre el Gobernador y su subordinado ejecutivo inmediato se consideraron suficientes, sin necesidad de legislación afirmativa, para suministrar cualquier fuerza adicional que pudiera ser necesaria a la doctrina de un poder implícito de destitución "a falta de una prescripción estatutoria en sentido contrario."

La sección 34 de la Ley Foraker, después de constituir "el Distrito de Puerto Rico," disponía que "el Presidente con el concurso y consentimiento del Senado nombrará un juez de distrito, un fiscal de distrito y un márshal para dicho distrito, *cada uno por el término de cuatro años, a menos que antes sean depuestos por el Presidente.*" La sección 41 de la Ley Jones sigue este lenguaje al constituir un distrito

judicial local y pasa a decir "el Presidente con el concurso y consentimiento del Senado nombrará un juez de distrito, quien servirá su cargo *por el término de cuatro años y hasta que su sucesor sea nombrado y tome posesión* y cuyo sueldo será de $5,000 anuales. De igual modo se nombrarán un fiscal de distrito, cuyo sueldo será de $4,000 por año, y un márshal para dicho distrito con un sueldo de $3,500 anuales, *cada uno por el término de cuatro años a menos que sean antes destituídos por el Presidente."* Aquí el único fin posible de la enmienda y de la interpretación por el Congreso en cuanto a su facultad para fijar un término son tan claras que sería más que supérfluo el hacer cualquier comentario.

El subtítulo final de nuestra primera Ley Orgánica (secciones 33 y siguientes) era "la Judicatura."

El primer párrafo de esa división es como sigue (bastardilla nuestra):

"Sección 33.—Que el poder judicial residirá en las cortes y tribunales de Puerto Rico *establecidos ya y en ejercicio, incluyendo los juzgados municipales creados en virtud de la orden general número ciento diez y ocho,* promulgada por el Brigadier General Davis, Voluntarios de los Estados Unidos, el 16 de agosto de 1899, *incluyendo también los tribunales de policía* establecidos por la Orden General, número ciento noventa y cinco, promulgada el 29 de noviembre de 1899 por el Brigadier General Davis, Voluntarios de los Estados Unidos, *y las leyes y ordenanzas de Puerto Rico y sus municipios que están en vigor,* en todo lo que no se oponga a la presente, *declarándose subsistentes por esta ley dichas Cortes y Tribunales.* La jurisdicción de estas Corte y los trámites seguidos en ellas, *así como los distintos funcionarios y empleados de las mismas,* respectivamente, serán los que se definen y prescriben *en dichas leyes y ordenanzas y las citadas Ordenes Generales,* número ciento diez y ocho, y ciento noventa y cinco, *mientras no se legisle otra cosa;* Disponiéndose, sin embargo: Que el Presidente y Jueces Asociados del Tribunal Supremo y el Márshal (Alguacil Mayor) del mismo, serán nombrados por el Presidente, con el concurso y consentimiento del Senado; *y los Jueces de las Cortes de Distrito serán nombrados por el Gobernador,* con el concurso y consentimiento del Consejo Ejecu-

tivo, y todos los demás funcionarios y agregados de las demás cortes *serán elegidos según disponga la Asamblea Legislativa, la cual tendrá autoridad para legislar de tiempo en tiempo, conforme tenga por conveniente, con referencia a dichas cortes, y cualesquiera otras que estime oportuno establecer;* su organización, el número de jueces y funcionarios y agregados para cada una, su jurisdicción, sus procedimientos, *y demás asuntos que las afecten.*"

El capítulo penúltimo de nuestra actual Ley Orgánica se titula "Departamento Judicial" y comprende las secciones desde la 40 a la 49, la primera y última de las cuales prescriben lo siguiente (bastardilla nuestra):

"Sección 40.—El poder judicial residirá en las Cortes y Tribunales de Puerto Rico *ya establecidos y en ejercicio de acuerdo y por virtud de las leyes vigentes.* La jurisdicción *de dichos Tribunales* y los trámites seguidos en ellos, *así como los distintos funcionarios y empleados de los mismos, continuarán como al presente* hasta que otra cosa se disponga por ley; Disponiéndose, sin embargo, que el Presidente y los Jueces Asociados del Tribunal Supremo serán nombrados por el Presidente, con el concurso y consentimiento del Senado de los Estados Unidos, *y la Asamblea Legislativa de Puerto Rico tendrá autoridad, que no esté en contradicción con esta Ley, para, de tiempo en tiempo según lo crea conveniente, organizar, modificar o hacer un nuevo arreglo de los Tribunales* y su jurisdicción y procedimientos, con excepción de la Corte de Distrito de los Estados Unidos para Puerto Rico."

"Sección 49.—En lo sucesivo todos los Jueces, Marshals y Secretarios de los tribunales *establecidos actualmente o que se establecieren en adelante en Puerto Rico,* y cuyo nombramiento por el Presidente no esté dispuesto por ley, serán nombrados por el Gobernador con el concurso y consentimiento del Senado de Puerto Rico."

Las secciones 34 de la anterior ley y 41 de la actual, ambas se refieren a la Corte Federal local y abarcan substancialmente la misma materia. Los particulares especificados en la sección 35 de la Ley Foraker están comprendidos en las secciones 42 y 43 de la nueva ley. Las secciones 44 a 47 de la Ley Jones se refieren exclusivamente a la Corte Federal local y abarcan las materias anteriormente contenidas

en las secciones 2 a la 4, inclusive, de una enmienda de fecha marzo 2, 1921.   La sección 48 autoriza simplemente la expedición de autos de *habeas corpus* y *mandamus* por las cortes insulares.

La sección 49 de la Ley Jones debe ser interpretada en relación con la 40 de dicha ley y ambas a la luz de la anterior legislación.

No olvidemos que los jueces, marshals y secretarios que han de ser nombrados por el Gobernador de acuerdo con las prescripciones de la sección 49 son los funcionarios "de los tribunales establecidos actualmente o que se establecieren en adelante en Puerto Rico." Estos "tribunales establecidos actualmente" son las "cortes y tribunales ya establecidos y en ejercicio de acuerdo. y por virtud de las leyes vigentes" mencionadas en la sección 40.   Estos mismos "jueces, marshals y secretarios," una vez nombrados por el Gobernador, quedan comprendidos entre "los distintos funcionarios y agregados" de las cortes "ya establecidas y en ejercicio de acuerdo y por virtud de las leyes vigentes." La condición legal de estos funcionarios está unida inseparablemente a "la jurisdicción de dichos tribunales y los trámites seguidos en ellos." Estos funcionarios, y por tanto, sus facultades, deberes y duración de sus cargos, "continuarán como al presente hasta que otra cosa se disponga por ley," no "hasta que sus sucesores hayan sido nombrados" como allí se dispone, "sino hasta que otra cosa se disponga por ley."

La sección 49 es tanta parte de la sección 40 como lo sería si estuviera incorporada en ella por medio de un precepto adicional (*proviso*).

Y además, y demostrándose un extraordinario cuidado, encontramos en la sección 55 una declaración expresa del propósito de *"conservar la integridad de todas"* las mencionadas cortes y su jurisdicción, "hasta que se disponga otra cosa por ley, a no ser que de otro modo se provea *específicamente* en esta ley." La subdivisión final de la Ley Jones

se titula "Disposiciones Diversas," y la sección 55 es una de aquellas amplias aunque específicas salvaguardias contra la posible mala interpretación de cualquier cosa contenida en alguna otra parte de la ley.

Estas declaraciones claras y enfáticas hechas con referencia especial a las cortes existentes son por supuesto suplementarias a las disposiciones más generales de la sección 57, la cual prescribe lo siguiente:

"Sección 57.—Las leyes y ordenanzas de Puerto Rico actualmente en vigor, continuarán vigentes, excepto en aquello en que sean alteradas, enmendadas o modificadas por la presente, hasta que sean alteradas, enmendadas o derogadas por la autoridad legislativa que se provee en la presente para Puerto Rico, o por ley del Congreso de los Estados Unidos; y dicha autoridad legislativa tendrá poder, cuando no exista incompatibilidad con esta Ley, mediante la debida legislación, para enmendar, alterar, modificar o derogar cualquiera ley u ordenanza, civil o criminal, que continúe en vigor en virtud de esta Ley, según de tiempo en tiempo lo estimare conveniente."

Interpretadas estas varias secciones conjuntamente y a la luz de las leyes existentes a que hemos hecho referencia, la intención del Congreso claramente expresada sería al parecer dejar en completo vigor, ejercicio y efecto, las leyes existentes en tanto se refieren a la organización e integridad de las cortes insulares, incluyendo "los varios funcionarios y empleados de las mismas," por lo menos en tanto puedan ser razonablemente armonizadas o permanecer en unión de las disposiciones de la nueva Ley Orgánica. Y esto está en completa armonía con el principio general de que "Aunque una nueva constitución por su propia naturaleza intenta suplantar una constitución anterior, la intención no es substituir todo el cuerpo estatutorio legal. Por tanto, mientras de los estatutos existentes no quedan derogados expresa o implícitamente por la constitución, quedan en completa fuerza y efecto." 12 Cyc. 725.

Esto no se contesta con decir meramente que "los tér-

minos específicos que comprenden la materia determinada en cuestión prevalecerán a los términos generales,'' por la simple razón de que la sección 49 no contiene disposición específica para la destitución como (con la sola excepción del Secretario Ejecutivo) ocurre en todos los demás casos en que el poder de nombramiento se confiere directamente al Gobernador por la Ley Orgánica. La doctrina del caso de *Kepner* v. *United States* y de los otros casos citados *en pari materia* no puede convertirse en autoridad para la proposición de que una inferencia innecesaria y que es más que dudosa en una parte de la Ley Orgánica pueda pasar por encima y anular la intención claramente expresada en otras partes de la misma ley. Es mucho más de aplicación la cita del caso de *Township* v. *Talcott, supra,* la que no se explica por qué fué citada en relación con la alegación de que ''Cuando cierto poder se confiere en una constitución, todos los incidentes de ese poder también se otorgan con la concesión y cualquier acto de una legislatura en derogación o limitación de esa facultad o de cualquiera de sus incidentes, es anticonstitucional y nula.''

Los abogados del Gobernador no alegan que en ausencia de la sección 49 la legislatura tendría menos poder bajo la sección 40 de la Ley Jones que el que tenía de acuerdo con la sección 30 de la Ley Foraker. Pero se dice que la eliminación del precepto de que todos los funcionarios y empleados, excepto los jueces y marshals de la Corte Suprema y jueces de las cortes de distrito habían de ''ser elegidos como pueda disponer la Asamblea Legislativa,'' y la substitución de la facultad de nombramiento conferida al Gobernador en la sección 49, privaba a la legislatura de la facultad de fijar cualquier limitación a tal poder de nombramiento a partir y después de la aprobación de la Ley Jones. Se citan entonces los casos de *Sayers* v. *Wilmington* y *Menahan* v. *Lewis, supra,* en apoyo de la proposición contenida en una declaración aislada que aparece en el caso citado en último tér-

mino al efecto de que "si una ley es aprobada con anterioridad a la fecha en que la Constitución entró en vigor no tendría validez si lo fuera después de esa fecha, entonces tal ley anterior quedaría invalidada por la Constitución."

Estos casos no son de aplicación y no sostienen la amplia declaración contenida en la cita independiente que acabamos de hacer, la cual debe ser interpretada en relación con el contexto y a la luz de las anteriores decisiones de la misma corte citadas como autoridad para sostenerla.

En el caso de *Sayers* la corte resolvió (citamos del sumario) lo siguiente:

"El artículo octavo de la Constitución, párrafo 1°., que prescribe que todas las contribuciones serán uniformes sobre la misma clase de artículos dentro de los límites territoriales de la autoridad que fija la contribución y serán impuestas y cobradas bajo la ley general, pero que la Asamblea General puede eximir del pago de contribución a aquella propiedad que mejor promueva el bienestar público, no deroga las leyes de la legislatura que eximen a cierta propiedad, decretadas con anterioridad a las mismas."

Lo que la corte dijo, *argüendo,* con respecto a la cuestión de compatibilidad o incompatibilidad, debe entenderse que se refiere a esa cuestión e interpretado esto en relación con el contexto y a la luz de los hechos y circunstancias envueltos. El efecto y substancia de todo el razonamiento es que si la legislatura tenía poder bajo una nueva constitución para crear excepciones a la regla general prescrita en ella, entonces la anterior legislación, válida bajo la antigua constitución que establece tal excepción, no era necesariamente incompatible con la regla general así expuesta.

El caso no sostiene que la legislación válida decretada de acuerdo con una clara concesión constitucional queda siempre necesariamente derogada implícitamente o por deducción debido a una omisión en conferir poderes igualmente específicos y plenos bajo una nueva constitución. Por otra parte constituye autoridad para la proposición de que una regla

general para el futuro, prescrita en una nueva constitución, no produce necesariamente el efecto de una derogación de las leyes anteriores que establecen excepciones, restricciones o limitaciones dentro de la intención de los autores de la constitución y, por tanto, no está en conflicto con tal regla general.

En el caso de *Monaghan* v. *Lewis,* la misma corte, después de resolver que cierta ley había sido derogada por una ley subsiguiente, también resolvió que la ley anterior era incompatible con una prescripción constitucional.

En ninguno de estos casos de Delaware consideraba la corte el significado y alcance del poder legislativo bajo la concesión constitucional e independientemente de la cuestión de incompatibilidad ya discutida. El razonamiento, hasta donde puede llegar, es correcto, pero ninguna de las opiniones pretende establecer una regla universal, o norma por la cual se puedan medir los poderes constitucionales de una legislatura ni se resuelve que en todos los casos la legislación anterior queda anulada simplemente porque la legislatura, por falta de una concesión específica, no podía haber decretado las mismas leyes después de la adopción de la nueva constitución.

En el presente caso, si una ley fijando un término, cuando antes no existía ninguno, sería inválida, no por falta de la debida concesión de poder para crear y legislar con respecto al cargo sino sola y exclusivamente por razón de un "verdadero conflicto" y necesaria incompatibilidad con la sección 49, entonces, desde luego que semejante legislación decretada anteriormente, sería asimismo incompatible con la misma disposición constitucional y por tanto nula. Eso es por sí evidente y es todo lo que los dos casos de Delaware, interpretados lógicamente, puede decirse que establecen.

La sección 49 no limita ni siquiera en cuanto al futuro las anteriores concesiones de poder legislativo como no sea la prohibición implícita contra la restricción indebida o irra-

zonable del poder de nombramiento investido en el Goberna-
dor, el cual, como hemos indicado, no comprende necesaria-
mente un poder absoluto de destitución.

En adición a los términos más específicos de la sección
40 encontramos estas prescripciones anteriores y más amplias:

"Art. 25.—Todos los poderes legislativos locales en Puerto Rico,
con excepción de lo que de otro modo se disponga en esta Ley, resi-
dirán en una Asamblea Legislativa, que constará de dos Cámaras:
una, el Senado, y la otra, la Cámara de Representantes; y las dos
Cámaras se designarán 'La Asamblea Legislativa de Puerto Rico.' "

"Art. 37.—La autoridad legislativa estatuída por la presente, se
aplicará a todos los asuntos de carácter legislativo que no sean local-
mente inaplicables, incluyendo la facultad de crear, consolidar y re-
organizar los municipios, según fuere necesario, y proveer y derogar
leyes y ordenanzas para los mismos; y también la facultad de alte-
rar, reformar, modificar o derogar cualquiera o todas las leyes y or-
denanzas, de cualquier clase, actualmente vigentes en Puerto Rico o
en cualquier municipio o distrito del mismo, hasta donde dicha alte-
ración, reforma, modificación o derogación fuere compatible con las
disposiciones de esta Ley.

"No se creará por la Asamblea Legislativa ningún departamento
ejecutivo no provisto por esta Ley; pero la Asamblea Legislativa po-
drá consolidar departamentos, o suprimir cualquier departamento,
con el consentimiento del Presidente de los Estados Unidos."

De modo que no nos olvidamos de que la sección 49 reco-
noce por su faz y expresamente comprende la futura con-
tingencia en cuanto a las cortes "que en adelante se esta-
blecieren en Puerto Rico."

"Además, es una regla general de interpretación de estatutos que
cuando en las secciones anteriores y declarativas ha sido ya expre-
sado el alcance y extensión de la facultad y privilegios concedidos,
la naturaleza de la concesión que de tal modo se revela, rige y sirve
de interpretación a todas las secciones subsiguientes; y es innece-
sario en cada sección subsiguiente volver a expresar o usar palabras
y expresiones que han de revelar enteramente el alcance de aquellas
facultades y privilegios; pero estas secciones subsiguientes serán en-
tendidas (a no ser que hubiera palabras restrictivas y limitaciones

a las mismas) como coextensivas y aplicables al alcance y extensión de las facultades hasta entonces concedidas.'' Talbott v. Silver Bow County, 139 U. S. 443–4.

Si la Asamblea Legislativa local, bajo los poderes generales legislativos o bajo la autoridad específica ''para de tiempo en tiempo, según lo crea conveniente, organizar, modificar o hacer un nuevo arreglo de los tribunales y su jurisdicción, tiene o no poder para crear nuevas cortes y fijar los términos de los jueces y funcionarios de las mismas, es otra cuestión. Pero aún cuando el Congreso hubiera expresamente prohibido la futura reorganización, cambio o modificación de las cortes ahora existentes, privando así a la legislatura insular de todo poder para actuar, de ello no se sigue necesariamente que la anterior legislación en cuanto a esto quedaba por tanto invalidada. La regla general es que: ''Un precepto constitucional de que la legislatura no aprobará leyes de cierta naturaleza, sólo produce efecto en relación al futuro y no invalida los estatutos que ya existen.'' 12 Corpus Juris, 726, nota 17 (*a*) y casos citados.

Las personas interesadas en la historia de nuestras cortes insulares pueden encontrar un punto de partida provechoso para tal investigación en el bosquejo titulado ''La Judicatura en Puerto Rico'' del fenecido Juez Asociado de esta corte, Sr. McLeary, publicado en el tomo 3, Opiniones del Attorney General de Puerto Rico, 1912, en la página 585.

Sin entrar en detalles podemos decir que en el año 1904 tuvo lugar una reorganización radical y completa de la judicatura por la legislatura insular.

El Attorney General que redactó o quien inspeccionó cuidadosamente los manuscritos originales de estas leyes era un hombre versado en el derecho, hábil como escritor conocía completamente la significación de las palabras y poseía un maduro juicio debido a los años de experiencia que tuvo como Fiscal de Distrito de los Estados Unidos, Juez de una Corte Suprema Territorial y miembro del Congreso. Estas

leyes fueron aprobadas en su forma definitiva por una de las mentalidades más notables de la rama judicial que haya alguna vez examinado minuciosamente las leyes de nuestra legislatura local.

Como hemos indicado, la sección 33 de la primera ley orgánica expresamente prescribía que "los jueces de las cortes de distrito serán nombrados por el gobernador, con el concurso y consentimiento del Consejo Ejecutivo," pero nada decía en cuanto a su término, salarios, deberes y condiciones para el cargo. Sin embargo, la legislatura no vaciló en la sección 2 de la ley "para reorganizar el sistema judicial de Puerto Rico," etc., en prescribir tales requisitos y deberes, fijar los sueldos y disponer que "el gobernador, con el asentimiento del Consejo Ejecutivo, nombrará todos los jueces de distrito por un período de cuatro años." La sección 7 expresaba que "todos los jueces municipales cuyos cargos se crean por esta ley serán designados por elección popular." No se hacía mención del término de duración del cargo. La sección 10 prescribía que "en cada corte municipal habrá un marshal, quien será electo por el voto popular," pero guardaba silencio en cuanto a la duración del cargo. La sección 11 contenía un precepto semejante respecto a los secretarios, con la misma omisión de toda referencia en cuanto a duración.

Otra ley creaba el cargo de marshal de distrito. La sección 31 y 32 prescriben lo siguiente:

"Sec. 31.—Término del cargo de marshal. El término del cargo de marshal será por cuatro años, más estará sujeto en toda época a ser separado por el Gobernador por causa fundada.

"Sec. 32.—El marshal será elegido por los electores legales del distrito en que ha de desempeñar sus deberes en las próximas elecciones, y la persona elegida, como queda dicho, sucederá a la persona que en dicha época desempeñe el referido cargo, sin consideración al tiempo que haya servido; *Disponiéndose,* que dicho cargo será cubierto por nombramiento oficial por un período que medie desde el día en que empiece a regir esta Ley hasta que tome posesión

el electo, que será el primero de enero de 1905." Leyes de 1904, p. 107.

Una tercera ley "creando el cargo de secretario del tribunal de distrito," prescribía en la sección 8 que "el secretario será elegido por los electores legales del distrito en que ha de desempeñar sus deberes en las próximas elecciones," pero no se especificaba término alguno.

La sección primera de otra ley de la misma fecha dispone que "el gobernador, por y con el consentimiento del Consejo Ejecutivo nombrará un fiscal para cada distrito judicial, el que ejercerá su cargo durante cuatro años y cesará al terminar los cuatro años contados desde la fecha de su nombramiento."

No es necesario que examinemos las varias consideraciones que puedan haber influído en la legislatura al adoptar aquí el lenguaje del estatuto federal que prescribe el nombramiento de los fiscales de los Estados Unidos, e incidentalmente o de otro modo, la fraseología interpretada en el caso de *Parsons*. Un número de razones claras podrían sugerirse respecto al motivo por el cual sería conveniente que un fiscal, a diferencia de otros funcionarios de la corte, debía quedar bajo el control administrativo inmediato del departamento ejecutivo del gobierno. Será bastante con decir de paso que para los fines de este caso puede admitirse sin resolverse, que la intención de la legislatura en la ley citada en último lugar fué que el fiscal de distrito de ningún modo debía continuar en su cargo por un período mayor del especificado.

Un año después, la sección 8 de la ley "creando el cargo de secretario del tribunal de distrito" fué enmendada a fin de que dijera en parte lo siguiente:

"La duración del cargo de secretario será por cuatro años; pero podrá ser destituído en cualquier época por el gobernador mediante causa justificada. El secretario será elegido por los electores capa-

citados del distrito en que ha de desempeñar sus deberes en las pró-
ximas elecciones;''   *   *   *.

Y las secciones 7, 10 y 11 de la ley "Para reorganizar
el sistema judicial de Puerto Rico," etc., también fueron en-
mendadas a fin de que expresaran en tanto era pertinente,
lo siguiente:

"Sec. 7.—La duración de los cargos de jueces municipales crea-
dos por esta Ley, será de cuatro años, pero el gobernador podrá
destituirles por causa justificada en cualquier tiempo. Los jueces
municipales serán designados por elección popular;"   *   *   *.

"Sec. 10.—En cada corte municipal habrá un marshal y la du-
ración de su cargo será por cuatro años; pero el gobernador podrá
destituirle por causa justificada en cualquier tiempo. El marshal
será elegido por elección popular;"   *   *   *.

"Sec. 11.—En cada corte municipal habrá un secretario, y la
duración de su cargo será de cuatro años; pero el gobernador podrá
destituirle por causa justificada en cualquier tiempo. El secretario
será elegido por elección popular;"   *   *   *.

El propósito del precepto de 1904 de que el gobernador
nombrará "todos los jueces de distrito por un período de
cuatro años" no era indicar el medio de selección. Esa era
una cuestión que había sido definitivamente resuelta y que-
daba fuera del control de la legislatura local por la Ley Or-
gánica. La única intención posible fué fijar un término de
cuatro años. Por otra parte, al prescribir sobre la elección
de los jueces municipales, marshals y secretarios, la cues-
tión de duración del cargo al parecer nunca fué considerada
en absoluto. El objeto era conferir a los municipios como
medio experimental un grado mayor de gobierno propio local
mediante un cambio en el método de selección. La fijación
de un término definido fué cosa en que luego se pensó y
por tanto la omisión quedó subsanada en el año 1905. Pero
entonces la mente de la legislatura no estaba ocupada en
la manera de elegir a los funcionarios en cuestión. Eso en-
tonces había quedado resuelto. El propósito era fijar un
término. Por consiguiente la ley no expresa que los jueces

municipales serán elegidos por un término de cuatro años o en cada elección alternada, sino primero y principalmente que "la duración de los cargos de jueces municipales creados por esta ley será de cuatro años, pero el gobernador podrá destituirles por causa justificada en cualquier tiempo." Entonces, en una frase separada, distinta e independiente el precepto de la anterior ley en cuanto al método de selección ha sido adicionado con un disponiéndose que comprende el período de transición. La cuestión de la duración de los cargos está tan separada y distinta de la de la forma de selección como lo está el precepto relativo a la duración del cargo de marshal de la corte de distrito en la sección 31, *supra,* de la ley de 1904, de la materia principal contenida en la sección 32 de la ley, que también ha sido citada anteriormente.

La disposición de la sección 8 de la ley de 1904 que dice que "el juez municipal será un abogado, de más de veintiún años de edad, admitido por la Corte Suprema de Puerto Rico, de buena reputación, que haya practicado su profesión en las cortes insulares y que sea un residente en el territorio de Puerto Rico," guarda aún más íntima relación con la cuestión de la elección que el término de la duración del cargo fijado en la enmienda de 1905. Y como se verá del texto de las enmiendas arriba citadas, lo que hemos dicho respecto al término de duración del cargo de juez municipal es igualmente aplicable a la duración del cargo de los secretarios y marshals municipales. Además, encontramos el mismo método duplicado en el caso del secretario de la corte de distrito que acredita en cada caso que en el año 1904 la idea predominante, si no el único pensamiento en tanto se trataba de estos funcionarios electivos, era la de un cambio en el método de selección, mientras que en el año 1905 la legislatura consideraba la cuestión de la duración del término y las prescripciones en cuanto a la elección fueron incorporadas sólo como un elemento necesario para llevar adelante

en la ley como fué enmendada, cosas que están comprendidas en la disposición anterior.

Hemos entrado algo en detalles en este particular debido únicamente al esfuerzo hecho por confundir los términos de duración del cargo fijados por la ley en el precepto sobre elección por voto popular, de modo que pueda decirse que todo el asunto ha sido tratado en la sección 49 de la Ley Jones. Pero aún cuando esta confusión metafísica fuese factible en el caso de funcionarios electivos, todavía tendríamos a los jueces de distrito que nunca han sido elegidos y en cuyo método de selección no se había verificado cambio alguno, ni pudo haberse verificado excepto mediante acción congresional, pero cuyos términos de duración y requisitos para el cargo habían sido claramente definidos por la legislatura local. La sección 49 no puede ser interpretada en el sentido de que signifique una cosa en el caso de los jueces de distrito y otra en el de los demás funcionarios cuyos términos habían sido fijados por la ley.

El caso de *Distrito de Columbia* v. *Hutton, supra,* respecto al cual se ha hecho gran hincapié, así como la mayor parte de los otros de la misma clase, se comenta por sí mismo.

Cuando las leyes de 1904 fueron aprobadas existía gran duda en la mente de muchas personas en cuanto a la corrección y sabiduría del precepto relativo a la elección de jueces municipales. Las profesías pesimistas de aquellos que no aprobaban la política entonces adoptada desapareció luego en cierto modo y el mal que el Congreso pretendió remediar en el año 1917 no surgió de la duración del cargo y requisitos para el mismo que habían sido restablecidos por la ley, sino más bien y exclusivamente del método prescrito para la selección de los funcionarios en cuestión y especialmente de los jueces municipales. El objeto, y el único fin era separar a las cortes municipales, y con ellas a los marshals y secretarios de las cortes de distrito de las influencias de la política partidarista. No existe fundamento satisfactorio en

el que pueda basarse la imputación de una intención en de-
rogar cualquier parte o porción de leyes existentes que no
estuviere tan profundamente arraigada en estas restricciones
relativas a la elección por el voto popular que no pudiera
distinguirse de ellas ni existe por sí sola o en unión de otras
disposiciones que no eran necesariamente incompatibles con
la idea de la selección por nombramiento.

El Congreso sabía en el año 1917 que la prescripción de
la Ley Orgánica de 1900 sobre el nombramiento de los jueces
de distrito por el gobernador había sido interpretada por
la legislatura insular en el sentido de que no era incompa-
tible con la fijación de un término y la especificación de re-
quisitos para el cargo.   Ellos sabían perfectamente que (con
la sola excepción del marshal de esta corte, que es un nom-
bramiento presidencial de acuerdo con la Ley Foraker) el
término de duración del cargo de todo funcionario cuyo nom-
bramiento por el gobernador estaba autorizado bajo la sec-
ción 49 había sido fijado por la ley por más de una década.
Ellos entendían perfectamente el efecto de un término esta-
tutorio a la cuestión de un poder implícito de destitución como
incidental al poder de nombramiento.   Igualmente conocían
bien el principio de que las derogaciones tácitas no son fàvo-
recidas.

Si, dentro de las circunstancias, el Congreso hubiera te-
nido la intención de derogar estas leyes locales sobre la du-
ración del cargo y los requisitos en unión de las prescrip-
ciones estatutorias para la selección por el voto popular, no
es irrazonable suponer que alguna referencia se hubiera he-
cho a la facultad para destituir que ahora se alega estaba
investida en el gobernador.   Por otra parte, a falta de tal
intención, no era necesario hacer mención de la duración del
cargo porque (con la sola excepción ya indicada) el término
de todo cargo en cuestión había sido fijado por la ley local.
Pero si puede imputarse al Congreso una intención de de-
rogar implícitamente las prescripciones estatutorias relativas

a los términos de duración del cargo, entonces *a fortiori* puede decirse que existe una intención semejante en cuanto a las disposiciones que prescriben los requisitos para cargos. *A fortiori,* porque la fijación de un término afecta solamente a la facultad de destitución que se alega se infiere del poder de nombramiento, mientras que la especificación de los requisitos es una limitación directa al poder de nombramiento mismo. Sin embargo, a la luz de las otras secciones *in pari materia* ya consideradas, tal propósito parece casi inconcebible. Y, como ya se ha indicado, las derogaciones tácitas no son favorecidas.

"La legislatura tiene facultad general para prescribir los requisitos de funcionarios cuando los mismos no han sido prescritos por la constitución y de este modo puede limitar la elección ejecutiva, aún cuando sea sin facultad para hacer el nombramiento o designar al funcionario por quien habrá de hacerse.

"De modo que la legislatura puede prescribir sobre el sueldo o salario de un funcionario o empleado aún cuando el nombramiento esté investido por la constitución en un funcionario ejecutivo." 12 C. J. 837.

Véase también el tomo 29 de Cyc. pág. 1375; 22 R. C. L., págs. 400, 401, secs. 40, 41 y 42.

La validez de la reorganización del sistema judicial llevada a cabo por la legislatura local en el año 1904, fué prontamente atacada. El primer caso fué resuelto *per curiam* citándose las secciones 33, 34, 35, y 15 de la Ley Foraker, nuestras leyes de 1904, págs. 103, 104, 110 y varios casos. *Dones* v. *Urrutia,* 202 U. S. 214. Al ser sometida la misma cuestión un año después un severo reproche fué expresado por la Corte Suprema en el caso de *Kent* v. *Pueblo de Puerto Rico,* 207 U. S. 113.

En el caso de *Kawananakoa* v. *Polyblank,* 205 U. S. 349, el abogado de los apelantes alegó, entre otras cosas, que:

"El territorio de Hawaii es una corporación municipal con ca-

pacidad para demandar y ser demandada. 1 Dillon sobre Corpora-
ciones Municipales, sec. 20; 1 Thompson sobre Corporaciones, sec. 1.

"Esta corte ha llamado a los territorios 'municipalidades orga-
nizadas,' y los ha equiparado al Distrito de Columbia. Talbott v.
Silver Bow Co., 139 U. S. 438, 445.

"El ejemplo más semejante que puede presentarse es entre el de
el Territorio de Hawaii y el Distrito de Columbia. El último se ha
declarado que es una corporación municipal. Barnes v. District óf
Columbia, 91 U. S. 540." El párrafo tercero del sumario dice lo
siguiente:

"Un territorio de los Estados Unidos se diferencia del Distrito
de Columbia en que el primero es en sí la fuente de la que general-
mente emanan derechos, aunque el Congreso puede intervenir, mien-
tras que en el segundo el cuerpo de derechos privados lo crea y re-
gula el Congreso y no la legislatura del Distrito."

La misma alegación se hizo con referencia a la forma de
gobierno establecida para esta Isla en el caso de *Rosaly* v.
*El Pueblo,* 16 D. P. R. 508, y la opinión disidente del Juez
Asociado Sr. McLeary contiene una discusión instructiva so-
bre la materia que empieza en la página 515. La decisión
de la Corte Suprema de los Estados Unidos en el caso citado
en último lugar debió ser suficiente para establecer el espí-
ritu de esa proposición en esta jurisdicción. El caso ha
sido reportado en el tomo 227 U. S. 270, y en la página 274
la corte repite lo que dijo en el caso anterior de *Gromer* v.
*Standard Dredging Co.,* 224 U. S. 362, en el cual en la pá-
gina 370 y al interpretar la Ley Foraker, se había dicho que:

"El propósito de la ley es dar gobierno propio local confiriendo
una autonomía semejante a la de los Estados."

Y en el caso de *Camuñas et al.* v. *Porto Rico Railway,
Light & Power Co.,* 272 Fed. 924, la Corte de Circuito de
Apelaciones para el Primer Circuito, dice lo siguiente:

"La Ley Orgánica de marzo 2, 1917, (Est. Comp. 1918, Comp.
St. Ann. Supp. 1919, secs. 3803 a–3803 z), inviste a Puerto Rico de
poderes generales muy amplios. En la sección 5 los ciudadanos de
Puerto Rico son declarados ciudadanos de los Estados Unidos. Puerto

Rico es ahora soberano. Porto Rico v. Rosaly, 227 U. S. 270, 33 Sup. Ct. 352, 57 L. Ed. 507.

"En la sección 37 se confieren a la legislatura poderes amplios y comprensivos.

(Se cita la sección 37, *supra*.)

"Claramente que esta concesión de poder es quizás casi equivalente al poder de una legislatura de Estado para decretar todas las leyes que no sean incompatibles con la constitución federal o de Estado. La Ley Orgánica es el equivalente práctico de una constitución de Estado. El hecho de que queda sujeto a enmienda o derogación por el Congreso es inmaterial para los presentes fines. En ese sentido el Congreso ocupa en cuanto a Puerto Rico el lugar del pueblo de un Estado, actuando directa o indirectamente por medio de una convención constitucional."

Véanse también los casos de *Hornbuckle* v. *Toombs,* 85 U. S. (18 Wall.) 648; *Territory* v. *O'Connor,* 41 N. W. 746; *Simms* v. *Simms,* 175 U. S. 162; *De la Rama* v. *De la Rama,* 201 U. S. 303; *Nelson* v. *United States,* 30 Fed. Rep. 112; *Ponce* v. *Roman Catholic Church,* 210 U. S. 296, y *Christianson* v. *King County,* 239 U. S. 356.

Por supuesto que el Congreso pudo haber conferido a esta Isla las facultades legislativas limitadas que generalmente contiene la carta de un municipio del rango más inferior, o podría haber legislado para nosotros directamente como lo ha hecho para el Distrito de Columbia. Pero, en su sabiduría, no ha hecho ni una ni otra cosa. Ha dicho a nuestra legislatura insular en substancia y en lenguaje que es demasiado claro de modo que no pueda fácilmente ser mal interpretado: Por la presente conferimos a usted todos los poderes de un estado soberano con sujeción solamente a aquellas ligeras restricciones y limitaciones que expresamente se prescriben aquí o que necesariamente se infieren de los términos de esta ley. Esta es una espada de dos filos. Tómela y úsela. Que su brazo se haga fuerte y flexible y pueda dirigir este gran poder con sabiduría y juicio al abrirse paso hacia el fin de todo buen gobierno.

Puede o no ser cierto que mucho de lo anterior tenga todas las indicaciones de una cruzada contra los molinos de viento.

De todos modos este es un caso de lo más infortunado. Es lamentable que la cuestión envuelta haya jamás surgido. Tal vez es malo que no hubiéramos podido llegar a un acuerdo en la orden *per curiam* sometida primero por el anterior Juez Presidente. Es desgraciado que no hayamos podido llegar a un acuerdo respecto a los varios memorandums presentados subsiguientemente incluyendo en ellos la presente argumentación. También parece serlo que hayamos estado obligados a prestar tanta consideración a una materia tan poco provechosa. Que no hayamos tenido tiempo suficiente para resumir y comparar los numerosos casos de Estados los cuales sin indicar cómo o por qué se dice que señalan conclusiones contrarias a las que hemos llegado en este caso.

El examen ligero y sin dirección determinada que se ha pretendido hacer de estos casos, sin la ayuda de los abogados ni la oportunidad de pesarlos y medirlos en oposición a otros *in pari materia* y con el fin de formular una exposición clara del resultado, deja mucho que desear. Pero toda vez que estamos considerando la expedición de un mandamiento por la mayoría de la corte, dirigido al Jefe Ejecutivo de la Isla, hemos creído conveniente hacer una reseña por lo menos y discutir con alguna extensión tantas teorías como hayan podido presentarse sucesivamente en oposición a la concesión del auto.

No es nuestro ánimo intervenir, ni tenemos por ahora la idea de hacer una revisión judicial de la amplia discreción que tiene el ejecutivo al considerar la cuestión de destitución y al apreciar la prueba, después de una notificación y audiencia. Dar tal notificación y la oportunidad de defenderse no es una gran molestia, ni de acuerdo con las anteriores decisiones de esta corte puede considerarse que siquiera equivale a una gran inconveniencia.

Asumiendo, como lo hacemos, que existe justo motivo que sirve de base a la pretendida destitución en este caso, el cumplimiento con la ley puede aparecer que es una mera formalidad. Pero es una formalidad que una vez invocada no puede ser desatendida o ignorada. En su fin y en realidad no tiene nada de rutinario sino que es un principio vivificante de suma importancia.

El auto debe ser expedido.

> *Con lugar el auto, ordenándose al demandado reponer al peticionario en su cargo o en su defecto comparecer a exponer las razones en contrario.*

Jueces concurrentes: Sres. Presidente del Toro y Asociados Aldrey y Franco Soto.

El Juez Asociado Sr. Wolf disintió.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO, SR. WOLF.

A falta de algún debido precepto legal en contrario la delegación de un poder absoluto de nombramiento es la delegación de una facultad absoluta para destituir. *Ex parte Hennen,* 13 Peters 230; *Shurtleff* v. *United States,* 189 U. S. 311; *Burnap* v. *United States,* 252 U. S. 515, y casos; *Clayton* v. *Utah Territory,* 132 U. S. 632; Dillon sobre Corporaciones Municipales, párrafos 462, 473; 22 R. C. L. 562; 29 Cyc. 1371; 29 Cyc. 1408.

Lo que se infiere en un estatuto o concesión es tanta parte del mismo como si la parte no expresada estuviera escrita en la concesión misma. *United States* v. *Babbitt,* 1 Black 561; *Tel. Co.* v. *Eyser,* 19 Wall. 427; *Luria* v. *United States,* 231 U. S. 9, 24; 12 C. J. 719; 36 Cyc. 1112.

El artículo 49 de la Ley Orgánica al expresar que "en lo sucesivo todos los jueces, marshals y secretarios de los tribunales establecidos actualmente o que se establecieren en adelante en Puerto Rico, y cuyo nombramiento por el Pre-

sidente no esté dispuesto por ley, serán nombrados por el gobernador," en sus términos, al menos, en cuanto a los funcionarios que menciona, confirió una facultad absoluta de nombramiento y destitución al gobernador.

Estas proposiciones no se refutan formalmente. La tentativa, según la entiendo, es afirmar que los jueces municipales a la fecha de la aprobación de la Ley Orgánica tenían un término fijo de duración por cuatro años; que el Congreso ratificó la existencia de la anterior legislación de Puerto Rico y por tanto que el gobernador no puede destituir a un juez municipal sin notificación y audiencia. El efecto de esta alegación es que la delegación de la facultad de nombramiento y destitución se confiere con la limitación de que al destituirse a un juez municipal la notificación y audiencia son condiciones precedentes. Sostengo que con la aprobación del artículo 49 de la Ley Orgánica la existencia de una limitación a la facultad de destitución es incompatible con la delegación absoluta de facultad conferida por dicho artículo. Sostengo, además, que los jueces municipales en Puerto Rico con anterioridad al año 1917 tenían únicamente un término electivo y que dicho término desapareció con el caso de la elección.

El derecho a una notificación y audiencia es incidental a la existencia de un término, un desenvolvimiento de la Ley Común. La facultad para destituir es incidental a la de nombrar, y asímismo una evolución de la Ley Común. Como incidentes ninguna tiene preferencia alguna histórica o trascendental sobre la otra. Para los cargos cuyos términos de duración no estén fijados por una constitución, el poder legislativo puede conferir al gobernador el derecho absoluto de destitución o fijar una limitación al mismo según lo estime conveniente. Sin embargo, sostengo que cuando el Congreso dió una facultad de nombramiento sin limitación alguna manifestó su intención de que el elemento incidental de destitución debe acompañarle y que la creación o existen-

cia de un término no puede llevar consigo su limitación incidental corriente.

Cuando los dos elementos incidentales son incompatibles el incidente creado por el poder inferior debe ceder al conferido por el poder superior, el Congreso de los Estados Unidos. *In praesentia majores ceseat potentia minores.*

Todo el mundo está de acuerdo en que las Constituciones deben recibir una interpretación uniforme. Cuando el Congreso ha nombrado un número de funcionarios que necesariamente pueden ser destituídos por el gobernador el hecho de que uno o más de dichos funcionarios tenían un término fijo no puede afectar a la intención general del Congreso evidenciada por las palabras usadas. Tres veces por lo menos en la Ley Orgánica se confiere un poder absoluto de nombramiento. El Presidente lo tiene con respecto a los jueces de esta corte. El Juez Federal lo tiene en relación con ciertos funcionarios de su corte. El Gobernador lo tiene como se consigna en el artículo 49. No hay razón alguna para suponer que la intención del Congreso fué diferente cuando casi exactamente el mismo lenguaje se emplea en cada artículo. La indicación subsiguiente en la Ley Orgánica de que debe subsistir la legislación local que no esté en contradicción con ella no puede prevalecer en contraposición a la delegación terminante de facultad conferida al gobernador.

No necesito sostener que la legislatura no tiene ninguna facultad para fijar un término a los funcionarios nombrados en el artículo 49. La legislatura puede tener y probablemente tiene esta facultad. Lo que sí afirmo es que si hay un término que existe o si se crea un término para los funcionarios nombrados en el artículo 49, la consecuencia de las dos fuerzas, el poder de nombramiento y destitución conferido por el Congreso, y la fijación de un término por la legislatura, es dar a determinada persona nombrada un término de duración del cargo definido a menos que antes sea

destituído por el gobernador. En toda la Ley Orgánica y en otras leyes del Congreso se nombran a ciertos funcionarios por términos a menos que antes sean destituídos. Creo que en ningún caso semejante sería necesaria la notificación o audiencia, pero una resolución en contrario no podría afectar a este caso si, como sostengo, la facultad para destituir es absoluta. .

El artículo 49 de la Ley Orgánica al suprimir la elección de jueces municipales abolió el término de los mismos. La ley de 1905 en forma confirió a los jueces municipales un término absoluto de cuatro años, pero era un término que corría de elección en elección y esa fué claramente la intención de la legislatura, en mi opinión. Un solo ejemplo aclararía esto. Si un determinado juez municipal falleciese o renunciase, el gobernador, de acuerdo con la ley, no podría nombrar un sustituto por cuatro años sino solamente para cubrir el término no vencido. No existía tal cosa de un juez municipal sujeto a nombramiento a menos que fuera por períodos que estaban por vencer. Era un sistema de elección de funcionarios que prevalecía.

La cita de la sección 7 de la Ley para reorganizar el sistema judicial de Puerto Rico, de marzo 10 de 1904, según quedó enmendada por la ley de marzo 9 de 1905, explicará mejor lo que quiero expresar:

"Sección 7.—La duración de los cargos de jueces municipales creados por esta Ley, será de cuatro años; pero el gobernador podrá destituirles por causa justificada en cualquier tiempo. Los Jueces Municipales serán designados por elección popular; *disponiéndose,* que por el período que falte desde la fecha en que quedare vigente esta Ley hasta que se celebraren las próximas elecciones y los Jueces Municipales hubieren tomado posesión de sus cargos, lo cual tendrá lugar el primero de enero de 1905, el Gobernador, con el consentimiento del Consejo Ejecutivo, nombrará un Juez Municipal para cada distrito, según lo dispuesto en la sección 8 de esta Ley. Los Jueces Municipales de San Juan, Ponce y Mayagüez deberán ser mayores de veinticinco años de edad, serán letrados, de buena repu-

tación con derecho a postular en la Corte Suprema de Puerto Rico, y en ejercicio de su profesión en las Cortes Insulares.''

Disiento por tanto de la opinión de la mayoría.